[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| IN RE SEALED CASES | Nos. 22-3073, 23-3002, 23-3003, 23-3035, 23-3036, 23-3043, 23-3049 |

## COMBINED RESPONSE TO MOTIONS TO UNSEAL

Charlie Savage, a reporter for The New York Times, has asked this Court to unseal a handful of appeals. Those appeals each relate to one of two grand jury investigations that targeted President Trump. During those investigations, the President instructed witnesses to withhold, on privilege grounds, testimony, documents, or both. The government moved to compel the withheld evidence, and the district court generally granted those motions. Then, the President appealed. Based on the grand jury secrecy rule, *see* Fed. R. Crim. P. 6(e), and Circuit Rule 47.1, those appeals proceeded under seal. Now, Mr. Savage seeks access to those sealed appeals. *See* D.C. Cir. R. 47.1(c) (providing that an "interested person may move at any time to unseal any portion of the

record in this court"). He does not request "disclosure of the names of the subpoena recipients." Mot. 4.[1]

Based on similar requests filed in district court, the government has already redacted and released the relevant district court orders on appeal. *See* A1-412 (collecting the now-public district court documents); *see* Fed. R. Crim. P. 6(e)(3)(F) (only "the district where the grand jury convened" has authority to "disclose a grand-jury matter"). Those orders were redacted to protect any still-secret Rule 6(e) material, disclosing only information that has been "sufficiently widely known" to "lose its character" as secret grand jury material. *In re Grand Jury Subpoena, Judith Miller* (*Miller II*), 493 F.3d 152, 154 (D.C. Cir. 2007) (per curiam) (alteration and quotation marks omitted). And the district court has approved of the public release of each relevant document as redacted. *See generally In re Application of The New York Times* (*2022 Application*), No. 1:22-mc-100 (D.D.C. filed Oct. 25, 2022); *In re Donald J. Trump* (*2025 Application*), No. 1:25-mc-8 (D.D.C. filed Feb. 10, 2025).

[1] Unless otherwise noted, this response cites Mr. Savage's motion in Case No. 22-3073, which is representative of all his motions. The page numbers refer to the PDF pagination.

Given this background, there is no need to tread new ground in resolving Mr. Savage's present motions. The now-redacted district court orders provide a roadmap for identifying any material that remains subject to Rule 6(e). Following that roadmap, the government has proposed redactions for the appellate-level materials[2] at issue. Like the district court, this Court should approve those redactions and allow the redacted documents to be disclosed to Mr. Savage and other members of the public.

## BACKGROUND

### I. Grand Jury Investigations

Two grand juries in the U.S. District Court for the District of Columbia conducted investigations that led to federal indictments of President Trump, which have since been dismissed. Before those indictments issued, however, the President and federal government litigated several privilege disputes—both before the district court and on appeal to this Court. Mr. Savage's unsealing request relates to this "pre-indictment litigation over" the President's privilege assertions. Mot. 1.

[2] The parties have agreed to exclude from consideration any materials originally filed in a district court, *e.g.*, materials attached to a motion or that would ordinarily appear in an appendix.

**A.** The first grand jury investigated the aftermath of the 2020 presidential election (Election Investigation). As part of that investigation, the government subpoenaed witnesses to testify about certain specified topics. *E.g.*, A12. President Trump then instructed the witnesses to withhold any privileged testimony, generally asserting executive privilege and attorney-client privilege. *E.g.*, A13-14. After the witnesses followed that instruction, the government moved to compel testimony from the witnesses. *See, e.g.*, A14. The district court ultimately granted five separate motions to compel, *see* A1-3, A54-57, A111-112, A298-300, A411, and the President appealed each of those decisions. *See* Case Nos. 22-3073, 23-3002, 23-3003, 23-3043, 23-3049. The President also sought a stay pending appeal in each case, which the district court denied. *See* A44-45, A99-100, A289-292, A377-383, A412 (redacted orders denying stays).

In each of the five appeals, the President again sought a stay from this Court. *See, e.g.*, Public Docket Sheet, No. 22-3073. The Court denied each stay motion and ultimately dismissed each appeal.

**B.** The second grand jury investigated President Trump's handling of certain documents (Documents Investigation). As part of this

Investigation, the government subpoenaed a witness to provide documents and testimony. A209-210. That witness withheld documents from the government, asserting attorney-client privilege and the work-product doctrine. A209. The witness also asserted privilege over testimony relating to six specified topics. A209-210. The government moved to compel this withheld evidence, and the district court granted that motion. *See* A166-169 (redacted order). President Trump and the witness both appealed, *see* Case Nos. 23-3035, 23-3036, each seeking a stay pending appeal from the district court. *See* A289, A292. The district court denied both motions. A289-292 (redacted transcript).

On appeal, the President and the witness again sought a stay from this Court, and this Court consolidated the two appeals. *See* Public Docket Sheets, Nos. 23-3035, 23-3036. The Court denied the stay motions and ultimately dismissed the appeals. *Id.*

## II. Unsealing Proceedings in District Court

This is not the first attempt to access grand jury materials relating to "pre-indictment litigation" over the President's privilege assertions. Mot. 1. Mr. Savage and The New York Times have filed two separate miscellaneous cases in the U.S. District Court for the District of

Columbia—seeking essentially the same relief. As the "district where the grand jury convened," that court was the appropriate venue for any "petition to disclose a grand-jury matter." Fed. R. Crim. P. 6(e)(3)(F).

**A.** The first unsealing application was filed in late 2022. *2022 Application*, Dkt. No 1. The applicants—including Mr. Savage and The New York Times—sought "materials regarding the scope of executive privilege invoked by [the President] or former Trump Administration officials." *Id.* at 1. Even so, applicants recognized that any "factual material" was still "subject to secrecy under Rule 6(e)" and should be redacted. *Id.* In this petition, applicants' requests were limited to the Election Investigation. *See id.*

Initially, the government opposed any unsealing whatsoever. The district court agreed, but while its decision was on appeal, the government made a limited disclosure concerning matters occurring before the grand jury in a public court hearing. This Court agreed with the district court's analysis but remanded the case for reconsideration in light of the government's new disclosure. On remand, the government agreed to provide redacted copies of certain grand jury materials—specifically opinions addressing the merits of executive privilege

disputes, including any stay opinions. It could not, however, disclose the identity of the witnesses involved, the factual nature of the disputed testimony, or any other material still subject to Rule 6(e) protections.

The government first filed the relevant documents *ex parte* and under seal, allowing the district court to review the proposed redactions. *See 2022 Application*, Minute Order (Sep. 16, 2024). Then, pursuant to a district court order, the government filed redacted versions on the public docket. *Id.*, Dkt. No. 32. And after the district court resolved a few lingering disputes, the government provided "two more minor disclosures" on the public docket. *Id.*, Dkt. No. 36, at 1 (Memorandum Opinion); *Id.*, Dkt. No. 37 (Notice of Filing). At present, there are no ongoing disputes regarding the 2022 Application.

In connection with the 2022 Application, the government redacted and released several orders that had been appealed to this Court. Specifically, the government released the following district court materials that relate to the present appeals:

- Case No. 23-3043: Orders and opinions compelling testimony and denying a stay pending appeal, A298-384;
- Case No. 23-3049: Orders and opinions compelling testimony and denying a stay pending appeal, A385-412;

**B.** The second unsealing application was filed by Mr. Savage alone in early 2025. *2025 Application*, Dkt. No. 1. He again requested disclosure of materials "from pre-indictment litigation over claims of attorney-client and attorney work product privilege." *Id.,* Dkt. No. 1, at 1. And Mr. Savage's request now addressed both the Election Investigation and the Documents Investigation.

As before, the government agreed to redact and release certain documents in response to the 2025 Application, limiting its public disclosure to exclude any still-secret information. After the district court defined the universe of public material, the government filed proposed redactions *ex parte* and under seal. *See 2025 Application*, Dkt. No. 6, at 7-10 (Memorandum Opinion). The district court approved of the proposed redactions, and the government filed the relevant materials on the public docket. *Id.*, Dkt. No. 11 (Notice of Filing); *see also id.*, Dkt. Nos. 15-21 (addressing additional disclosures). Thereafter, the district court dismissed the application with prejudice. *Id.*, Minute Order (Mar. 17, 2026).

In connection with the 2025 Application, the government redacted and released several orders that had been appealed to this Court.

Specifically, the government released the following district court materials that relate to the present appeals:

- Case No. 22-3073: Orders and opinions compelling testimony and denying a stay pending appeal, A1-53;
- Case No. 23-3002: Orders and opinions compelling testimony and denying a stay pending appeal, A54-110;
- Case No. 23-3003: Orders and opinions compelling testimony and denying a stay pending appeal, A111-164;
- Case Nos. 23-3035 and 23-3036: A decision denying a stay pending appeal, A260-297;

In addition, the district court approved of the redactions applied to certain documents the President filed in connection with a criminal case in the Southern District of Florida. *See 2025 Application*, Dkt. No. 6, at 8-9. Those materials include an order and opinion for Case Nos. 23-3035 and 23-3036. *See* A165-259.

## III. Present Motions to Unseal

Mr. Savage has now filed six motions to unseal before this Court. He asserts a "common law and First Amendment right of access to judicial records" and argues that each appeal "has been formally disclosed" such that "it is no longer covered by" the grand jury secrecy rule. Mot. 1. At the same time, Mr. Savage recognizes that his new request is essentially the same as the "two requests" he "previously

submitted" to the district court. *See* Mot. 1-2. For example, he explains that the "orders and opinions" on appeal have already been redacted and released publicly. Mot. 3. And consistent with the court disclosures, Mr. Savage "does not request the disclosure of the names of the subpoena recipients." Mot. 4.

Previously, the parties jointly moved to consolidate Mr. Savage's motions before a single panel. The Court denied that motion but permitted the government to file a single consolidated response to the motions.

## ARGUMENT

Mr. Savage has filed essentially the same motion in six appeals, seeking to unseal materials related to "pre-indictment litigation" over President Trump's privilege assertions during grand jury proceedings. Mot. 1. Generally, material of this sort must remain secret "as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). And any produced documents must be carefully redacted to prevent disclosure of still-secret material. *See In re Motions of Dow Jones & Co.*, 142 F.3d 496, 501, 505-06 (D.C. Cir. 1998).

The present motions do not require the parties or Court to break any new ground. In district court proceedings, the government has already redacted and released every order on appeal. *See* A1-412. The district court approved of those redactions, and Mr. Savage has not challenged that approval in district court or on appeal. Indeed, he agrees that at least "the names of the subpoena recipients" should remain under seal. Mot. 4. Thus, to resolve the present motions, the parties and Court need only follow the roadmap these now-public orders provide. And the government has done just that—proposing redactions to each appellate record in *ex parte* filings entered today.

The Court should approve the government's proposed redactions, allow the government to file the redacted documents publicly, and provide Mr. Savage with an opportunity to respond once the redacted documents are available.

## I. The Court Can Authorize Release Only of Material No Longer Protected by Rule 6(e)

The Supreme Court has long held that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). In fact, that rule is "so well established" that this Court has

detailed the "plethora of authority recognizing that the grand jury context presents an unusual setting where privacy and secrecy are the norm." *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1150 (D.C. Cir. 2006) (quotation marks omitted). In this unusual setting, the public has "no First Amendment" or common-law right to access grand jury proceedings. *Dow Jones*, 142 F.3d at 499-500, 504. Instead, Rule 6(e) of the Federal Rules of Criminal Procedure controls. *Id.*

Rule 6(e) bars virtually any person from "disclos[ing] a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B) (listing covered individuals). And the phrase "matters occurring before the grand jury" has been interpreted broadly, reaching "not only what has occurred and what is occurring, but also what is likely to occur." *Dow Jones*, 142 F.3d at 499-500. Information that even "tend[s] to" reveal "some secret aspect" of the grand jury's investigation, like "the identities of witnesses" or "the substance of testimony," falls within the scope of Rule 6(e) and cannot be disclosed. *Bartko v. U.S. DOJ*, 898 F.3d 51, 73 (D.C. Cir. 2018) (quotation marks omitted).

Notwithstanding the usual secrecy rules, "when once-secret grand jury material becomes sufficiently widely known, it may lose its character

as Rule 6(e) material." *Miller II*, 493 F.3d 152, 154 (D.C. Cir. 2007) (per curiam) (alteration and quotation marks omitted). At that point, the public may be entitled to access the once-secret materials. But a narrow disclosure cannot justify blanket unsealing. "Grand jury material not yet publicly disclosed" must "remain redacted" from any documents released to the public. *Id.* at 155.

Similar principles apply to ancillary proceedings—*i.e.*, judicial proceedings that are related to, but "at arm's length" from, the grand jury itself. *See Dow Jones*, 142 F.3d at 498 (quotation marks omitted). Ancillary proceedings might arise for a host of reasons, including when a witness refuses to testify on privilege grounds. *See id.* In that circumstance, the government may move to compel testimony from the witness, and the district court must step in to resolve that dispute. When ancillary proceedings do occur, Rule 6(e)(6) ensures that the ensuing litigation does not reveal any otherwise confidential grand jury material. An ancillary proceeding "must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6). Like matters before the grand jury itself, there is no First Amendment or common law

right of access to ancillary proceedings. *See Dow Jones*, 142 F.3d at 499-500, 505. And still-secret material must be redacted from any material that can be released publicly. *See id.*

Together, the principles discussed above constrain this Court's ability to unseal the six appeals at issue. Each appeal arose from ancillary grand jury proceedings, which must remain under seal "to the extent and as long as necessary" to protect the secrecy of the underlying grand jury proceedings. *See* Fed. R. Crim. P. 6(e). So any still-secret material must be redacted before the appellate documents may be released.

An additional principle further constrains this Court's authority—even more so than that of the district court. The Federal Rules of Criminal Procedure require any "petition to disclose a grand-jury matter" to be filed in "the district where the grand jury convened." Fed. R. Crim. P. 6(e)(3)(F). This allows the district court—which is inherently closer to any grand jury proceedings—the first opportunity to assess the scope of any Rule 6(e) protections. Thus, any new dispute over the applicability of Rule 6(e) to the materials at issue here should first proceed in district court, followed by an appeal to this Court if necessary. *See, e.g.*, *Miller*

*II*, 493 F.3d 152 (appeal from district court unsealing orders); *Dow Jones*, 142 F.3d 496 (similar).

## II. The Already-Public District Court Orders Provide a Roadmap for Redacting the Appellate Materials

In resolving Mr. Savage's motions to unseal, this Court does not write on a blank slate. Two district court proceedings have already applied the Rule 6(e) principles above to unseal portions of the relevant ancillary proceedings. *See, e.g.*, *2022 Application*, Dkt. No. 32 (public redacted documents); *2025 Application*, Dkt. No. 11 (same). Most importantly, the court has released public versions of every order on appeal. *See* A1-412.

Those decisions—the "Redacted Orders"—provide a roadmap for redacting the appellate materials at issue here. The Redacted Orders reflect a careful parsing between secret and non-secret information. And it is difficult to imagine a more on-point disclosure of information. The Redacted Orders, necessarily, involve the same facts and legal questions at issue in the relevant appeals. Moreover, the Redacted Orders involve both decisions on the merits and decisions denying a stay pending appeal—further paralleling the appellate proceedings, which themselves involved motions for a stay pending appeal. *See, e.g.*, A1-43 (merits), A44-

53 (stay). In short, the district court has already overseen the difficult work of parsing between secret and now-public information, and no party disputes the district court's analysis of those questions. Nor does this Court have authority to reconsider the district court's assessment of "grand-jury matter" anew based on Mr. Savage's motions. *See* Fed. R. Crim. P. 6(e)(3)(F) (requiring any petition to unseal to be filed in the district where the grand jury convened).

Accordingly, the government has proposed redactions to the appellate materials in separate, *ex parte* filings entered today. Those redactions hew closely to the now-public district court filings, including protecting the subpoena recipients' names, and the Court should approve public release of the redacted files.

## CONCLUSION

The Court should approve the government's proposed redactions, allow the government to file the redacted documents publicly, and provide Mr. Savage with an opportunity to respond once the redacted documents are available.

Respectfully submitted,

THOMAS PULHAM

*/s/ J. Kain Day*

J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7234*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 514-4214*
*j.kain.day@usdoj.gov*

MAY 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify this motion complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2970 words, according to the count of Microsoft Word.

*/s/ J. Kain Day*
J. Kain Day

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using Court's Box system. Service will be accomplished on the following individual via email:

Charlie Savage
The New York Times
1627 I St. NW
Washington, DC 20016
202-369-6653
savage@nytimes.com

*s/ J. Kain Day*
J. Kain Day

[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**Nos. 22-3073, 23-3002, 23-3003, 23-3035,**
**23-3036, 23-3043, 23-3049**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

In re Sealed Cases

---

On Appeal from the United States District Court
for the District of Columbia

---

**Addendum to Combined Response**
**to Motions to Unseal**

---

THOMAS PULHAM
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7234*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*202-514-4214*

## TABLE OF CONTENTS

**Case No. 22-3073**

Order, Case No. 25-mc-8, Docket No. 11-2 ........................................ A1

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-3............... A4

Order, Case No. 25-mc-8, Docket No. 11-4 ....................................... A44

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-5............. A46

**Case No. 23-3002**

Order, Case No. 25-mc-8, Docket No. 11-7 ....................................... A54

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-8............. A58

Order, Case No. 25-mc-8, Docket No. 11-9 ....................................... A99

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-10......... A101

**Case No. 23-3003**

Order, Case No. 25-mc-8, Docket No. 11-13 .................................. A111

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-14......... A113

Order, Case No. 25-mc-8, Docket No. 11-15 .................................. A153

Memorandum Opinion, Case No. 25-mc-8, Docket No. 11-16......... A155

**Case Nos. 23-3035 and 23-3036**

Order, Case No. 23-cr-80101, Docket No. 566-8.............................. A165

Memorandum Opinion, Case No. 23-cr-80101, Docket No. 566-9 .. A173

Transcript, Case No. 25-mc-8, Docket No. 11-18 ............................ A260

**Case Nos. 23-3043**

Order, Case No. 22-mc-100, Docket No. 32-14 ................................ A298

Memorandum Opinion, Case No. 22-mc-100, Docket No. 32-15..... A301

Transcript, Case No. 22-mc-100, Docket No. 32-16 ........................ A347

**Case No. 23-3049**

Memorandum Opinion, Case No. 22-mc-100, Docket No. 32-17..... A385

Transcript, Case No. 22-mc-100, Docket No. 32-18 ........................ A403

Order, Case No. 22-mc-100, Docket No. 37-1 .................................. A411

Order, Case No. 22-mc-100, Docket No. 37-2 .................................. A412

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-25 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL** |

**ORDER**

[redacted] withheld testimony from the grand jury, under instruction from former president Donald J. Trump to invoke executive privilege and also [redacted], attorney-client privilege, regarding communications and meetings, the topics of which generally are set out in attachments to a letter, dated [redacted], from the United States to counsel for the former president [redacted] prompting the government to file the pending Motion to Compel Testimony Withheld from the Grand Jury, [redacted], [redacted], seeking an order to compel [redacted] to give testimony previously withheld on instructions from the former president.

Upon consideration of the United States' Motion [redacted] and the entire record herein, the Court finds that (1) the testimony withheld by [redacted] on instructions from the former president are assumed to be presumptively protected by the presidential communications privilege arising from the former president's generalized interest in confidentiality; (2) testimony withheld by [redacted] on instructions from the former president to invoke attorney-client privilege should not be withheld since this privilege is inapplicable before

the grand jury to communications made or received by [redacted]; (3) the grand jury has a demonstrated, specific need for testimony from [redacted] about communications and meetings that overcomes the former president's assertion of the presidential communications privilege, as relied on by the witnesses; and (4) the United States has sufficiently demonstrated that evidence of these communications is important and relevant to the grand jury's investigation and that the evidence is not available with due diligence elsewhere; and, accordingly, it is hereby—

**ORDERED** that the United States' Sealed Motion to Compel Testimony Withheld from the Grand Jury, [redacted], is **GRANTED**; it is further

**ORDERED** that [redacted] is to appear before the Grand Jury of the United States District Court for the District of Columbia and give testimony, which he has previously withheld on the basis of the presidential communications privilege or attorney-client privilege, relating, but not limited, to any communications and meetings in the topic areas generally described in the [redacted] Letter, and any similar such communications or meetings; it is further

**ORDERED** that [redacted] is to appear before the Grand Jury of the United States District Court for the District of Columbia and give testimony, which he has previously withheld on the basis of the presidential communications privilege, relating, but not limited, to any communications and meetings in the topic areas generally described in the [redacted] Letter, and any similar such communications or meetings; it is further

**ORDERED** that the United States submit to the Court, [redacted], at 12 p.m., any proposed redactions to the accompanying Memorandum Opinion that are necessary

before disclosure of the Opinion to the witnesses, their counsel, the former president, and his counsel.

**SO ORDERED.**

Date: September 28, 2022

BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-25 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL**<br><br>**EX PARTE TO GOVERNMENT ONLY** |

## MEMORANDUM OPINION

In June 2022, a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued subpoenas for testimony to [redacted] and [redacted]. In [redacted] both witnesses appeared separately before the grand jury and declined to respond to certain questions by invoking executive privilege and, for [redacted], also attorney-client privilege, pursuant to directions given to each witness by former president Donald J. Trump. The former president claims that the presidential communications privilege, one species of executive privilege, bars these two witnesses from testifying about communications with him before the grand jury, and that attorney-client privilege further bars such testimony by [redacted]. The government now moves to compel withheld testimony from these two witnesses because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

Case 1:22-gj-00025-BAH *SEALED* Document 11-3 Filed 09/29/22 Page 2 of 40

## I. BACKGROUND

The grand jury's need for testimony from [redacted] stems directly from these witnesses' knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. [redacted]. Those events have been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC"), as summarized in part below.

### A. 2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress

In the November 2020 presidential election, 81,268,924 Americans, amounting to 51.31% of the votes cast, elected Joseph Biden as president, compared to 74,216,154 votes, or 46.86%, for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Sept. 27, 2022)). The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful. *Id.* In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states that candidate Biden

won to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14, 2020, on fraudulent elector certificates. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 00:54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Sept. 27, 2022) (describing the fake elector scheme).[1]

As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were then certified by a Joint Session of Congress convened on January 6, 2021, over which the former vice president was to preside, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process

[1] [redacted]

describing the counting of electoral votes in Congress). "In anticipation of that event, President Trump had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

[redacted]

[redacted]

[redacted]

[redacted]

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president

specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), [https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification](https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification) (last accessed Sept. 27, 2022) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20–3:47:42, 4:41:17–4:41:33). At that rally, the former president's private attorney Rudolph Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral College Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:09. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC

Hr'g Tr. (July 21, 2022)") at 00:34:48–00:36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Sept. 27, 2022). [redacted]

As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol. For example, on January 6, 2021, the Federal Bureau of Investigation ("FBI") made an emergency request to a social media platform for non-content user identification information of users who broadcasted live video or uploaded videos from physically within the Capitol building when it was occupied by unauthorized persons, to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)). *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022) (denying motion to suppress fruits of FBI's

emergency request, on January 6, 2021, to Facebook for non-content user-generated location information ("UGLI") derived from user-generated content posted from inside the Capitol building during the attack). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B. Instant Grand Jury Investigation**

[redacted]

**C. Procedural History**

In connection with the instant grand jury investigation, the government planned to serve subpoenas to [redacted] to require testimony.

[redacted]

[redacted] Following [redacted] discussions with counsel for [redacted], the government learned that the former president's counsel had attempted to exclude certain information from the witnesses' Committee interviews on grounds of executive privilege. [redacted] Anticipating that the former president would assert the privilege again in reference to any grand jury testimony of [redacted] and that such invocation of the privilege would necessitate discussions between counsel for the former president and of the witnesses, the government sought, with the consent of counsel for [redacted] an order from this Court "permitting the Government to discuss the grand jury subpoenas for [redacted] with counsel for the incumbent and former presidents[,]" which included "communicating with the Office of White House Counsel (for the incumbent President) and [redacted] (for the former president)," [redacted]. Such discussions would enable the government to "ascertain whether any potential privilege holder – including the incumbent and former Presidents – intend to instruct the witnesses not to testify regarding communications covered by executive privilege[,]" [redacted], and thereby remove "the onus of these consultations" from the witnesses, [redacted]. The government's motion to disclose the relevant grand jury materials as requested was granted on June 10, 2022. [redacted]

On June 15, 2022, the government served on [redacted] grand jury subpoenas to testify, [redacted], along with cover letters [redacted]. The government subsequently forwarded those cover letters to the Office of White House Counsel, querying whether President Biden would assert executive privilege to bar [redacted] testimonies, [redacted]

[redacted], to which the White House Counsel's Office responded in less than one week that President Biden "does not intend to assert executive privilege," [redacted]. The government was permitted to disclose the White House Counsel's Office letter to [redacted]. [redacted]

The government made the same request communicated to President Biden to the former president's counsel, sending a letter on [redacted], the same day the letter was sent to the White House Counsel, with copies of the [redacted] cover letters. [redacted]. Several weeks later, the former president's counsel sent directly to counsel for [redacted], on [redacted], respectively—[redacted]—letters instructing that they were "to the fullest extent permitted by law, . . . not to provide testimony about, or reveal in any forum, privileged communications and correspondence." [redacted]. The letters from the former president's counsel further explained—without using the term "executive privilege"—that "there is an expectation of confidentiality in a President's conversations and correspondence with those who advise and assist him," which "confidentiality is protected under the United States Constitution" and "[a]ll such presidential communications are presumptively privileged." [redacted]. In the letter to [redacted] [redacted], counsel to the former president also barred [redacted] from providing testimony about communications and correspondence "that are privileged because of [redacted] role as an

attorney." [redacted]

[redacted] testified before the grand jury on [redacted], and [redacted], [redacted], and each witness notably declined to answer certain questions, citing executive privilege and, [redacted], attorney-client privilege as well. [redacted][2]

On [redacted], the government moved to compel [redacted] to testify [redacted], listing as respondents the two grand jury witnesses as well as the former president. [redacted]

Simultaneously with the filing of this motion [redacted], the government requested permission for limited disclosure of the sealed motion to the witnesses and the former president subject to certain protections. The Court granted that request, citing Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private interests served by the grand jury secrecy requirement." [redacted]

---

2 [redacted]

3 [redacted]

[redacted] Pursuant to the Protective Order, the government was directed to serve, through counsel, the two grand jury witnesses and the former president with copies of the Protective Order, the government's motion to compel with accompanying proposed order, and the government's motion for the protective order. [redacted] The Protective Order prohibited the witnesses and former president from disclosing any information pertaining to these proceedings to the public and restricted access to the proceeding's materials to attorneys of record, their clients, and those individuals necessary to litigate the issues presented. [redacted] Finally, the Protective Order directed conferral among the interested parties on a briefing schedule and a date for submission of any agreed-upon schedule to the Court. [redacted]

In the interest of fairness and to enable the most fulsome review, an extended briefing schedule, as agreed to by the parties, was ordered on the motion to compel beyond the time requirements of Local Criminal Rule 47(b), to give the former president additional time to respond to the government's motion—resulting in twenty-five days to submit an opposition—and the government seven additional days—fourteen days total—to submit a reply. [redacted]. After all briefing was submitted, [redacted], to give the parties another opportunity to explain their positions. The government's motion is now ripe for review.

## II. DISCUSSION

The executive privilege doctrine is "used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch." *In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997). Thus, at the outset, the specific species of this privilege at issue here is described before turning to the separate issues of whether the former president's invocation of presidential communications privilege operates, in this grand jury context, to bar the compelled

testimony of [redacted], and whether the former president's assertion of attorney-client privilege bars the compelled testimony of [redacted]. The answer is the same as to both issues: Neither privilege invoked by the former president blocks the testimony of the witnesses on matters highly relevant and important to the grand jury investigation. Finally, the procedural steps urged by the former president that would delay resolution of the government's motion to compel or the witnesses' testimony before the grand jury, or both, are discussed and easily dispatched.

**A. Executive Privilege Generally**

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id.* § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect executive branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id.* at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing

*In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 1114, that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both the government and former president's counsel confirmed, at issue in this motion is the presidential communications privilege. [redacted][4] That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86

[4] "All hearings on matters affecting a grand jury proceeding shall be closed." D.D.C. LCrR 6.1. [redacted]

(quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected

from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection and, [redacted], the parties agreed that three categories of presidential communications have varying levels of, or no, such protection. [redacted] "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see*

*GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Nixon*, 418 U.S. at 705; *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)). Certainly, for instance, the president's sandwich order at lunch is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties. [redacted]

### B. Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from [redacted] and whether any level of privilege has been waived or inadequately asserted. The government takes the position that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021. [redacted][5] The former president counters that communications regarding January 6, 2021, were in fulfillment of his

[5] *See also* Gov't's *Ex Parte* Mem. at 14 n.2.

Case 1:22-gj-00025-BAH *SEALED* Document 18 Filed 10/28/22 Page 18 of 40

constitutional duty to "take Care that the Laws be faithfully executed," [redacted], and so constitute core communications involving "election integrity" and "national security," subject to the utmost privilege deference, [redacted]. Yet, the former president does not suggest that the compelled testimony at issue is at the level of military or diplomatic secrets or in any way requires national security classification such that "absolute" protection may be appropriate. *See In re Sealed Case*, 121 F. 3d at 743 n.12.

Each party is partially correct. The communications at issue do not involve matters of the utmost confidentiality and so "absolute" deference to the presidential communications privilege is not appropriate. They do not involve confidential military or diplomacy secrets. Despite the former president's best efforts to shoehorn the [redacted] topics the government flags for the grand jury witnesses' testimonies into the realm of national security secrets, [redacted], that effort falls flat because many of those topics concern [redacted]—and have no relation to secrets capable of causing damage to national security, as the former president's counsel has admitted, [redacted]. That said, the communications implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C.

The government next contends that President Biden's decision not to assert executive privilege over the testimonies of [redacted] requires the former president's assertion of privilege to "yield." [redacted] The former president highlights, however, that the Supreme Court recently and expressly held this question open, [redacted] and counters that a presidential successor cannot "invade" or waive the privileged communications of his predecessor because that would surely temper candor in the decisionmaking process, [redacted].

The government then proffers that the former president failed to make an assertion of privilege specific enough to identify which communications qualify for protection and why. [redacted].[7] The former president retorts that he made the most specific assertion of privilege possible given the general nature of the [redacted] topics for testimony enumerated in the cover letters sent to [redacted] and that he has no other obligation to be any more specific. [redacted]

The Court need not enter this fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witnesses to testify fully before the grand jury.

### C. Presidential Communications Privilege Does Not Bar Compelled Testimony

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and

---

6 [redacted]

7 [redacted]

dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id.*

What resulted is the standard of need test, *id.* at 754, which both parties agree applies here, [redacted]. The test directs that "[a] party seeking to

overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701; *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219 (1951); *In re Martin Marietta Corp.*, 856 F.2d 619, 622 (4th Cir. 1988). The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and

enforcing the law." *In re Sealed Case*, 121 F.3d at 753; *cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege). In short, [redacted], in the grand jury context, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is "baked into" the two-prong test from *In re Sealed Case*. [redacted].

Before analyzing how both prongs of the standard of need test apply to the testimony sought to be compelled before the grand jury here, the former president's novel proposal for a threshold test for the government to overcome is addressed.

**1. *Former President's Proposed Threshold "Viability" Test***

The former president seeks to tweak the straightforward and well-settled standard of need test. He argues, initially in his brief, that "[a]ny evaluation of need must also be made in the context of the viability of the underlying investigation" such that, "if the premise of the underlying investigation is flawed, then there is no actual 'need' to invade the privilege." [redacted] To establish "viability," he further asserts that the government must prove "beyond a reasonable doubt" that, *inter alia*, "(1) there was no fraud in the 2020 Presidential election, or, at minimum that any fraud was insufficient to affect the outcome; and (2) that President Trump knew that there was no fraud and falsely claimed that there was fraud with intent to deceive." [redacted] Doubling-down on his critique of the ongoing grand jury investigation in terms more appropriate in summation at trial, the former president continued that "the Government cannot prove there was ***no*** fraud or irregularities in the 2020 Election" when "indeed such irregularities and specific instances of fraud [were] identified," [redacted]

[redacted], and, further, that "the Government cannot prove corrupt intent or an intent to deceive" since "[i]t is simply not a crime to question the integrity of an election," [redacted] nor can the "Government [] establish any connection between President Trump and the alleged criminal conduct on January 6, 2021," [redacted]

[redacted], counsel for the former president walked back the assertion that, at this investigative juncture, the government must present proof beyond a reasonable doubt, [redacted], and instead urged the Court to "drill down into the definition of important evidence" in the first prong of the standard of need test by considering whether the evidence sought is "directly relevant to issues that are expected to be central in the trial," which must include questions of potential criminality and not political disagreement, [redacted]. Central to the former president's "viability" theory is that the instant grand jury investigation merely probes disagreement among the former president, the former vice president, and their key advisors over aggressive political machinations challenging the 2020 presidential election results, when such machinations do not amount to criminal conduct. [redacted] *see also* Resp't's Opp'n at 10 ("However, the Government fails to adequately allege that the subpoenaed testimony would reveal criminal activity. President Trump carried out his constitutional duties to see that the laws were faithfully executed when he communicated with top advisors as to whether the presidential election was conducted with integrity.").

Precedent counsels strongly against accepting the former president's invitation to short-circuit the grand jury's investigation by requiring an initial threshold judicial inquiry into investigative "viability," for at least two reasons. First, the grand jury, not the Court, decides "whether or not a crime has been committed." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991). The grand jury has a "unique role," *id.*, "enshrined in the Constitution," to "'determin[e] if there is probable cause" and to "protect[] citizens against unfounded criminal

prosecutions,'" *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983) (citing *Branzburg v. Hayes*, 408 U.S. 665, 686–87 (1972)). For this strong public interest in allowing the grand jury to carry out this constitutional role, the presidential communications privilege may give way to the grand jury's authority. *In re Sealed Case*, 121 F.3d at 756; *see also Sirica*, 487 F.2d at 712–13.

In practice, if the evidence, or lack thereof, before the grand jury does not point to criminal activity, then the grand jury will end its investigation accordingly without issuing indictments and without unfairly implicating innocent persons in the public sphere. *See Wood v. Georgia*, 370 U.S. 375, 390 (1962) ("Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused."). If, on the other hand, the evidence is sufficient to support probable cause to believe that a person committed a specific crime, the grand jury is tasked with the duty of presenting an indictment. After presentment of an indictment, the prosecutors have the job of persuading a petit jury beyond a reasonable doubt that a defendant, who was the target of the grand jury's investigation, committed the charged violation of criminal law.

Judicial intervention to prejudge the "viability" of a grand jury investigation is an obvious usurpation of the grand jury's role and is wholly inappropriate. The former president's invitation for this Court to engage in such usurpation is an obvious effort to frustrate the grand jury's consideration of the very issue with which the grand jury is tasked, namely, to determine whether probable cause indicates a crime was committed and, if so, by whom. Cutting off the grand jury investigation now by starving it of information subject to the presidential communications privilege might ultimately spare the former president from having to persuade a petit jury that he and his close associates engaged merely in aggressive political maneuvering on

multiple fronts and crossed no line into illegality, such as a criminal effort to obstruct Congress's official proceeding to certify the results of the 2020 presidential election. Such line-drawing is assigned under our criminal justice system, as an initial matter, to the grand jury. "The grand jury requires no authorization from its constituting court to initiate an investigation" and, in its daily work, the grand jury "swears in its own witnesses . . . and deliberates in total secrecy." *United States v. Williams*, 504 U.S. 36, 48 (1992) (citing FED. R. CRIM. P. 6(c)). This Court declines the former president's invitation to insert itself into matters constitutionally tasked to the grand jury. *See id.; see also* U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.").

Second, the threshold for matters the grand jury may investigate is suspicion of criminality, not the viability of criminal charges before a petit jury. "The grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *R. Enters.*, 498 U.S. at 297 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)). While "grand juries are prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass,'" *Trump v. Vance*, 140 S. Ct. at 2428 (quoting *R. Enters.*, 498 U.S. at 299), "the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority," *R. Enters.*, 498 U.S. at 300–01; *see also United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.").

As the grand jury progresses in its inquiry, its fact-finding mission centers on reasonableness and relevancy. The "necessary consequence of its investigatory function" permits the grand jury to probe "all information that might possibly bear on its investigation until

it has identified an offense or has satisfied itself that none has occurred," thereby allowing it to "paint[] with a broad brush." *R. Enters.*, 498 U.S. at 297. That broad authority, however, has limits. "[A] grand jury subpoena issued through normal channels is presumed to be reasonable," unless its recipient persuades a district court that there is "no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.* at 301. Thus, the contours for initiating and conducting grand jury investigations are clear, and the former president has made no showing, absent conclusory allegations unsupported by evidence, that any act of the grand jury's investigation thus far has been improper or even unreasonable.

Having rejected the former president's restructuring of the standard of need test, the remaining task is to apply that test to the facts of the pending motion.

**2. *Application of the Standard of Need Test***

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the withheld testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. [redacted]

Case 1:21-gj-00025-JEB Document 18 Filed 06/28/22 Page 27 of 40

[redacted]

Case 1:21-gj-00025-BAH *SEALED* Document 18 Filed 10/29/22 Page 28 of 40

[redacted]

As to whether the testimony of [redacted] could potentially shed important light on those matters, the answer is clearly affirmative. [redacted]

[redacted]

Relevant to the test's second prong, no alternative to this evidence is available. Of the participants in the communications [redacted], these two witnesses possess unique and inimitable evidence. [redacted]

[redacted]

On these grounds, [redacted] possess vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

**D. Attorney-Client Privilege**

As noted in Part I.C *supra*, following disclosure to the former president of the grand jury subpoena and cover letter as to [redacted] the former president instructed [redacted] "not to provide testimony about, or reveal in any forum, privileged communications and correspondence – including those that are privileged because of [redacted] role as an attorney." [redacted]

8 [redacted]

[redacted] Given this assertion of attorney-client privilege, [redacted] invoked this privilege to withhold information while testifying before the grand jury [redacted] prompting [redacted][9] Following discussion of the attorney-client privilege generally and the scope of this privilege when invoked for government attorneys, the Court analyzes whether the former president is entitled to assert this privilege here to block [redacted] testimony in response to the grand jury inquiries and concludes he is not.

**1. *Attorney-Client Privilege Generally***

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389). Thus, the privilege covers only communications "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[Attorney-client] privilege applies only if the person to whom the communication was made is 'a member of a bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding.'"

[9] [redacted]

(quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

The responsibility for protecting the attorney-client privilege lies with the holder: "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case,* 877 F.2d 976, 980 (D.C. Cir. 1989)); *see also SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (placing onus on "the holder [to] zealously protect the privileged materials, taking all reasonable step to prevent their disclosure"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) ("voluntary disclosure by the holder of such a privilege . . . waives the privilege"). Consequently, "settled law" directs that the party claiming the privilege bears the burden of proving that the communications are protected and must do so through "present[ation of] underlying facts demonstrating the existence of the privilege." *In re Lindsey*, 158 F.3d at 1270 (quoting *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)). A blanket assertion of the privilege will not suffice; "the proponent must conclusively prove each element of the privilege." *Id.* (internal citation omitted).

The D.C. Circuit takes an "all-or-nothing approach" to waiver of the attorney-client privilege, *Protect Democracy Project*, 10 F.4th at 891, such that "voluntary disclosure of privileged material . . . to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter,'" *id.* (quoting *In re Sealed Case*, 121 F.3d at 741). Consistent with this approach, disclosure of the "substance" of privileged communications waives the attorney-client privilege. *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

As relevant here, the Circuit also recognizes a government attorney-client privilege. In that formulation, the attorney representing a government agency or department may provide

legal advice that is subject to privilege. *In re Lindsey*, 158 F.3d at 1269. The prerequisites for the privilege to apply in the government attorney context, more generally, require that the communications primarily be for legal advice, and therefore "advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege." *Id.* at 1270.

Like the presidential communications privilege, the government attorney-client privilege is not always absolute. For government attorneys in the executive branch, this privilege is limited by their responsibility to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and the president's sworn duty to "faithfully" execute his office and, "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," *id.* art. II, § 1, cl. 8, which the Executive Branch is bound "by oath or affirmation" to uphold, *In re Lindsey*, 158 F.3d at 1273. Executive branch attorneys must adhere "to the cause of constitutional government" and to protect the public interest through "transparen[cy] and accountab[ility]." *Id.* at 1273. They owe loyalties that surpass the desires of any individual client agency and are "not to defend clients against criminal charges" or "protect wrongdoers from public exposure." *Id.* at 1272. As the D.C. Circuit eloquently explained, "[w]ith respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar," *id.*, since government attorneys have the duty "to 'take Care that the Laws be faithfully executed," which encompasses the "[i]nvestigation and prosecution of federal crimes [as] one of the most important and essential functions within that constitutional responsibility," *id.* (citing U.S. CONST. art. II, § 3). As such, "a government attorney . . . may not assert an attorney-client privilege before a federal grand jury if communications with the client contain information pertinent to possible criminal violations." *Id.* at 1274.

### 2. *Attorney-Client Privilege Does Not Bar Testimony at Issue*

The binding precedent of *In re Lindsey* squarely applies to limit the former president's assertion of attorney-client privilege over [redacted] testimony. [redacted] The government seeks to ask [redacted] before the grand jury about the [redacted] *see also supra* at Part II.C.ii. As *In re Lindsey* instructs, such a showing vitiates the former president's claim to privilege and permits [redacted] to testify to those communications.

None of the former president's efforts to bolster invocation of the attorney-client privilege are successful. First, he highlights the "critical need to protect the ability of a President to obtain candid advice from his or her attorneys." Resp't's Opp'n at 9. The D.C. Circuit addressed—and rejected—that same argument in *In re Lindsey*. There, the Circuit "assume[d]" that carving out an exception for government attorney-client privilege "may chill some communications between government officials and government lawyers," but nonetheless noted that "the Supreme Court has not been troubled by" an exception to executive privilege in the grand jury context. 158 F.3d at 1276. The Circuit then held that "government officials will still enjoy the benefit of fully confidential communications with their attorneys unless the communications reveal information relating to possible criminal wrongdoing." *Id.* Likening the

exception to corporate officers that may not keep certain communications from shareholders in litigation, the Circuit observed that "[a]ny chill on candid communications with government counsel flowing from our decision not to extend an absolute attorney-client privilege to the grand jury context is both comparable and similarly acceptable." *Id.* The same reasoning applies to reject the former president's argument that vitiating the government attorney-client privilege here will hinder a president's ability to obtain candid legal counsel in the future.

Second, the former president contends that he and the former vice president held a "common interest" such that any waiver of attorney-client privilege by the former vice president does not apply to him. Resp't's Opp'n at 10–11. The Circuit rejected a similar argument in *In re Lindsey*, holding that a government attorney's "obligation not to withhold relevant information acquired" through his post remains despite that attorney being present during discussions between the president and his personal counsel, which is conversely protected by the privilege in the face of a grand jury subpoena, because the government and personal counsel lacked a common interest. 158 F.3d at 1283. Thus, application of *In re Lindsey* is dispositive and pierces any attorney-client privilege applicable to [redacted] *See In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994) ("The common interest privilege protects communications between a lawyer and two or more clients regarding a matter of common interest."). When the former president and vice president consulted with [redacted] regarding the latter's role in the electoral vote certification, the former president apparently staunchly held the view that the former vice president could overturn the election results at the certification, **Ex. B** (HSC Hr'g Tr. (June 16, 2022)) at 4, 32, while the former vice president repeatedly asserted his mere "ceremonial" role in the proceeding that lacked legal authority to disrupt it, *id.* at 28–30. Even if [redacted] was not a government attorney

and *In re Lindsey* did not apply, [redacted]

Notably, this does not leave the former president without any protection from the attorney-client privilege for his confidential communications with counsel over legal matters. As the D.C. Circuit also explained in *In re Lindsey*, 158 F.3d at 1276, the former president's communications with his *personal* attorneys are protected by attorney-client privilege, allowing him full frankness and confidentiality in those conversations. Simply put, [redacted] was not the former president's personal lawyer and so that protection is not implicated here.

Finally, the former president also attempts to circumvent *In re Lindsey*'s application by arguing that "the Government fails to adequately allege that the subpoenaed testimony would reveal criminal activity." Resp't's Opp'n at 10. The Court disagrees. As previously explained, [redacted]. His testimony before the grand jury is directly relevant to the grand jury's investigation into [redacted]. The exception to government attorney-client privilege exists to allow investigations into such activity, and as [redacted]

As an executive branch attorney, [redacted] has a responsibility and duty to inform the grand jury of information he possesses pertinent to the grand jury's investigation into [redacted]. Accordingly, the former president's claim of

attorney-client privilege fails.

### E. Former President's Suggested Additional Procedures

Finally, the former president requests that the Court impose additional, and extraordinary, procedures before this grand jury investigation may proceed. These requests are denied.

First, the former president demands that, "if the Government has [redacted] justified its need for the privileged testimony it seeks," as the government has done, *see supra* Part II.C, "[t]he next step in the process is *in camera* review by this Court to ensure that only evidence relevant to the grand jury's inquiry is disclosed," Resp't's Opp'n at 6–7 (citing *In re Sealed Case*, 121 F.3d at 742, and *Sirica*, 487 F.2d at 719–22). The former president is mistaken. When the D.C. Circuit permitted that *in camera* review procedure in *In re Sealed Case* and *Sirica*, such review was necessary to determine whether the previously acquired evidence was relevant to the grand jury's investigation. *In re Sealed Case*, 121 F.3d at 745; *Sirica*, 487 F.2d at 719. As already explained, [redacted] prospective grand jury testimonies are highly relevant to the grand jury's investigation. Review of the [redacted] topics the government seeks to ask the grand jury witnesses suffices to show the direct relevance of [redacted] testimonies to the grand jury's investigation. [redacted] Thus, *in camera* review of their anticipated testimony would be superfluous in assessing relevancy and result only in additional delay to the grand jury's proceedings.

Moreover, the former president does not reckon with the difficult logistics of conducting *in camera* review of yet-to-be-given grand jury testimony. Courts were able to conduct *in camera* review of potential grand jury evidence in *In re Sealed Case* and *Sirica* because that evidence consisted of pre-existing and complete records—documents in *In re Sealed Case*, 121 F.3d at 734, and tape recordings in *Sirica*, 487 F.2d at 704–05—not testimony as here. The former president downplays how extraordinary his request is. He essentially asks that grand jury

witnesses, typically unknown to the judge supervising the grand jury, provide prospective testimony in the form of proffers to the Court, which otherwise has no role in presenting evidence to the grand jury. In other words, the former president apparently envisions that the Court will elicit and review the prospective grand jury witness's proffer to decide whether and what aspects of that testimony are relevant to the grand jury's investigation, despite the fact that government counsel has the most comprehensive knowledge of the evidence already gathered and presented to the grand jury. Indeed, review of the transcripts of [redacted] prior grand jury testimonies reveal to which questions they invoked privileges on behalf of the former president, but those transcripts say nothing about the line of questioning the government may pursue in follow-up and to clarify other information already presented to the grand jury.[10] The government is in a far better position than the Court to elicit that information effectively and efficiently. The former president's request would have the Court doing the government's job of probing *grand jury witnesses*, and that is certainly impermissible. *See Williams*, 504 U.S. at 48.

What is obvious is that the overall process proposed by the former president would necessarily involve multiple steps, beginning with this Court conferring with the government over the anticipated testimony to ascertain the overall status of the grand jury investigation in order to assess the relevancy of the particular witnesses' testimony; conducting proffers of the grand jury witnesses; examining those proffers to determine what is relevant, or not, to the grand jury investigation; instructing the government and grand jury witness as to those relevance determinations, to ensure that any forthcoming testimony was appropriately cabined; and, perhaps, reviewing the grand jury testimony itself to ensure compliance with the relevance determinations. This process would be time-consuming and potentially sufficiently fraught with errors as to frustrate the grand jury investigation. The Supreme Court has wisely cautioned

---

10 [redacted]

against "saddl[ing] a grand jury with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *R. Enters.*, 498 U.S. at 298–99 (citing *United States v. Dionisio*, 410 U.S. 1, 17 (1973)). The former president's proposal for some version of *in camera* review of the grand jury witnesses' testimonies invites just such meddling to encumber the grand jury's authority. This proposal is rejected.

Second, the former president requests that the Court stay a ruling on this motion until a record is created for any additional grand jury witnesses that may or are anticipated to assert executive privilege. Resp't's Opp'n at 12–14. The former president references two potential witnesses—[redacted]—that he predicts will be called to testify before the grand jury relevant to this investigation and will invoke executive privilege to block disclosure of certain topics as did [redacted] *Id.* at 12–13. The former president claims that judicial economy favors consolidating the motions to compel for all four witnesses, so the Court need only make one disposition. *Id.* at 13–14.

The former president is incorrect. The nature of what each witness knows and their differing positions in the White House and in relation to the former president necessitate individualized review of their privilege claims. The former president admitted as much [redacted]. The former president's request also requires too much speculation. No motion to compel [redacted] grand jury testimonies has been filed, and the Court does not operate on

conjecture. *See Thompson*, 20 F.4th at 24 ("[C]ourts should not reach out to evaluate a former president's executive privilege claim based on future possibilities for constitutional conflict." (internal citations omitted)). In this circumstance, judicial economy actually favors handling existing matters as they come before the Court based on the facts at hand rather than creating reasons to delay an ongoing grand jury investigation for motions that have yet to be filed.

Finally, the former president asserts that, "even if this Court concludes that the presidential communications privilege alone is an insufficient ground to withhold testimony, [he] is entitled to an opportunity to raise more particularized claims of privilege." Resp't's Opp'n at 7 (quoting verbatim *In re Sealed Case*, 121 F.3d at 743–45). [redacted] this request is dependent on the success of the former president's consolidation request: The former president wants to preserve an opportunity to assert additional privileges relevant to [redacted] testimonies post-consolidation. [redacted] This suggested procedural request is rendered moot, however, by rejection of the former president's request for consolidation.

## III. CONCLUSION

Based on the foregoing analysis, the presidential communications privilege presents no bar to eliciting testimony before the grand jury from [redacted], [redacted], and [redacted], [redacted]. Nor does the attorney-client privilege bar testimony from [redacted]. Accordingly, the government's motion to compel testimony from these two grand jury witnesses is GRANTED.

Date: September 28, 2022

BERYL A. HOWELL
Chief Judge

Case 1:22-gj-00025-BAH *SEALED* Document 3 Filed 10/06/22 Page 1 of 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-25 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**<u>UNDER SEAL</u>** |

**<u>ORDER</u>**

On September 28, 2022, this Court granted the United States' motion to compel the grand jury testimony of [redacted], [redacted], and ordered the witnesses to appear before the grand jury to give testimony previously withheld on the basis of the presidential communications privilege or attorney-client privilege, *see* Order Granting Gov't's Mot. to Compel Testimony Withheld from the Grand Jury, ECF No. 17; Redacted Memorandum Opinion regarding Gov't's Mot. to Compel Testimony Withheld from the Grand Jury, ECF No. 20. Despite having a full week to consider the Court's decision, former president Donald J. Trump moved at 4:30 p.m. last night, [redacted], for a stay of the grand jury's ongoing investigation, and thus the witnesses' forthcoming testimony, pending his appeal of the Order to the D.C. Circuit. [redacted]

Upon consideration of the motion and the United States' expedited response [redacted] and the entire record herein, the Court finds that the former president has not met his burden warranting the extraordinary relief of a stay of the grand jury witnesses' testimonies.

Case 1:22-gj-00030-BAH *SEALED* Document 3 Filed 10/06/22 Page 2 of 2

An accompanying Memorandum Opinion will follow shortly.

Accordingly, it is hereby

**ORDERED** that the former president's Motion to Stay Pending Appeal, [redacted], is **DENIED**.

**SO ORDERED.**

Date: October 6, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-25 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL** |

**MEMORANDUM OPINION**

Before the Court is a motion to stay an ongoing grand jury investigation pending former president Donald J. Trump's appeal of this Court's Order granting the government's motion to compel grand jury testimony [redacted]. *See* Order Granting Gov't's Mot. to Compel Testimony Withheld from the Grand Jury ("Order"), ECF No. 17; Redacted Memorandum Opinion regarding Gov't's Mot. to Compel Testimony Withheld from the Grand Jury ("Memorandum Opinion" or "Mem. Op."), ECF No. 20. The former president submitted his stay request the evening before [redacted] despite ample time to do so following the grant of the motion to compel on September 28, 2022. Leaving no choice but to seek exceedingly expedited review, the former president does not meet the high bar for extraordinary relief that a stay confers. His motion is thus denied.

## I. BACKGROUND

A detailed enumeration of the factual and procedural history preceding this motion is described in the Memorandum Opinion, *see* Mem. Op. at 2–12, and is thus incorporated by reference here. Following issuance of the Order, the former president had eight full days to appeal that ruling and seek to stay the grand jury's investigation, but instead waited until the

evening before [redacted] to do so. [redacted]. The Court granted the former president leave to file under seal the motion to stay and the notice of appeal in accordance with the protective order in place. [redacted] Upon notice that the former president did not confer with the government regarding his motion to stay, the Court ordered the government to respond to the former president's request within 15 hours after service of the motion, [redacted] leaving the Court with two hours [redacted] to resolve the former president's motion. [redacted]. The motion is now ripe for review.

## II. LEGAL STANDARD

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "'A stay is not a matter of right, even if irreparable injury might otherwise result,'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)), and "[a] stay pending appeal is always an extraordinary remedy, *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966).

Courts considering a stay request pending an appeal must "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254–55), by balancing the following factors as applied to the specific facts of the case:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S. at 434 (internal citations omitted). The third and fourth factors "merge" when the stay applicant so moves against the government. *Id.* at 435. The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255. Like a preliminary injunction, absent a showing of a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to the turn tide in plaintiffs' favor." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 366 (D.C. Cir. 1999).

**III. DISCUSSION**

For the reasons stated in the Memorandum Opinion, the former president is unlikely to succeed on the merits. As explained there, the presidential communications privilege in this instance gives way to the specific need of the grand jury's ongoing criminal investigation into the events surrounding January 6, 2021. *See* Mem. Op. at 19–22, 26–30. Aside from accentuating the "extraordinary" and "significant" nature of the presidential communications privilege as being "of paramount importance to the country and [] integral to the proper functioning of the Executive Branch," [redacted] the former president's one-page argument to support his likelihood of success on the merits centers on the theory that he has been denied "an opportunity to raise more particularized claims of privilege before the testimony is provided to the Grand Jury," [redacted]

He is incorrect. Before asserting any privilege claims to this Court, the former president was informed of the [redacted] general topics the government sought to inquire of the grand jury

witnesses. [redacted] Those listed topics provide sufficient detail to permit the former president to evaluate the applicability of all privilege claims available to him.

In addition to being provided with the general information about the specific topics of the grand jury's inquiry of the witnesses at issue, the former president has had ample chances to make all his arguments before the Court asserting applicable privileges. First, in his response to the government's motion to compel [redacted] the former president asserted [redacted] the presidential communications privilege and attorney-client privilege [redacted]. [redacted] [redacted]), [redacted] Both asserted privileges were rejected in turn following detailed analyses. *See* Mem. Op. at 12–13; *see also id.* at 13–37. Then, [redacted], counsel had the chance to assert additional privilege claims, but instead clarified that the former president's request to later assert more particularized claims of privilege only applied to speculative, forthcoming motions to compel two other grand jury witnesses. [redacted] Counsel for the president made no attempt to assert additional particularized privilege claims relating to the testimonies of [redacted] at the hearing.

If any such additional claims exist, the former president's coy approach to articulating them is not a recipe for success in seeking a stay. *See In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750–51 (D.C. Cir. 2006) ("The basis of a privilege must be adequately established in the record through evidence sufficient to establish the privilege with reasonable certainty.") (internal quotations and citations omitted); *SEC v. Lavin*, 111 F.3d 921, 928 (D.C. Cir. 1997) ("A claim of privilege must be presented to a district court with appropriate deliberation and precision before a court can rule on the issue.") (internal citations and quotations omitted). Assuming that the former president seeks to assert the other species of executive privilege, the deliberative process privilege, which protects from disclosure "records documenting the decisionmaking of executive officials generally," *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d 737, 745 (D.C. Cir. 1997)), that privilege claim is weaker than that asserted under the presidential communications privilege because the twelve topics on which the witnesses' testimony will focus do not implicate "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" nor material that is "predecisional" or "deliberative" that the common law privilege is intended to protect, *In re Sealed Case*, 121 F.3d at 737. The law of this circuit makes clear that the deliberative process privilege is more limited than its all-encompassing presidential privilege counterpart, *see Protect Democracy Project*, 10 F.4th at 885–86 (citing *In re Sealed Case*, 121 F.2d at 745–46), and so an unsuccessful claim to the latter necessitates an unsuccessful claim to the former.

In sum, the former president has been given multiple opportunities and sufficient time—all that he requested and agreed-to—to present the entirety of his arguments in resolving his privilege invocation. His arguments simply are not persuasive and will be no more so on appeal given binding precedent.

The former president's claim of irreparable harm is similarly unconvincing. He argues that the witnesses' testimonies on previously withheld topics would result in his "valid privileges [being] irretrievably lost" without "remediation," and that, absent a stay, the issue would be moot following the witnesses' testimonies. [redacted] The former president has only himself to blame for those outcomes. No matter the irreparable injury, "a stay is not a matter of right." *Nken*, 556 U.S. at 433 (quoting *Virginian Ry. Co.*, 272 U.S. at 672). The former president's choice to [redacted] after the Court's Order and [redacted] before [redacted] to appeal the ruling left little time for him to plead his case before the D.C. Circuit, for either vacatur or a stay. *Cf.* D.C. Cir. R. 8(a)(1) ("A motion for a stay of a judgment or of an order of the district court or any other motion seeking emergency relief must state whether such relief was previously requested from the district court and the ruling on that request."). An injury cannot be irreparable and thus weigh in favor of granting a stay when the irreparability was a product of the former president's own delay or indecision.

Finally, the interests of the government, the witnesses, and the public weigh against a stay. Grand jury investigations are constitutionally protected with a "broad" authority to "inquire into all information that might possibly bear on its investigation." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991); U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). The testimonies of the witnesses are relevant, important, and integral to the grand jury's ongoing criminal investigation. *See* Mem. Op. at 19–22, 26–30; *see also In re Sealed Case*, 121 F.3d at 754–55. The former president's motion to stay is an obvious effort to delay further that investigation, which clear legal precedent counsels against tolerating. *Cf. R. Enters., Inc.*, 498 U.S. at 298–99 ("We have expressly stated that grand jury proceedings should be free of [procedural] delays" and "detours" that "'would assuredly impede its investigation and frustrate

the public's interest in the fair and expeditious administration of the criminal laws.'" (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973))); *Gomez v. U.S. Dist. Ct. for N.D. Cal.*, 503 U.S. 653, 654 (1992) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief," particularly when "last-minute attempts to manipulate the judicial process" via a stay application, ripe "more than a decade ago," amount to "abusive delay" without good cause).

As context, the grand jury served its subpoenas on [redacted] Their scheduled testimonies were held on [redacted] with [redacted] witnesses withholding answers to numerous questions on the former president's instructions to invoke the presidential communications privilege and [redacted] attorney-client privilege. [redacted] The Court resolved the government's motion to compel the withheld testimonies on September 28, 2022, and so the grand jury's investigation has been stalled by almost [redacted] months given the former president's invocation of privilege on the eve of the first rescheduled witness testimony.

This is an obvious pattern of delay, and nowhere does the former president state in his motion that he will seek expedited review and resolution of this matter by the D.C. Circuit on appeal. *See, e.g.*, D.C. Cir. R. 2 ("In the interest of expediting decisions or for other good cause, the court may suspend the requirements of these Circuit Rules."); D.C. Cir. R. 27(f) ("Any party may request expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would ordinarily be required for this court to receive and consider a response. . . . The motion must be filed at least 7 days before the date by which court action is necessary or counsel must explain why it was not so filed."). The Court thus declines to further

pause the grand jury's constitutionally protected work, particularly in the absence of any reassurance that the former president's delay tactics will cease.

## IV. CONCLUSION

Based on the foregoing analysis, the former president's motion to stay pending appeal is DENIED.

Date: October 6, 2022

BERYL A. HOWELL
Chief Judge

Case 1:22-gj-00033-BAH Document 1 Filed 09/29/22 Page 1 of 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-33 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL** |

## ORDER

[redacted], withheld testimony from the grand jury, under instruction from former president Donald J. Trump to invoke executive privilege and attorney-client privilege over communications and meetings relevant to the grand jury's investigation. In response, the government filed the pending [redacted], seeking an order to compel [redacted] to give testimony previously withheld on the former president's instruction.

Upon consideration of the government's Motion [redacted] and the entire record herein, the Court finds that (1) the testimony withheld by [redacted] on instruction from the former president are assumed to be presumptively protected by the presidential communications privilege arising from the former president's generalized interest in confidentiality; (2) testimony withheld by [redacted] on instruction from the former president to invoke attorney-client privilege should not be withheld since this privilege is inapplicable before the grand jury to

communications made or received by either [redacted] in their capacities as attorneys in the White House Counsel's Office and within the Executive Branch; (3) the grand jury has a demonstrated, specific need for testimony from [redacted] about communications and meetings that overcomes the former president's assertion of the presidential communications privilege, as relied on by the witnesses; and (4) the government has sufficiently demonstrated that evidence of these communications is important and relevant to the grand jury's investigation and that the evidence is not available with due diligence elsewhere. Accordingly, it is hereby—

**ORDERED** that the government's Sealed Motion to Compel Testimony Withheld from the Grand Jury, [redacted] is **GRANTED**; it is further

**ORDERED** that [redacted] are to appear before the Grand Jury of the United States District Court for the District of Columbia and give testimony, which they have previously withheld on the basis of the presidential communications privilege or attorney-client privilege, relating, but not limited, to any communications and meetings regarding the [redacted] topics, and any similar such communications or meetings:

[redacted]

[redacted]. [redacted]

[redacted]

[redacted]. [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] it is further

**ORDERED** that the government submit to the Court, by [redacted] at 12 p.m., any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to the witnesses, their counsel, the former president, and his counsel.

**SO ORDERED.**

Date: November 19, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-33 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL**<br>**EX PARTE TO GOVERNMENT ONLY** |

**MEMORANDUM OPINION**

In [redacted], a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued subpoenas for testimony to [redacted], during the relevant period of the presidential administration of Donald J. Trump. In [redacted] both witnesses appeared separately before the grand jury and declined to respond to certain questions by invoking executive privilege and attorney-client privilege, pursuant to directions given to each witness by former president Trump. The government now moves to compel the witnesses' withheld testimony because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

## I. BACKGROUND

The grand jury's need for testimony [redacted] stems directly from these witnesses' knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. [redacted]. Investigation into these events has been

ongoing and described at length in a prior opinion relevant to compelling the grand jury testimony of [redacted]. *See* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-25, ECF No. 18 at 2–12 (Sept. 28, 2022) ("Sept. 2022 Mem. Op."). The January 6 events have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC"). These facts relevant to the instant witnesses are summarized below.

**A. 2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress**

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Nov. 18, 2022)). The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful. *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely

contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 00:54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Nov. 18, 2022) (describing the fake elector scheme).[1] The former president's supporters took steps towards this desired end

1 [redacted]

in Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all states won by President Biden. [redacted] This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. [redacted]

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification. As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were then certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

[redacted]

[redacted]

[redacted]

---

2 [redacted]

3 [redacted]

Case 2:23-mj-00033-*SEALED* Document 13 Filed 10/19/22 Page 6 of 41

[redacted]

[redacted]

Case 1:22-gj-00033-BAH *SEALED* Document 13 Filed 12/19/22 Page 7 of 41

[redacted]

“Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse” and, during his “more than hour-long speech,” repeated his claims of a “rigged” election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president “to ‘do the right thing’ by rejecting various States’ electoral votes and refusing to certify the election in favor of Mr. Biden.” *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Nov. 18, 2022) (“January 6th Rally Speech”)). The former president also encouraged his supporters to go to the Capitol to “demand that Congress do the right thing” by refusing to certify the votes and to “fight like hell” or else “you’re not going to have a country anymore.” *Id.* (citing January 6th Rally Speech at 3:47:20–

---

4 [redacted]

Case 1:22-gj-00033-BAH Document 13 Filed 11/22/22 Page 8 of 41

3:47:42, 4:41:17–4:41:33). At that rally, the former president's private attorney Rudolph Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral College Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Nov. 18, 2022).

[redacted]

[redacted]

As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol. For example, on January 6, 2021, the Federal Bureau of Investigation ("FBI") made an emergency request to a social media platform for non-content user identification information of users who broadcasted live video or uploaded videos from physically within the Capitol building when it was occupied by unauthorized persons, to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)). *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022) (denying motion to suppress fruits of FBI's emergency request, on January 6, 2021, to Facebook for non-content user-generated location information ("UGLI") derived from user-generated content posted from inside the Capitol building during the attack). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B. Instant Grand Jury Investigation**

[redacted]

### C. Procedural History

[redacted] the grand jury issued subpoenas [redacted] [redacted]. The witnesses were initially scheduled to testify before the grand jury [redacted] but by agreement, the testimonies were rescheduled [redacted], [redacted]

[redacted]

Anticipating the former president's privilege assertions over the witnesses' testimonies, given his similar assertions over these witnesses' statements to the House Select Committee, [redacted], [redacted], the government sought, with the consent of the witnesses' counsel, [redacted] an order from this Court "permitting the Government to discuss the grand jury subpoenas for [redacted] with counsel for the incumbent and former Presidents[,]" which included "communicating with the Office of White House Counsel (for the incumbent President)" and counsel for the former president, [redacted] Such discussions would enable the government to "ascertain whether any potential privilege holder – including the incumbent and former Presidents – intends to instruct the witnesses not to testify based on an assertion of executive privilege[,]" [redacted] and thereby remove "the onus of these consultations" from the witnesses, [redacted]. [redacted] The government's motion was granted that day. Order Authorizing Disclosure of Grand Jury Material, ECF No. 5.

Accordingly, the government notified the White House Counsel's Office [redacted], and inquired whether President Biden would assert executive privilege to bar the witnesses' testimonies. [redacted] The White House Counsel's Office responded on [redacted], that President Biden "will not assert executive privilege" with respect to the two witnesses' testimonies. [redacted]

---

5 The government filed an initial motion seeking a disclosure order on July 25, 2022, [redacted] and then submitted an amended motion the next day, [redacted] The motions are generally identical with the exception of additional paragraphs regarding [redacted] As such, only the amended motion is described above.

[redacted] The White House Counsel's letter elaborated that "President Biden recognizes the importance of candid advice in the discharge of a President's constitutional responsibilities and believes that, in appropriate cases, executive privilege should be asserted to protect either current or former White House senior staff from having to testify about conversations concerning the President's exercise of his duties." [redacted] That said, given "the extraordinary events surrounding" the January 6 attack on the Capitol and the "unique circumstances" presented by such an unprecedented event, President Biden determined "that an assertion of executive privilege is not in the public interest with respect [to] the efforts to thwart the orderly transition of power under our Constitution." [redacted]

The government communicated the same request to the former president's counsel by letter [redacted], the government raised the former president's knowledge of the grand jury's ongoing investigation through notification of the [redacted] subpoenas and, more specifically, the government's prior disclosure to him of [redacted] topics about which [redacted] were to be questioned before the grand jury. [redacted]

[redacted] before the witnesses' scheduled grand jury testimony, the former president's counsel sent directly to counsel [redacted] letters instructing that they were "to the fullest extent permitted by law, . . . not to provide testimony about, or

reveal in any forum, privileged communications and correspondence, including information covered by executive privilege, attorney-client privilege, and any other applicable privilege." [redacted] These letters on behalf of the former president express the view that the "real purpose" of the government's "entire" investigation into January 6 is to "attack [former] President Trump and the Republican party" in the months before the November 2022 midterm election, [redacted], adding that "there is an expectation of confidentiality in a President's conversations and correspondence with the people who advise and assist him," which "confidentiality is protected under the United States Constitution and all such communications are presumptively privileged," [redacted] The letters then clarify that the former president specifically invokes the presidential communications privilege. [redacted]

[redacted] and, pursuant to the former president's instruction, each witness declined to answer multiple questions, citing executive privilege and attorney-client privilege. [redacted]

[redacted], the government moved to compel [redacted] to testify to those excluded topics, listing as respondents the [redacted] grand jury witnesses and the former president. [redacted]

---

6 [redacted]

[redacted]

Simultaneous with these filings, the government requested permission for limited disclosure [redacted] to the witnesses and the former president subject to certain protections. [redacted] The government's request for a disclosure and protective order was granted [redacted], pursuant to Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private interests served by the grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 8.[8]

After conferral, the parties agreed to a briefing schedule consistent with the time requirements of Local Criminal Rule 47(b), giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply. Min. Order (Oct. 21, 2022); *see also* Resp. Order of the Court, ECF No. 9 (parties' recommended briefing schedule). Having submitted no request for oral argument on the motion, the parties rested on the arguments presented in their papers.[9] The government's motion is now ripe for review.

---

7 [redacted]

8 [redacted]

9 [redacted]

## II. DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege or the attorney-client privilege operates to bar the compelled testimony of [redacted]. Upon review, neither privilege claim succeeds because the significant need for the important evidence outweighs any interest in keeping information from the grand jury. [10]

---

[redacted]

[10] [redacted] understanding of the former president's instructions for their testimony before the grand jury as carrying forward the [redacted]

**A. Executive Privilege Generally**

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id*. § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d 729, 736 (D.C. Cir. 1997).

The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect executive branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id*. at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications

directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both the parties confirmed, at issue in this motion is the presidential communications privilege. [redacted] That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of

those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection. Rather, there are

Case 1:22-gj-00033 *SEALED* Document 11 Filed 09/29/22 Page 19 of 41

three separate categories of presidential communications with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Nixon*, 418 U.S. at 705; *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)). Certainly, for instance, the president's lunch order is in the last category and is entitled to no

privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B. Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from [redacted], and whether any level of privilege has been waived or inadequately asserted. The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all. [redacted]

The former president responds that the communications in question are presidential within the privilege's utmost protection because they involve "[s]afeguarding the integrity of federal elections through the faithful execution of the law," which, he claims, "is a fundamental duty of the President of the United States." [redacted] He then points to five amendments to the Constitution that each "concern[], at least in part, federal elections," as well as 52 U.S.C. § 10101 *et seq.*, the section of the U.S. Code on voting and elections, as the laws he sought to faithfully execute. [redacted].[12] The former president then declares that "the integrity of a federal election is a matter of national security[,]" [redacted] because of "the potential for interference in

---

11 [redacted]

12 The former president specifically refers to the following constitutional amendments: the Twelfth Amendment on electoral votes for president and vice president; the Twentieth Amendment on the beginning and end dates for presidential and congressional terms; the Twenty-Second Amendment on presidential term limits; the Twenty-Third Amendment on the right of District of Columbia residents to participate in presidential elections; and the Twenty-Sixth Amendment on the right of citizens over age 18 to vote. [redacted]

the administration of federal elections" and the requirement that the "election process is fair, transparent, and conducted in accordance with the law," [redacted]. Consequently, in the former president's view, "[w]hen a President speaks with his top legal advisors about the transparency, legality, and integrity of a presidential election, those conversations must be full, frank, and candid[,]" thus amounting to a privilege from disclosure that is "essentially absolute," [redacted] (citing *In re Sealed Case*, 121 F.3d at 743, n.12).

Each party is partially correct. To begin with the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" deference under the presidential communications privilege, he is incorrect. The communications at issue do not involve confidential military or diplomacy secrets. Nor does the former president claim that the communications concern classified information that would risk damage to national security upon unauthorized disclosure. Despite the former president's best argument that communications concerning the 2020 presidential election are national-security focused and thus any knowledge the witnesses have of these communications is privileged, this argument is unavailing for at least three reasons. First, the events on January 6, 2021—including, among other things, the rally that day, its planning and organization, law enforcement's response, and Congress's conduct in an official proceeding, [redacted]—were public and have no relation to secrets capable of causing damage to national security. Second, the government's topics of inquiry do not concern matters of election security. Rather, they include, [redacted]

[redacted] Third, much like waiver that is well-recognized in the attorney-client-privilege doctrine, *see, e.g.*, *In re Sealed Case*, 121 F.3d at 741 (describing the "all-or-nothing approach" to waiver of attorney-client privilege); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (holding that disclosure of the "substance" of communications amounts to waiver), many of the discussions concerning alleged "election security," as defined by the former president, occurred in the presence of non-Executive Branch officials, [redacted].[14] The former president cannot claim that "core communications" so integral to his commander-in-chief duties are subject to the utmost deferential privilege when he did not treat them as such.[15]

---

13 [redacted]

14 [redacted]

15 [redacted]

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C.[16]

The government next contends that President Biden's decision not to invoke executive privilege over the testimonies of [redacted] requires the former president's assertion of privilege to "yield." [redacted][17] The former president highlights, however, that the Supreme Court recently and expressly held this question open, [redacted] (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "the presidential communications privilege would be a nullity," [redacted] The former president concludes that "[t]here is no doubt that an assertion of executive privilege survives a President's tenure in office." [redacted] (citing *GSA*, 443 U.S. at 448–49).

The government then proffers that the former president's privilege invocation was "too vague and generalized to demonstrate which communications at issue arguably qualify for the

---

[redacted]

[16] The former president also argues that the government's failure to provide a factual basis for its assertion that the communications in question are not presidential communications means that the government "has not met its burden of overcoming the presumption of privilege." [redacted] The Court need not reach this issue given its adopted presumption that the communications at issue are privileged.

[17] [redacted]

presidential-communications privilege." [redacted].[18] The former president retorts that his privilege invocation "was as specific as possible" given that the government "has not identified [to him] the specific questions that [redacted] declined to answer." [redacted].

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witnesses to testify fully before the grand jury.[19]

### C. Presidential Communications Privilege Does Not Bar Compelled Testimony

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether

---

18 [redacted]

19 While still preserving its argument that the communications in question are not presidential communications, [redacted]1, the government urges the Court to set those issues aside by assuming that the communications to which [redacted] would testify are presumptively privileged and thus to focus on whether the grand jury's need for the evidence is important to its investigation and not available elsewhere with due diligence, thereby outweighing the former president's privilege claim. [redacted] The Court agrees that this focus is dispositive.

the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id.*

What resulted is the standard of need test, *id.* at 754, which both parties agree applies here, [redacted] The test directs that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701. The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of

information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[20] In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

---

[20] *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

Case 1:22-gj-00033-BAH SEALED Document 1-6 Filed 09/22 Page 27 of 41

### D. Application of the Standard of Need Test

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the withheld testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene. Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress. *See Thompson*, 20 F.4th at 15–16. Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations. Those that unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement officers along the way, damaged property, and delayed the certification of the 46th president have, and continue to be, prosecuted in the interest of justice and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct executed on January 6, 2021. In prior proceedings, the government disclosed to the former president topics of investigative interest, [redacted].[21] [redacted]

[21] [redacted]

[redacted]. [redacted]

As to whether the testimonies of [redacted] could potentially shed important light on those matters, the answer is clearly affirmative. These [redacted] witnesses participated directly in presidential communications, enabling them to provide first-hand, eyewitness evidence to illuminate what the former president and his associates knew and said, if anything, about the relevant topics, making their testimony directly relevant, important, and essential to the grand jury's investigation. [redacted]

[redacted]. Without a doubt, their first-hand accounts can provide insight into the grand jury's investigation by supplementing the grand jury's factual repository with primary evidence and revealing individuals', including government officials', intent behind potentially criminal actions, a required showing under the relevant statutes. *See, e.g.*, 18 U.S.C. § 1001(a)(2) (*knowingly* or *willfully* making a materially false, fictitious, or fraudulent statement or representation) (emphasis added).

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation, the government correctly states that "aspects of the meetings themselves, and the specific words spoken during them" are "central," and thus make it "critical to present to the grand jury the accounts of the persons who were in the room or on the phone when the conversations took place to learn what was discussed by and about relevant individuals in the privacy of the White House." [redacted]

[redacted] On this issue, the testimony of [redacted] would be highly relevant, as already demonstrated by [redacted], after this Court granted the government's motion to compel his testimony. [redacted]

In addition, the nature of the evidence substantiating—or not—the former president's and his associates' claims of election fraud are also probative of intent. In this regard, [redacted]

[redacted]

As yet another example of how the testimonies of [redacted] would be highly relevant, they can further illuminate and corroborate the extent of the pressure brought on the former vice president to delay or subvert the certification of the Electoral College votes for president on January 6, 2022. [redacted]

[redacted]

[redacted]

[redacted]

In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections. [redacted] The witnesses' highly relevant testimonies will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome, testimony pertaining to that key information more than fulfills the first prong of the standard of need test.[22]

Relevant to the test's second prong, no alternative to this evidence is available. Of the participants in the communications about which [redacted] invoked various privileges, these [redacted] witnesses possess unique and inimitable evidence. [redacted]

---

22 The former president's attempt to distinguish these facts from those in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), falls flat. [redacted] [redacted] knowledge far surpasses merely "[former] President Trump's discussions [redacted] about the integrity of the 2020 presidential election." [redacted]. As described at length, their knowledge concerns efforts to obstruct an official proceeding of Congress and thus, as the Circuit in *In re Sealed Case* similarly held, provides highly important and relevant evidence to the grand jury's ongoing criminal investigation into the events on January 6, 2021.

Case 1:22-gj-00033-BAH SEALED Document 13 Filed 09/29/22 Page 34 of 41

[redacted] one-on-one conversations between the former president and [redacted], making these [redacted] individuals the only witnesses to what the former president was told and said and providing the government with no available alternative to obtain this evidence short of issuing a subpoena to Trump. Moreover, in at least one known instance—[redacted]—actions of the witness himself are vital and irreplaceable evidence in the grand jury's investigation.

Likewise, given the mostly conversational aspect of the communications in question, individuals who participated in the meetings and calls or heard about them through participants, *i.e.*, [redacted], are the only way to shepherd in this evidence. In its exhaustive search for witnesses, the government states that other executive officials with knowledge of this information are likely to assert similar executive privileges.[23] The government thus far has not discovered any written records of these conversations, leaving merely witnesses' recollections of the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487 F.2d at 718.

On these grounds, [redacted] possess vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

**E. Attorney-Client Privilege**

As noted in Part I.C *supra*, following the government's disclosure of the grand jury subpoenas, the former president instructed the witnesses "not to provide testimony about, or

23 [redacted]

reveal in any forum, privileged communications and correspondence, including information covered by . . . attorney-client privilege." [redacted] Both [redacted] then invoked this privilege to withhold information while testifying before the grand jury about various topics, prompting [redacted] Following discussion of the attorney-client privilege generally and the scope of this privilege when invoked for government attorneys, the Court analyzes whether the former president is entitled to assert this privilege here to block [redacted] testimonies in response to the grand jury inquiries and concludes that he is not.

**1. *Attorney-Client Privilege Generally***

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389). Thus, the privilege covers only communications "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[Attorney-client] privilege applies only if the person to whom the communication was made is 'a member of a bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily

---

24 [redacted]

either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding.'" (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

The responsibility for protecting the attorney-client privilege lies with the holder: "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case,* 877 F.2d 976, 980 (D.C. Cir. 1989)); *see also SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (placing onus on "the holder [to] zealously protect the privileged materials, taking all reasonable step to prevent their disclosure"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) ("voluntary disclosure by the holder of such a privilege . . . waives the privilege"). Consequently, "settled law" directs that the party claiming the privilege bears the burden of proving that the communications are protected and must do so through "present[ation of] underlying facts demonstrating the existence of the privilege." *In re Lindsey*, 158 F.3d at 1270 (quoting *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)). A blanket assertion of the privilege will not suffice; "the proponent must conclusively prove each element of the privilege." *Id.* (internal citation omitted).

The D.C. Circuit takes an "all-or-nothing approach" to waiver of the attorney-client privilege, *Protect Democracy Project*, 10 F.4th at 891, such that "voluntary disclosure of privileged material . . . to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter,'" *id.* (quoting *In re Sealed Case*, 121 F.3d at 741). Consistent with this approach, disclosure of the "substance" of privileged communications waives the attorney-client privilege. *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

As relevant here, the Circuit also recognizes a government attorney-client privilege. In that formulation, the attorney representing a government agency or department may provide legal advice that is subject to privilege. *In re Lindsey*, 158 F.3d at 1269. The prerequisites for the privilege to apply in the government attorney context, more generally, require that the communications primarily be for legal advice, and therefore "advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege." *Id.* at 1270.

Like the presidential communications privilege, the government attorney-client privilege is not always absolute. For government attorneys in the executive branch, this privilege is limited by their responsibility to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and the president's sworn duty to "faithfully" execute his office and, "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," *id.* art. II, § 1, cl. 8, which the Executive Branch is bound "by oath or affirmation" to uphold, *In re Lindsey*, 158 F.3d at 1273. Executive branch attorneys must adhere "to the cause of constitutional government" and to protect the public interest through "transparen[cy] and accountab[ility]." *Id.* They owe loyalties that surpass the desires of any individual client agency and are "not to defend clients against criminal charges" or "protect wrongdoers from public exposure." *Id.* at 1272. As the D.C. Circuit eloquently explained, "[w]ith respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar," *id.*, since government attorneys have the duty "to 'take Care that the Laws be faithfully executed," which encompasses the "[i]nvestigation and prosecution of federal crimes [as] one of the most important and essential functions within that constitutional responsibility," *id*. (citing U.S. CONST. art. II, § 3). As such, "a government attorney . . . may not assert an attorney-client privilege before a federal grand jury

if communications with the client contain information pertinent to possible criminal violations." *Id.* at 1274.

### 2. *Attorney-Client Privilege Does Not Bar Testimony at Issue*

The binding precedent of *In re Lindsey* squarely applies to limit the former president's assertion of attorney-client privilege over [redacted] testimonies. [redacted] are barred government attorneys [redacted] Both witnesses unequivocally understood that they were not personal attorneys to Donald J. Trump[redacted] The former president was also informed of how their government-attorney roles were distinct from that of his personal counsel[redacted]

The government seeks to probe the witnesses about their knowledge of [redacted] In their capacities as government attorneys, [redacted] advised the former president concerning the certification and outcome of the election. [redacted] Thus, they have knowledge of

---

25 [redacted]

26 [redacted]

27 [redacted]

28 [redacted]

[redacted]—directly relevant to the government's criminal investigation. *See also supra* Part II.D. As *In re Lindsey* instructs, such a showing vitiates the former president's claim to privilege and permits the witnesses to testify to these communications.

None of the former president's efforts to bolster his invocation of the attorney-client privilege are successful. First, he argues in a footnote that, because "the [g]overnment has not provided [former] President Trump with the questions that they want answered by his attorneys," [redacted], "[former] President Trump cannot provide additional details regarding the specific legal advice sought." Resp't's Opp'n at 8 n.3. Most obviously, the former president mistakenly refers to [redacted] as "his attorneys" when they are attorneys to the Executive Branch, not his personal counsel. *See supra* nn.26–28. Moreover, as the government notes, the former president was informed of the nature of the government's investigation through correspondence from the government disclosing [redacted] topics central to this investigation preceding the grand jury testimonies of [redacted]. [redacted] alerting the former president that these witnesses are being queried [redacted]

---

[redacted]

Case 1:22-gj-00033-BAH SEALED Document 15 Filed 09/29/22 Page 40 of 41

[redacted] Thus, the former president was sufficiently notified of the nature of the government's investigation and could assess any applicable privilege assertions as to [redacted].

The former president then posits that *In re Lindsey* is factually distinguishable because, there, the government's investigation concerned actions of then-President Clinton that occurred before his presidency, relevant to a civil lawsuit, whereas the instant criminal inquiry concerns "communications here involv[ing] a core executive duty – to ensure the integrity of a presidential election." Resp't's Opp'n at 8–9. This argument is meritless. Nowhere in *In re Lindsey* does the D.C. Circuit cabin its holding to civil suits or to non-executive actions taken by a former president before taking office. The majority in *In re Lindsey*, without question, held that government attorneys could not invoke attorney-client privilege to avoid testifying before a grand jury to matters relevant to criminal violations of the law. 158 F.3d at 1278.[30] This unqualified language applies squarely to block the former president's counterargument.

To be sure, this analysis does not leave the former president without any protection from the attorney-client privilege for his confidential communications with counsel over legal matters. As the D.C. Circuit made clear in *In re Lindsey*, 158 F.3d at 1276, the former president's communications with his *personal* attorneys are protected by attorney-client privilege, allowing him full frankness and confidentiality in those conversations. Simply put, neither [redacted] was the former president's personal lawyer and so that protection is not implicated here.

---

29 [redacted]

30 [redacted]

As executive branch attorneys, [redacted] have a responsibility and duty to inform the grand jury of information they possess pertinent to the grand jury's investigation into [redacted]. Accordingly, the former president's claim of attorney-client privilege fails.

## III. CONCLUSION

Based on the foregoing analysis, neither the presidential communications privilege nor the attorney-client privilege bar eliciting testimony before the grand jury from [redacted], that they have withheld. Accordingly, the government's motion to compel testimony from these [redacted] grand jury witnesses is GRANTED.

Date: November 19, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-33 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL** |

**ORDER**

On [redacted], this Court granted the United States' motion to compel the grand jury testimony of [redacted], and ordered the witnesses to appear before the grand jury to give testimony previously withheld on the basis of the presidential communications privilege or attorney-client privilege, *see* Order Granting Gov't's Mot. Compel Testimony Withheld from Grand Jury, ECF No. 12; Memorandum Opinion regarding Gov't's Mot. Compel Testimony Withheld from Grand Jury, ECF No. 13. Former president Donald J. Trump moved for a stay of the grand jury's ongoing investigation, and thus the witnesses' testimony, pending his appeal of the Order to the D.C. Circuit. [redacted]

Upon consideration of the motion and the United States' response and the entire record herein, the Court finds that the former president has not met his burden warranting the extraordinary relief of a stay of the grand jury witnesses' testimonies.

Accordingly, it is hereby

**ORDERED** that the former president's Sealed Motion for Stay Pending Appeal, [redacted], is **DENIED**; and it is further

**ORDERED** that the government submit to the Court, by [redacted] at 5 p.m., any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to the witnesses, their counsel, the former president, and his counsel.

**SO ORDERED.**

Date: December 18, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-33 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**<u>UNDER SEAL</u>**<br><br>**<u>EX PARTE TO GOVERNMENT ONLY</u>** |

**<u>MEMORANDUM OPINION</u>**

Former president Donald J. Trump seeks to stay an ongoing grand jury investigation pending his appeal of this Court's Order and Memorandum Opinion, both issued on November 19, 2022 ("Nov. 2022 Order" and "Nov. 2022 Decision," respectively), ECF Nos. 12 and 13, granting the government's motion to compel the grand jury testimony from [redacted]. [redacted] Upon review, the former president does not meet the high bar for the extraordinary relief that a stay confers. His motion is thus denied.

## I. BACKGROUND

A detailed enumeration of the factual and procedural history preceding this motion is described in the November 2022 Decision, at 2–14, and is thus incorporated by reference here.

Specific to this motion, on [redacted] the Court granted the government's motion to compel the grand jury testimony of [redacted] by sealed Order—disclosed to the parties and the witnesses—and issued with an accompanying Memorandum Opinion, [redacted]. *See* Nov. 2022 Order; Nov. 2022 Decision.

Case 1:22-gj-00033-BAH *SEALED* Document 21 Filed 12/15/22 Page 2 of 10

Pursuant to the Order, the government submitted proposed redactions to the Memorandum Opinion on [redacted] to remove matters subject to Federal Rule of Criminal Procedure 6(e), due to the grand jury's ongoing investigation, [redacted], which proposed redactions were approved by the Court and the redacted Memorandum Opinion ordered to be disclosed to the witnesses and the former president, *see* Min. Order (Nov. 22, 2022). The redacted version of the Memorandum Opinion was then disclosed by the government to the former president on November 28, 2022, in accordance with the Court's direction. *See* Memorandum Opinion (Witness Blackbox), ECF No. 15; Memorandum Opinion (Trump Blackbox), ECF No. 16.

Also, pursuant to the November 2022 Order and in furtherance of the grand jury's investigation, [redacted], and, according to the government, [redacted]

The former president then filed the instant motion for stay pending appeal on December 7, 2022. [redacted]. The Court ordered the government to respond to the former president's request approximately one week later, by December 13, 2022, [redacted] *see* Scheduling Order (Dec. 8, 2022). The former president has chosen to file no reply and, as of the date of issuance of this Memorandum Opinion, the former president has yet to file a notice of appeal with this Court. *Cf.* FED. R. APP. P. 4(b)(1)(A)(i). Given the expiration of the Scheduling Order on briefing in this matter, the motion is now ripe for review.

## II. LEGAL STANDARD

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "'A stay is not a matter of right, even if irreparable injury might otherwise result,'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)), and "[a] stay pending appeal is always an extraordinary remedy," *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966).

Courts considering a stay request pending an appeal must "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254–55), by balancing the following factors as applied to the specific facts of the case: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S. at 434 (internal citations omitted). The first and second factors are the "most critical" to determining whether a stay is warranted, *CREW v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) (citing *Nken*, 556 U.S. at 434), *aff'd*, *Crossroads Grassroots Policy Strategy v. CREW*, 139 S. Ct. 50 (2018) (Mem.), while the third and fourth factors "merge" when the stay applicant so moves against the government. *Nken*, 556 U.S. at 435. The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255. Like a preliminary injunction, absent a showing of a likelihood of success on the merits, "it would take a very strong

showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 366 (D.C. Cir. 1999).

## III. DISCUSSION

As disclosed by the government [redacted], following the Order, [redacted] testified before the grand jury on [redacted], about communications they previously withheld under the former president's executive and attorney-client privilege instructions. [redacted] That fact is fatal to the former president's motion. In the former president's words, "[redacted] will testify about privileged presidential communications regarding their advice to the President in discharging his official duties. This testimony, once elicited, forever voids the protections the privilege affords. The words cannot be returned to the mouths of the witnesses." [redacted] The former president's motion to stay the Order and delay the witnesses' grand jury testimonies is thus moot. *See Off. of Thrift Supervision Dep't of Treasury v. Dobbs*, 931 F.2d 956, 957–58, 960 (D.C. Cir. 1991) (dismissing appeal of subpoena enforcement decision as moot because appellant had already complied with the subpoena in question and so "there is no live controversy before this Court"); *In re Grand Jury Proceedings (John Roe)*, 142 F.3d 1416, 1422 (11th Cir. 1998) (ruling that an appeal of the denial of a motion to quash a grand jury subpoena was moot because the witness had already testified before the grand jury).

Having acknowledged that the witnesses' testimonies would moot his motion, the former president offers no rebuttal or cause to consider exceptions to mootness. [redacted] ("Additionally, should [redacted] testify regarding these privileged communications, the Government will undoubtedly move to dismiss this appeal for mootness."). Mootness alone

Case 1:22-gj-00033-BAH *SEALED* Document 21 Filed 09/29/22 Page 5 of 10

suffices to deny the former president's stay request, but for good measure, the three factors for evaluating a stay request against the government's interests are considered in turn.[1]

The former president is unlikely to succeed on the merits for the reasons stated in the November 2022 Decision. As explained there, the communications to which [redacted] testified were not matters of national security implicating the utmost protection as "core communications." *See* Nov. 2022 Decision at 21–22. The former president counters that he conferred with [redacted] on issues that were, "at the time, national security secrets." [redacted] The former president bestows that label far too loosely. None of the communications the government sought involved national security or classified—top secret, secret, or confidential—information per the designation of such according to Executive Order No. 13,526, the latest, and thus authoritative, order detailing a uniform system for classifying, protecting, and disclosing national security information. *See* 75 Fed. Reg. 707 (Dec. 29, 2009). Rather, the communications illustrate efforts by members of the Trump White House and campaign team, with other allies, to overturn a valid presidential election in favor of their preferred candidate—Donald J. Trump—and obstruct a Joint Session of Congress to further that end. The former president provides no evidence beyond bald allegations that the communications at issue involved election security rising to the level of risks to this nation's security.

---

[1] In opposition, the government argues that the former president's deadline to appeal the Order has lapsed under Federal Rule of Appellate Procedure 4. [redacted] That position is not entirely clear, however. Under the Federal Rules of Appellate Procedure, in civil cases, the deadline to file a notice of appeal after entry of the judgment or order appealed from is 30 days or, if one of the parties in the case is the United States, 60 days. FED. R. APP. P. 4(a)(1)(A)–(B). On the other hand, in criminal cases, the deadline to file a notice of appeal is "14 days after the later of the entry of either the judgment or the order being appealed; or the filing of the government's notice of appeal." *Id.* at 4(b)(1)(A)(i)–(ii). Whether grand jury matters fall under subsection (a) or (b) of Rule 4 is an issue of first impression in this Circuit. *See In re Grand Jury*, 490 F.3d 978 (D.C. Cir. 2007) (holding that the deadline to appeal the denial of a motion to disclose a grand jury transcript to the testifying grand jury witness fell under Rule 4(a), not Rule 4(b)). Nonetheless, the former president fails to prove that any of the three factors to consider for a stay weigh in his favor, and so the Court denies his motion to stay and need not interpret Rule 4 in this context.

As also explained in the November 2022 Decision, the presidential communications privilege in this instance gives way to the specific need of the grand jury's ongoing criminal investigation into the events surrounding January 6, 2021. *See* Nov. 2022 Decision at 24–34. Both in its motion to compel [redacted], the government amply and thoroughly established that [redacted] would each provide information important to the grand jury's investigation and unavailable with due diligence elsewhere. *See In re Sealed Case*, 121 F.3d 729, 754, 759–62 (D.C. Cir. 1997). Left with little else to challenge aside from relitigating points previously rejected in the November 2022 Decision, the former president raises—for the first time in his motion to stay—that "the areas of potential testimony identified in the Court's Order for [redacted] closely track the categories of information sought from [redacted]" [redacted] As a result, so goes the former president's argument, "any assertion that all witnesses have unique and important evidence as to each of these twelve discrete categories would strain credulity" and thus show that "the Government cannot demonstrate that the evidence is unavailable from other sources—including from the witnesses' testimony before the January 6th Select Committee." *Id.* at 9. That argument is meritless.

In his opposition to the government's motion to compel, the former president did not challenge that other witnesses' testimonies rendered the testimonies of [redacted] repetitive and thereby unnecessary, despite the former president knowing that other witnesses were testifying before the grand jury and had testified before the House Select Committee to Investigate the January 6th Attack on the United States Capitol. The former president's failure to challenge the due diligence factor of the standard of need test renders it waived. *Shea v. Kerry*,

796 F.3d 42, 56 (D.C. Cir. 2015) ("[A]n argument never made below is waived on appeal." (internal citations omitted)).

That aside, as explained in the November 2022 Decision, the perspective and first-hand accounts of [redacted] are primary and irreplaceable evidence. Multiple witnesses are necessary to understand and corroborate key events in a comprehensive criminal investigation. The witnesses also participated in one-on-one conversations with individuals, including the former president, making [redacted] the only available witnesses to introduce this evidence to the grand jury—short of issuing a grand jury subpoena to the former president himself. *See* Nov. 2022 Decision at 33–34.

Finally, the former president's general dislike of *In re Lindsey* does not render it non-binding authority. *In re Lindsey* is the law of this Circuit and thus controls the outcome of this case as [redacted] were self-proclaimed government attorneys and not personal counsel to the former president. *See* Nov. 2022 Decision at 38 & nn.26–27. The former president cites two out-of-circuit cases to argue that "the District of Columbia Circuit can follow the approach" of these circuits, [redacted], which both allowed government attorneys to invoke attorney-client privilege to shield from disclosure in criminal investigations conversations between a governor and his office's chief legal counsel, *see In re Grand Jury Investigation*, 399 F.3d 527, 533–36 (2d Cir. 2005), and between the staff and legal counsel of a state government's department of labor and training, *In re Grand Jury Subpoena*, 909 F.3d 26, 30–32 (1st Cir. 2018). That suggested "approach" is contrary to the law-of-the-circuit doctrine. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir.) (en banc) ("Inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that we must act alike in all cases of like nature. . . . [T]he law-of-the-circuit doctrine [states that] the *same issue* presented in a *later*

*case* in the *same court* should lead to the *same result*." (internal citations omitted and formatting in original)).

In sum, the former president offers no reason to deem his success on the merits of a, so far, non-existent appeal likely, or even plausible. This factor thus weighs against the former president's stay request.

The former president's claim of irreparable injury is similarly unconvincing given the mootness of the instant motion. *See supra* at 4–5. The harm the former president seeks to prevent through a stay has already occurred with [redacted] Even so, the former president did not act as if the risk of irreparable injury was real or impending. He waited 18 days from issuance of the Order he seeks to appeal to file his motion for stay, and he still has yet to file a notice of appeal. Both choices undermine the former president's contention now that irreparable injury supports a stay.[2]

Finally, the interests of the government, the witnesses, and the public weigh against a stay. Grand jury investigations are constitutionally protected with a "broad" authority to "inquire into all information that might possibly bear on its investigation." *United States v. R. Enters., Inc*., 498 U.S. 292, 297 (1991); U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). The testimonies of the witnesses are relevant, important, and integral to the grand jury's ongoing criminal investigation. *See* Nov. 2022 Decision at 24–34; *see also In re Sealed Case*, 121 F.3d at

---

[2] To support his irreparable harm argument, the former president cites an order issued by the D.C. Circuit in *Republican National Committee v. Pelosi*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022), which vacated the district court's decision to uphold a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol because the Committee voluntarily withdrew the subpoena under review and stated that it will not renew the subpoena. *Id.* at *1. This case is wholly inapposite, making the former president's reason for reliance on it entirely unclear, since the case neither supports his position nor is factually analogous. Put bluntly, this case is unpersuasive authority.

754–55. The former president's motion for stay is yet another conspicuous attempt to delay that investigation, which clear legal precedent counsels against tolerating. *Cf. R. Enters., Inc.*, 498 U.S. at 298–99 ("We have expressly stated that grand jury proceedings should be free of [procedural] delays" and "detours" that "'would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws.'" (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973))); *Gomez v. U.S. Dist. Ct. for N.D. Cal.*, 503 U.S. 653, 654 (1992) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief," particularly when "last-minute attempts to manipulate the judicial process" via a stay application, ripe "more than a decade ago," amount to "abusive delay" without good cause).

As context, the grand jury served its subpoenas on [redacted]. *See* Nov. 2022 Decision at 10. Their initial grand jury testimonies [redacted] withholding answers to numerous questions on the former president's instruction to invoke the presidential communications privilege and attorney-client privilege. *See id.* at 13. The Court resolved the government's motion to compel the withheld testimonies on November 19, 2022, and so the grand jury's investigation has been stalled by almost three months given the former president's invocation of privilege [redacted] of the witnesses' testimonies.

The Court thus declines to further pause the grand jury's constitutionally protected work, particularly in the absence of any reassurance that the former president's delay tactics will cease.

## IV. CONCLUSION

Based on the foregoing analysis, the former president's motion to stay the November 2022 Order and Decision pending appeal is DENIED.

Date: December 18, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-39 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL** |

# ORDER

[redacted] was subpoenaed to testify before the grand jury but has yet to do so because of the former president's invocation of executive privilege and attorney-client privilege over communications and meetings relevant to the grand jury's investigation. In response, the government filed the pending [redacted] seeking an order to compel [redacted] to give testimony over the former president's privilege instruction.

Upon consideration of the government's Motion [redacted] and the entire record herein, the Court finds that (1) the testimony the government seeks from [redacted] is assumed to be presumptively protected by the presidential communications privilege arising from the former president's generalized interest in confidentiality and the former president's invocation of the presidential communications privilege; (2) attorney-client privilege is inapplicable to [redacted] prospective testimony before the grand jury because the subject matter concerns communications made or received by [redacted] in his capacity as an attorney within the Executive Branch; (3) the grand jury has a demonstrated, specific need for testimony from [redacted] about

communications and meetings that overcomes the former president's assertion of the presidential communications privilege; and (4) the government has sufficiently demonstrated that evidence of these communications is important and relevant to the grand jury's investigation and that the evidence is not available with due diligence elsewhere. Accordingly, it is hereby—

**ORDERED** that the government's Sealed Motion to Compel Grand Jury Testimony, [redacted], is **GRANTED**; it is further

**ORDERED** that [redacted] is to appear before the Grand Jury of the United States District Court for the District of Columbia and give testimony, which has previously been the subject of an assertion by former president Donald J. Trump of the presidential communications privilege or attorney-client privilege, relating, but not limited to, any communications and meetings regarding the topic areas generally described in the government's [redacted] letter, and any similar such communications or meetings; it is further

**ORDERED** that the government submit to the Court, [redacted] at 12 p.m., any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to the witness, his counsel, the former president, and his counsel.

**SO ORDERED.**

Date: December 9, 2022

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS [redacted] | Case No. 22-gj-39 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL**<br><br>**EX PARTE TO GOVERNMENT ONLY** |

## MEMORANDUM OPINION

In [redacted] a grand jury sitting in this District and investigating conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election, issued a subpoena for testimony [redacted] the former president filed a Motion to Compel, requesting an Order requiring [redacted] to abide by the former president's instruction to invoke executive privilege and attorney-client privilege on the latter's behalf. Having postponed [redacted], thereby mooting the former president's motion, the government now moves to compel the witness's testimony because the grand jury's need for the important information overcomes the former president's privilege claims.

For the reasons explained below, the government's motion is granted.

## I. BACKGROUND

The grand jury's need for testimony from [redacted] stems directly from his knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. [redacted]

[redacted] Investigation into these events has been ongoing and described at length in two prior opinions relevant to compelling the grand jury testimony of [redacted] individuals: [redacted] *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-25, ECF No. 18 at 2–12 (Sept. 28, 2022) ("Sept. 2022 Mem. Op."); [redacted] *see* Memorandum Opinion, *In re Grand Jury Subpoenas*, No. 22-gj-33, ECF No. 13 at 1–14 (Nov. 19, 2022) ("Nov. 2022 Mem. Op."). The events leading up to and including January 6, 2021, have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC"). These facts relevant to the instant witness are summarized below.

### A. 2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Dec. 8,

2022)). The former president and his allies filed numerous legal challenges to election results across the country, none of which proved successful. *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022) (describing the fake elector scheme).[1] The former president's supporters took steps towards this desired end in

1 [redacted]

Case 1:25-mc-00090-JEB Document 1-4 15 Filed 09/29/25 Page 4 of 40

Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all states won by President Biden. *See id.* This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. *See id.*

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification. As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were to be certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

[redacted]

---

[redacted]

[redacted].

[redacted]

[2] [redacted]

[3] [redacted]

[4] [redacted]

[5] [redacted]

[redacted]

Case 1:22-mc-00039-JEB-JSB Document 15 Filed 02/19/22 Page 7 of 40

[redacted]

[redacted]

---

6 [redacted]

7 [redacted]

Case 1:25-mc-00039-JEB-JSB Document 11-14 Filed 09/15/25 Page 8 of 40

[redacted][8]

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Dec. 8, 2022) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20–3:47:42, 4:41:17–4:41:33). At that rally, the former president's attorney Rudolph Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral Count Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of

[8] [redacted]

Case 1:25-mc-00030-JEB-JSB Document 1-14 15 Filed 09/29/25 Page 9 of 40

the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Dec. 8, 2022).

[redacted]

As the events unfolded at the U.S. Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol and to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of

official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry, disorderly conduct, and other offenses on Capitol grounds)). *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 U.S. Dist. LEXIS 150326, at *9, *12 (D.D.C. Aug. 22, 2022). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B. Instant Grand Jury Investigation**

[redacted]

[redacted]

### C. The Grand Jury Subpoena

[redacted]

The government then notified the White House Counsel's Office of the subpoena on [redacted], and inquired whether President Biden would assert executive privilege to [redacted] That letter also listed [redacted] topics to be addressed [redacted]. [redacted] The White House Counsel's Office responded [redacted], that President Biden "will not assert executive privilege" with respect to the witness's testimony [redacted]. President Biden articulated that his waiver of executive privilege applied to the topics listed [redacted]

The government communicated the same request to the former president's counsel by letter [redacted], and similarly included the [redacted] anticipated topics [redacted]

testimony. [redacted]

During that period, [redacted] attempted to ascertain whether the former president would assert any privilege over aspects of his scheduled testimony. [redacted] emailed [redacted] counsel to the former president, notice of the subpoena and scheduled grand jury testimony, and sought "specific written direction" on invocation of any privileges if the former president intended to assert them. [redacted] responded later that day that, "well in advance" [redacted] scheduled testimony, he would provide "a letter that specifies [former] President Trump's position on applicable privilege(s) with respect to [redacted] appearance and testimony." [redacted]

While awaiting instruction from the former president, [redacted]

Then, on [redacted], [redacted] followed up with [redacted] via email, having yet to receive the promised letter, and repeated that, "[i]f President Trump is asserting any privileges with respect to [redacted] testimony, [redacted] must commence an emergency action to get a court ruling, before [redacted] appearance, on the assertion of any privileges by [former] President Trump." [redacted] Minutes later, [redacted] stated his intention "to provide a clear directive from [former] President Donald J. Trump as to those areas of questioning that would implicate executive privilege, and whether he asserts executive

Case 1:22-gj-00039-JEB-JEB Document 11-14 15 Filed 09/29/22 Page 13 of 40

privilege," and offered to call [redacted] days later to discuss his testimony. [redacted] The following day, [redacted] replied that "all communications should be in writing," and that he did not wish to risk being held in contempt for refusing to answer questions at the former president's instruction without a court order barring his testimony as to privileged topics. [redacted]

On [redacted] again emailed [redacted] having not received a response to his last message, stating that he "will not rely on [redacted] say-so that privileges apply here and be put in the middle of a privilege fight between DOJ and [former] President Trump" at the risk of a contempt holding. [redacted] He added that, "[a]bsent a court order otherwise, I will testify on Friday," [redacted] responded by email that he would confer with the government on the "the procedure that would be followed when a question is asked of [redacted] before the grand jury, the answer to which is covered by [former] President Trump's assertion of executive privilege." [redacted] same-day response reiterated that, in his opinion, "the proper course of action" is a court order to preclude aspects of his testimony, but he added that, "if I get the prosecutor's written assurances, I will abide by [former] President Trump's assertion." [redacted]

Later that day, specifically, [redacted] the former president's counsel finally sent [redacted] a letter citing the presidential communications privilege and instructing that he was "to the fullest extent permitted by law, . . . not to provide testimony about, or reveal in any forum, privileged communications and correspondence, including those that are privileged because of [his] role as an attorney." [redacted] The letter on behalf of the former president expressed the view that a president's "expectation of confidentiality in [his] conversations and correspondence with those who advise and assist him"

is “protected under the United States Constitution” and so makes “[a]ll such presidential communications . . . presumptively privileged.” [redacted]

Finally, on September 1, 2022, [redacted] the former president filed a Sealed Motion to Compel Witness [redacted] to Invoke Privilege Before the Grand Jury, as Instructed by the Privilege Holder (“Resp’t’s Mot. Compel”), [redacted] Therein, the former president requested an order directing [redacted] “to properly invoke executive and attorney-client privilege to all appropriate questions when complying with the federal grand jury subpoena for testimony,” [redacted] based on the former president’s understanding that [redacted] “intend[ed] to provide privileged testimony to the grand jury against the explicit directives of the privilege holder,” *i.e.*, the former president, [redacted] In response, the government postponed [redacted]’s grand jury testimony pending resolution of a motion to compel the testimony of [redacted] over the former president’s invocation of executive and attorney-client privilege, which, the parties agreed, concerned the same issues [redacted]. [redacted] (“This Motion seeks to prevent improper disclosure of privileged information before it occurs. As there is already a motion pending on this issue, [redacted] testimony can be delayed until the Court has made its ruling.”); [redacted].[9] Accordingly, the former president’s motion was denied as moot.

---

[9] [redacted]

Min. Order (Sept. 2, 2022).

### D. Procedural History of Instant Motion

[redacted], the government moved to compel [redacted] to testify before the grand jury, listing as respondents the witness and the former president. [redacted][10]

Simultaneous with these filings, the government requested permission for limited disclosure of the sealed motion to the witness and the former president subject to certain protections. [redacted] The government's request for disclosure and a protective order was granted [redacted], pursuant to Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private

---

[redacted]

10 [redacted]

interests served by the grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 9.[11]

After conferral, the parties agreed to a briefing schedule consistent with the time requirements of Local Criminal Rule 47, giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply. Min. Order (Nov. 16, 2022); *see also* Resp. Order of the Court, ECF No. 10 (parties' recommended briefing schedule). Having submitted no request for oral argument on the motion, the parties rested on the arguments presented in their papers.[12] The government's motion is now ripe for review.

## II. DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege or the attorney-client privilege operates to bar the compelled testimony of [redacted].

---

11 [redacted]

12 [redacted]

Upon review, neither privilege claim succeeds because the significant need for the important evidence outweighs any interest in keeping information from the grand jury.

**A. Executive Privilege Generally**

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id*. § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the Executive Branch has two distinct species, each derived from the same recognized need to protect Executive Branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id*. at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S.

683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both parties confirmed, at issue in this motion is the presidential communications privilege. [redacted] That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential

policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, in order to effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. Throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection. Rather, three separate categories of presidential communications exist with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711–12; *see also GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)); *cf. Nixon*, 418 U.S.

at 705. Certainly, for instance, the president's lunch order is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

### B. Presidential Communications Privilege Covers the Compelled Testimony at Issue

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel [redacted], and whether any level of privilege has been waived or inadequately asserted. The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all. [redacted].[13]

The former president responds that the communications in question are presidential within the privilege's utmost protection because they involve "[s]afeguarding the integrity of federal elections through the faithful execution of the law," which, he claims, "is a fundamental duty of the President of the United States." [redacted]. The former president then declares that "the integrity of a federal election is a matter of national security," such that "[w]hen a President speaks with his legal advisors about the transparency, legality, and integrity of a presidential election, those conversations must be full, frank, and candid[,]" thus amounting to a privilege from disclosure that is "essentially absolute." [redacted]

---

[13] [redacted]

Each party is partially correct. To begin with the former president's position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly "absolute" deference under the presidential communications privilege, he is incorrect. The communications at issue do not involve confidential military or diplomacy secrets. Nor does the former president claim that the communications concern classified information that would risk damage to national security upon unauthorized disclosure. Despite the former president's best argument that communications concerning the 2020 presidential election are national-security focused and thus any knowledge [redacted] has of these communications is privileged, this argument is unavailing for at least two reasons. [redacted]—were public and have no relation to secrets capable of causing damage to national security. Second, the government's topics of inquiry do not concern matters of election security. [redacted]

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C and II.D.

---

14 [redacted]

The government next contends that President Biden's decision not to invoke executive privilege over [redacted] testimony requires the former president's assertion of privilege to "yield." [redacted][15] The former president highlights, however, that the Supreme Court recently and expressly held this question open, [redacted] (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "it would thwart the primary purpose of the privilege, which is to ensure that the President can receive candid and honest advice in the performance of his constitutional duties," *id.* at 7 (citing *Nixon*, 418 U.S. at 705, and *GSA*, 443 U.S. at 448–49).

The government then proffers that the former president's privilege invocation was "too generalized and vague to qualify as an assertion" of the presidential-communications privilege. [redacted] The former president retorts that his privilege invocation "was sufficiently clear and unambiguous such that [redacted] could abide by its terms." [redacted]

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the issue addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the witness to testify fully before the grand jury.[17]

---

15 [redacted]

16 [redacted]

17 [redacted]

**C. Presidential Communications Privilege Does Not Bar Compelled Testimony**

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this

Case 1:22-gj-00039-JEB-JSBAL Document 11-1 15 Filed 09/29/22 Page 25 of 40

case.")). The Circuit then posited "what type of showing of need" was necessary "to overcome the privilege" in the grand jury context. *Id*. at 753.

What resulted is the standard of need test, *id.* at 753–54, which both parties agree applies here, [redacted] The test directs that "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701. The second prong requires a showing of "unavailability," that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive's unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that "a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a 'workable government' and gravely impair the role of the courts under Art. III" in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege. *Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential

communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[18] In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

**D. Application of the Standard of Need Test**

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for [redacted] testimony involves examining both the matters under investigation by the grand jury and whether the testimony could potentially shed important light on those matters. The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene. Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress. *See Thompson*, 20 F.4th at 15–16. Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations. Those that unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement along the way,

[18] *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

damaged property, and delayed the certification of the 46th president have, and continue to be, prosecuted in the interest of justice and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct executed on January 6, 2021. The government disclosed to the former president topics of investigative interest, [redacted]

The topics foreshadow the grand jury's ultimate decision whether individuals are criminally culpable for participating in the inception, organization, planning, and execution of the ultimate obstruction of the presidential vote certification in violation of 18 U.S.C. §§ 1512(c)(2) and (k), 1001(a)(2), and 371. *See Thompson*, 20 F.4th at 36 (linking the former president to the events on January 6, 2021); *see also Eastman v. Thompson*, 594 F. Supp. 3d at 1198–99.

As to whether [redacted] testimony could shed important light on those matters, the answer is clearly affirmative. [redacted]

Case 1:22-gj-00030-BAH Document 14 15 Filed 12/05/22 Page 28 of 40

[redacted] His testimony is, thus, directly relevant, important, and essential to the grand jury's investigation. [redacted]

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation, the government correctly states [redacted]

[redacted] For example, what and when the former president and his White House and campaign staff knew about election irregularities and whether any such irregularities produced an incorrect presidential election result for President Biden, as well as what the former president and his allies understood the law to be regarding the congressional certification proceeding or the vice president's role in such is highly probative context for assessing intent. On this issue, [redacted] *See* Nov. 2022 Mem. Op. at 30–33.

[redacted]

Case 1:22-mc-00030-JEB Document 15 Filed 12/29/22 Page 30 of 40

[redacted]

[redacted]

[redacted]

[redacted]

Despite all this, Eastman stood before the large crowd of Trump supporters at the rally at the Ellipse on January 6, 2021, [redacted]

[redacted]

As another example of the value [redacted]

[redacted]

[redacted]

In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections. [redacted] will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g.*, *In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome, testimony pertaining to that key information more than fulfills the first prong of the standard of need test.

Relevant to the test's second prong, no alternative to this evidence is available. On this point, the former president counters that [redacted] testimony is "duplicative of information already presented to the grand jury," [redacted]. [redacted] That argument is unpersuasive. [redacted]

[redacted] he possesses unique and inimitable evidence. [redacted] providing the government with no available alternative to obtain this evidence short of issuing a subpoena to Trump.

Likewise, given the mostly conversational aspect of the communications in question, individuals who participated in the meetings and calls or heard about them through participants, [redacted] are the only way to shepherd in this evidence. In its exhaustive search for witnesses, the government states that other executive officials with knowledge of this information are likely to assert similar executive privileges.[19] The government thus far has not discovered any written records of these conversations, leaving merely witnesses' recollections of the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487 F.2d at 718. Additionally, although multiple witnesses may provide testimony about the same meeting or conversation, as the government explains, [redacted], what these witnesses recall may differ in detail. Even overlapping testimony as to certain aspects of these conversations corroborates the overall communication the grand jury seeks to consider, ensuring that the investigation is of the utmost accuracy and completeness.

19 [redacted]

Case 1:22-gj-00039-JEB Document 14 15 Filed 12/29/22 Page 35 of 40

On these grounds, [redacted] possesses vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

**E. Attorney-Client Privilege**

As noted in Part I.C *supra*, following the government's disclosure of the grand jury subpoena, the former president instructed the witness "not to provide testimony about, or reveal in any forum, privileged communications and correspondence, including those that are privileged because of [redacted] role as an attorney." [redacted] Following discussion of the attorney-client privilege generally and the scope of this privilege when invoked for government attorneys, the Court analyzes whether the former president is entitled to assert this privilege here to block [redacted] testimony in response to the grand jury inquiry and concludes that he is not.

**1. *Attorney-Client Privilege Generally***

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389). Thus, the privilege covers only communications "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("[Attorney-client] privilege applies only if the person to whom the communication

was made is 'a member of a bar of a court' who 'in connection with th[e] communication is acting as a lawyer' and the communication was made 'for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding.'" (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984))).

The responsibility for protecting the attorney-client privilege lies with the holder: "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case,* 877 F.2d 976, 980 (D.C. Cir. 1989)); *see also SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997) (placing onus on "the holder [to] zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure"); *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) ("voluntary disclosure by the holder of such a privilege . . . waives the privilege"). Consequently, "settled law" directs that the party claiming the privilege bears the burden of proving that the communications are protected and must do so through "present[ation of] underlying facts demonstrating the existence of the privilege." *In re Lindsey*, 158 F.3d at 1270 (quoting *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980)). A blanket assertion of the privilege will not suffice; "the proponent must conclusively prove each element of the privilege." *Id.* (internal citation omitted).

The D.C. Circuit takes an "all-or-nothing approach" to waiver of the attorney-client privilege, *Protect Democracy Project*, 10 F.4th at 891, such that "voluntary disclosure of privileged material . . . to unnecessary third parties . . . 'waives the privilege, not only as to the specific communication disclosed but often as to all other communications relating to the same subject matter,'" *id.* (quoting *In re Sealed Case*, 121 F.3d at 741). Consistent with this approach,

disclosure of the "substance" of privileged communications waives the attorney-client privilege. *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).

As relevant here, the Circuit also recognizes a government attorney-client privilege. In that formulation, the attorney representing a government agency or department may provide legal advice that is subject to privilege. *In re Lindsey*, 158 F.3d at 1269. The prerequisites for the privilege to apply in the government attorney context, more generally, require that the communications primarily be for legal advice, and therefore "advice on political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege." *Id.* at 1270.

Like the presidential communications privilege, the government attorney-client privilege is not always absolute. For government attorneys in the Executive Branch, this privilege is limited by their responsibility to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, and the president's sworn duty to "faithfully" execute his office and, "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States," *id.* art. II, § 1, cl. 8, which the Executive Branch is bound "by oath or affirmation" to uphold, *In re Lindsey*, 158 F.3d at 1273. Executive Branch attorneys must adhere "to the cause of constitutional government" and to protect the public interest through "transparen[cy] and accountab[ility]." *Id.* They owe loyalties that surpass the desires of any individual client agency and are "not to defend clients against criminal charges" or "protect wrongdoers from public exposure." *Id.* at 1272. As the D.C. Circuit eloquently explained, "[w]ith respect to investigations of federal criminal offenses, and especially offenses committed by those in government, government attorneys stand in a far different position from members of the private bar," *id.*, since government attorneys have the duty "to 'take Care that the Laws be faithfully executed,'' which encompasses the "[i]nvestigation and prosecution of federal crimes [as] one of the most important and essential

functions within that constitutional responsibility," *id.* (citing U.S. CONST. art. II, § 3). As such, "a government attorney . . . may not assert an attorney-client privilege before a federal grand jury if communications with the client contain information pertinent to possible criminal violations." *Id.* at 1274.

**2. *Attorney-Client Privilege Does Not Bar Testimony at Issue***

The binding precedent of *In re Lindsey* squarely applies to limit the former president's assertion of attorney-client privilege over [redacted] testimony. [redacted] is a barred government attorney having served as [redacted] both within the presidential administration of Donald J. Trump. [redacted]

The government seeks to probe the witness about his knowledge of criminal misconduct contributing and leading up to the attack on the U.S. Capitol on January 6, 2021, and the halt of congressional proceedings to certify the 2020 presidential election. In his capacity as a government attorney, [redacted] advised the former president concerning the certification and outcome of the election from October 2020 to his exit from the White House.[20] Thus, he has

[20] [redacted]

[redacted] As *In re Lindsey* instructs, such a showing vitiates the former president's claim of privilege and permits the witness to testify to these communications.

The former president does little to challenge this conclusion, and that minimal effort is meritless. After citing *In re Lindsey* in his opposition, he claims that "the Government has failed to meet its burden of demonstrating that the attorney-client privilege does not apply." Resp't's Opp'n at 3. Yet the law is clear that the burden of successfully claiming the privilege falls on the privilege holder, not the party seeking to overcome a claim of privilege. *See In re Lindsey*, 158 F.3d at 1270 ("It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected."). He then spends the rest of the only paragraph dedicated to claiming attorney-client privilege to arguing that legal advice given to the president, especially that involving "[s]afeguarding the integrity of federal elections," "must be preserved." Resp't's Opp'n at 3. The well-established value of attorney-client privilege is not in dispute, and, contrary to the former president's view, [redacted] was not his personal attorney, so that legal doctrine is inapplicable. Rather, *In re Lindsey* operates to permit [redacted] grand jury testimony as an Executive Branch attorney, and the former president provides no reason to distinguish that precedent.

To be sure, this analysis does not leave the former president without any protection from the attorney-client privilege for his confidential communications with counsel over legal matters. As the D.C. Circuit made clear in *In re Lindsey*, 158 F.3d at 1276, the former president's communications with his *personal* attorneys are protected by attorney-client privilege, allowing

---

[redacted]

him full frankness and confidentiality in those conversations. Simply put, [redacted] was not the former president's personal lawyer and so that protection is not implicated here.

As an Executive Branch attorney, [redacted] has a responsibility and duty to inform the grand jury of information he possesses pertinent to the grand jury's investigation into [redacted] Accordingly, the former president's claim of attorney-client privilege fails.

## III. CONCLUSION

Based on the foregoing analysis, neither the presidential communications privilege nor the attorney-client privilege bar eliciting testimony before the grand jury from [redacted]. Accordingly, the government's motion to compel testimony from this grand jury witness is GRANTED.

Date: December 9, 2022



BERYL A. HOWELL
Chief Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA [redacted] | Case No. 22-gj-39 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL** |

**ORDER**

On December 9, 2022, this Court granted the United States' motion to compel the grand jury testimony of [redacted], and ordered the witness to appear before the grand jury to give testimony previously withheld on the basis of the presidential communications privilege or attorney-client privilege, *see* Order Granting Gov't's Mot. Compel Grand Jury Testimony, ECF No. 14; Memorandum Opinion regarding Gov't's Mot. Compel Grand Jury Testimony, ECF No. 15. The former president moves for a stay of the grand jury's ongoing investigation, and thus the witness's testimony, pending his appeal of the Order to the D.C. Circuit. [redacted]

Upon consideration of the motion, the United States' response, and the entire record herein, the Court finds that the former president has not met his burden warranting the extraordinary relief of a stay of the grand jury witness's testimony. Accordingly, it is hereby—

**ORDERED** that the former president's Sealed Motion for Stay Pending Appeal, [redacted] is **DENIED**; and it is further

**ORDERED** that the government submit to the Court, by [redacted], at 4 p.m., any proposed redactions to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to the witness, his counsel, the former president, and his counsel.

**SO ORDERED.**

Date: January 10, 2023

BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA [redacted] | Case No. 22-gj-39 (BAH)<br>Chief Judge Beryl A. Howell<br>**UNDER SEAL**<br>**EX PARTE TO GOVERNMENT ONLY** |

## MEMORANDUM OPINION

On [redacted], a grand jury sitting in this District issued a subpoena to [redacted], regarding possible violations of federal law. *See* December 9, 2022 Decision ("Dec. 2022 Decision") at 11, ECF No. 15. Although [redacted] promptly contacted the former president, [redacted] to inquire whether the latter planned to assert any privilege over [redacted] testimony, and was assured by counsel to the former president that instructions on privilege assertions would follow "well in advance" of [redacted] *id.* at 12, quite the opposite occurred. After multiple, unsuccessful follow-up requests from [redacted] for any privilege instruction, the former president waited until *two days before* [redacted] scheduled grand jury testimony to direct him to invoke executive and attorney-client privileges on the former president's behalf. *Id.* at 12–14. The government subsequently filed a motion to compel [redacted] testimony, [redacted] which the Court granted on December 9, 2022, over [redacted] the originally scheduled date for [redacted] appearance before the grand jury, *see* December 9, 2022 Order ("Dec. 2022 Order"), ECF No. 14; Dec. 2022 Decision.

The instant motion to stay that December Order follows the former president's routine tactic of waiting until the last minute to bring claims before this Court. The former president waited fourteen days after the December 2022 Order issued to seek a stay without mention of a request for expeditious consideration. [redacted]. Contrary to his characterization that the government "race[d] to moot the appeal" by putting [redacted] before the grand jury in compliance with the December 2022 Order, [redacted]—almost [redacted] after the Order issued, [redacted] The former president's strategy of waiting until the last minute to respond—a pattern forcing delay in the progress of a grand jury investigation—simply did not work here. With the record thusly set straight, the former president's inability to meet the high bar for a stay means that his motion must be denied.

## I. BACKGROUND

A detailed enumeration of the factual and procedural history preceding this motion is described in the December 2022 Decision, at 1–16, and is thus incorporated by reference here.

Specific to this motion, on December 9, 2022, the Court granted the government's motion to compel the grand jury testimony of [redacted] by sealed Order, which was disclosed to the parties and the witness, with the Order's accompanying Memorandum Opinion disclosed *ex parte* to the government. *See* Dec. 2022 Order; Dec. 2022 Decision. Pursuant to the Order, the government submitted proposed redactions to the Memorandum Opinion on December 12, 2022, to remove matters subject to Federal Rule of Criminal Procedure 6(e), due to the grand jury's ongoing investigation, [redacted], which

proposed redactions were approved by the Court that day and the redacted Memorandum Opinion ordered to be disclosed to the witness and the former president, *see* Min. Order (Dec. 12, 2022). The redacted version of the Memorandum Opinion was then disclosed by the government to the former president later that day, in accordance with the Court's direction. *See* Redacted Document Memorandum Opinion - Trump Blackbox, ECF No. 17; Redacted Document Memorandum Opinion - Witness Blackbox, ECF No. 18.

Also, pursuant to the December 2022 Order and in furtherance of the grand jury's investigation, [redacted], and, according to the government, [redacted].

The former president subsequently filed the instant motion for stay pending appeal on December 23, 2022. [redacted] The Court ordered the government to respond to the former president's request by January 3, 2023, [redacted], and the former president to reply by January 9, 2023, [redacted]. Both the government and the former president timely filed their positions, and the motion for a stay is now ripe for review.

## II. LEGAL STANDARD

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "'A stay is not a matter of right, even if irreparable injury might otherwise result,'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)), and "[a] stay

pending appeal is always an extraordinary remedy," *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966).

Courts considering a stay request pending an appeal must "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254–55), by balancing the following factors as applied to the specific facts of the case: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S. at 434 (internal citation omitted). The first and second factors are the "most critical" to determining whether a stay is warranted, *CREW v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam) (citing *Nken*, 556 U.S. at 434), *aff'd*, *Crossroads Grassroots Policy Strategy v. CREW*, 139 S. Ct. 50 (2018) (Mem.), while the third and fourth factors "merge" when the stay applicant so moves against the government, *Nken*, 556 U.S. at 435. An appeal that "shows little prospect of success" on the first factor is "arguably [a] fatal flaw for a stay application." *CREW*, 904 F.3d at 1019. The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255.

## III. DISCUSSION

As disclosed by the government [redacted] That fact is fatal to the former president's motion for a stay. In the former president's words, "[redacted] will testify about privileged

presidential communications" and "[t]his testimony, once elicited, forever voids the protections the privilege affords. The words cannot be returned to the mouth[] of the witness[]." [redacted] The former president's motion to stay the Order and delay the witness's grand jury testimony is thus moot. *See ff. of Thrift Supervision Dep't of Treasury v. Dobbs*, 931 F.2d 956, 957–58, 960 (D.C. Cir. 1991) (dismissing appeal of subpoena enforcement decision as moot because appellant had already complied with the subpoena in question by giving deposition testimony and so "there is no live controversy before this Court"); *In re Grand Jury Proceedings John Roe* , 142 F.3d 1416, 1422 (11th Cir. 1998) (ruling that an appeal of the denial of a motion to quash a grand jury subpoena was moot because the witness had already testified before the grand jury).[1] Consequently, mootness alone suffices to deny the former president's stay request, but for good measure, the three factors for evaluating a stay request against the government's interests are considered in turn.

Moreover, the former president is unlikely to succeed on the merits for the reasons stated in the December 2022 Decision. As explained there, the communications to which [redacted] will testify were not matters of national security implicating the utmost protection as "core communications." *See* Dec. 2022 Decision at 21–23. Notwithstanding this holding, the former president reiterates, in support of a stay, his characterization that he conferred with [redacted] on issues that were, "at the time, national security secrets." [redacted] The former president bestows that label far too loosely. None of the communications the government sought to elicit testimony before the grand jury involved national security, let alone classified—top

---

[1] To evade mootness, the former president counters that the government could still use [redacted] testimony "as the basis for a still unissued indictment or in any criminal proceeding" and because "a partial remedy" is available, such as "a curative instruction to the grand jury regarding the privilege of testimony" or a "future-use injunction." [redacted] The D.C. Circuit flatly rejected that position in *ffice of Thrift Supervision Dept. of Treasury v. Dobbs*: "[A] party cannot retrieve testimony once it is given; the party can only ask that the testimony be sealed against future use. In that event, such a challenge would be ripe only at the time when that future use is a real, not a speculative, possibility." 931 F.2d at 959.

secret, secret, or confidential—information per the designation of such according to Executive Order No. 13,526, which is the latest, and thus authoritative, order detailing a uniform system for classifying, protecting, and disclosing national security information. *See* 75 Fed. Reg. 707 (Dec. 29, 2009). Rather, the communications describe efforts by members of the Trump White House and campaign team, with other allies, to overturn a valid presidential election in favor of their preferred candidate—Donald J. Trump—and obstruct a Joint Session of Congress to further that end.[2] The former president provides no evidence beyond bald allegations that the communications at issue involved election security rising to the level of risks to this nation's security.[3]

As also explained in the December 2022 Decision, the presidential communications privilege in this instance gives way to the specific need of the grand jury's ongoing criminal investigation into the events surrounding January 6, 2021. *See* Dec. 2022 Decision at 24–35. Both in its motion to compel [redacted], the government amply and thoroughly established that [redacted] would provide information

---

[2] The former president's attempt to use the fact that redactions of certain "public events" in the December 2022 Decision must mean that the discussion concerned highly confidential communications is divorced from the context and therefore misguided. [redacted] The "public" events discussed in the December 2022 Decision are described in such a way that details of the grand jury's ongoing investigation are revealed, requiring redaction and withholding from the former president and the witness. Nevertheless, the former president knows that the "public events" concern the efforts to overturn the results of the 2020 presidential election, including during the process of certification of the Electoral College votes at the January 6, 2021, Joint Session of Congress. *See, e.g.*, Donald J. Trump, Rally on Electoral College Vote Certification at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Jan. 10, 2023).

[3] In a belated effort to bolster his description [redacted] testimony as concerning "national security secrets," in reply, the former president cites Executive Order 13,848, in which then-President Trump declared a national emergency pursuant to the International Emergency Economic Powers Act to address the threat of foreign interference in or undermining of public confidence in United States elections, [redacted] (citing 83 Fed. Reg. 46,843 (Sept. 12, 2018)), and President Biden's continuation of that order, [redacted] (citing 87 Fed. Reg. 55,681 (Sept. 7, 2022)). Of note, nowhere in his opposition to the underlying motion to compel did the former president invoke either order. Nonetheless, the orders do not change the analysis because the government sought testimony from [redacted] regarding attempts by members of the White House to overturn a valid presidential election, despite the lack of any outcome-determinative election fraud evidence originating either domestically or from abroad. Yet again, the former president's attempt to shoehorn those actions into the broad category of election security or national security secrets is unpersuasive.

important to the grand jury's investigation and unavailable with due diligence elsewhere. *See In re Sealed Case*, 121 F.3d 729, 754, 759–62 (D.C. Cir. 1997).

As he did in opposing the government's motion to compel, the former president again challenges the availability of alternative evidence, contending that "the areas of potential testimony identified in the Court's Order closely track the categories of information sought from numerous other witnesses." [redacted] As a result, the former president reasons, "the idea that [redacted] possesses 'unique and inimitable' information with respect to each of these [redacted] discrete categories strains credulity," [redacted] (quoting Dec. 2022 Decision at 34), and thus shows that "the Government cannot demonstrate that the evidence is unavailable from other sources—including from [redacted] before the January 6th Select Committee," [redacted] For the reasons already explained in the December 2022 Decision, that argument is meritless.[4] [redacted] perspective and first-hand account is primary and irreplaceable evidence. Multiple witnesses are necessary to understand and corroborate key events in a comprehensive criminal investigation. [redacted] the only available witness to introduce this evidence to the grand jury—short of issuing a grand jury subpoena to the other individuals, including the former president himself. *See* Dec. 2022 Decision at 33–35.

[4] Additionally, in opposing the government's motion to compel, the former president did not assert that other [redacted] before the House Select Committee to Investigate the January 6th Attack on the United States Capitol rendered [redacted] testimony repetitive and thereby unnecessary, despite the former president's knowledge months ago of the House Select Committee's work. As such, that aspect of his argument is waived. *Shea v. Kerry*, 796 F.3d 42, 56 (D.C. Cir. 2015) ("[A]n argument never made below is waived on appeal." (internal citation omitted)). Moreover, as the government points out, the "argument that the Government must rely on the Select Committee's transcripts [redacted] . . . implies that the witnesses were permitted to testify there on matters the former President now seeks to shield from the grand jury on the basis of executive privilege," when such permission, once granted, would make "any assertion of executive privilege before the grand jury . . . a nullity." [redacted] The former president's presentation of this argument in opposing a motion to compel based on privilege assertions is indeed puzzling when the obvious counterpoint is that all privileges have been waived because of witnesses' prior disclosures to the House Select Committee. In any event, this argument need not be addressed given that it is waived.

Finally, merely because the former president dislikes and disputes the holding in *In re Lindsey* does not render this decision non-binding authority. *In re Lindsey* is the law of this Circuit and thus controls the outcome of the former president's assertion of attorney-client privilege as to [redacted] testimony before the grand jury. [redacted] was a government attorney and not personal counsel to the former president. *See* Dec. 2022 Decision at 38. The former president cites two out-of-circuit cases to argue that "the District of Columbia Circuit can follow the approach" of these circuits, Resp't's Mot. at 9, which both allowed government attorneys to invoke attorney-client privilege to shield from disclosure in criminal investigations conversations between a governor and his office's chief legal counsel, *see In re Grand Jury Investigation*, 399 F.3d 527, 533–36 (2d Cir. 2005), and between the staff and legal counsel of a state government's department of labor and training, *In re Grand Jury Subpoena*, 909 F.3d 26, 30–32 (1st Cir. 2018). That suggested "approach" is contrary to the law-of-the-circuit doctrine. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir.) (en banc) ("Inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that we must act alike in all cases of like nature. . . . [T]he law-of-the-circuit doctrine [states that] the *same issue* presented in a *later case* in the *same court* should lead to the *same result*." (internal citations omitted and formatting in original)).

In sum, the former president offers no reason to deem his success on the merits likely, or even plausible. This factor thus weighs against the former president's stay request.

The former president's claim of irreparable injury is similarly unconvincing given the mootness of the instant motion. [redacted] The harm the former president seeks to prevent through a stay has already occurred with [redacted] Even so, the former president did not act as if the risk of irreparable injury was real or impending. He waited 14 days from issuance of the

Order he seeks to appeal to file his motion for stay and, as of issuance of this opinion, did not seek emergency relief or expedition before this Court or the Circuit. *See, e.g.*, D.C. Cir. R. 2 ("In the interest of expediting decisions or for other good cause, the court may suspend the requirements of these Circuit Rules."); D.C. Cir. R. 27(f) ("Any party may request expedited action on a motion on the ground that, to avoid irreparable harm, relief is needed in less time than would ordinarily be required for this court to receive and consider a response. . . . The motion must be filed at least 7 days before the date by which court action is necessary or counsel must explain why it was not so filed."). Both choices undermine the former president's contention that irreparable injury supports a stay.[5]

Finally, the interests of the government, the witness, and the public weigh against a stay. Grand jury investigations are constitutionally protected with a "broad" authority to "inquire into all information that might possibly bear on its investigation." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991); U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). [redacted] testimony is relevant, important, and integral to the grand jury's ongoing criminal investigation. *See* Dec. 2022 Decision at 24–35; *see also In re Sealed Case*, 121 F.3d at 754–55. The former president's motion for a stay is yet another conspicuous attempt to delay that investigation, which clear legal precedent counsels against tolerating. *Cf. R. Enters., Inc.*, 498 U.S. at 298–99 ("We have expressly stated that grand jury proceedings should be free of [procedural] delays" and "detours" that "'would assuredly impede its investigation and frustrate

---

[5] To support his irreparable harm argument, *see* Resp't's Mot. at 12, the former president cites an order issued by the D.C. Circuit in *Republican National Committee v. Pelosi*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022), vacating the district court's decision to uphold a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol because the Committee voluntarily withdrew the subpoena under review and stated that it will not renew the subpoena. *Id.* at *1. This case is wholly inapposite, making the former president's reason for reliance on it entirely unclear, since the case neither supports his position nor is factually analogous. Put bluntly, this case is unpersuasive authority.

the public's interest in the fair and expeditious administration of the criminal laws.'" (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973))); *Gomez v. U.S. Dist. Ct. for N.D. Cal.*, 503 U.S. 653, 654 (1992) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief," particularly when "last-minute attempts to manipulate the judicial process" via a stay application, ripe "more than a decade ago," amount to "abusive delay" without good cause).

As context, the grand jury served its subpoena on [redacted]. *See* Dec. 2022 Decision at 11. His grand jury testimony was scheduled [redacted], but was postponed by the government upon learning of the witness's intention to withhold testimony under the former president's privilege invocation. [redacted] The Court resolved the government's motion to compel [redacted] testimony [redacted], and so the grand jury's investigation has been stalled by almost 4 months given the former president's invocation of privilege on the eve of the witness's testimony.

The Court thus declines to pause further the grand jury's constitutionally protected work, particularly in the absence of any reassurance that the former president's delay tactics will cease.

## IV. CONCLUSION

Based on the foregoing analysis, the former president's motion to stay the December 2022 Order and Decision pending appeal is DENIED. An order consistent with this Memorandum Opinion will be issued contemporaneously.

Date: January 10, 2023



BERYL A. HOWELL
Chief Judge

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA<br>GJ 42-17 and GJ 42-69 | Case No. 23-gj-10 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL** |

## ORDER

Per. 18 and [redacted] (the "Witnesses"), attorneys who have represented former President Donald J. Trump, received grand jury subpoenas for documents and testimony and declined to comply in full because of the former president's invocation of attorney-client privilege and the work-product doctrine, as well as, in Per. 18 s case, the attorney's own independent claim to the protection of his opinion work product. The government filed the instant Motion to Compel, ECF No. 1, together with an *ex parte* supplement in support of the Motion, ECF No. 2, seeking an order to compel the Witnesses to give testimony and produce documents previously objected to by Per. 18 and the former president.

Upon consideration of the government's Motion and its *ex parte* supplement and the exhibits thereto; the oppositions submitted by the former president and Per. 18 the government's reply brief; the extensive supplemental briefing filed at the Court's direction by the former president, Per. 18 and the government; the March 9, 2023 hearing involving arguments from counsel for the former president, Per. 18 and the government; Per. 18 's *in camera, ex parte* submission of the documents he withheld from the government; and the entire record herein, the Court finds that (1) the government has made a prima facie showing that the former president committed criminal violations; (2) the crime-fraud exception applies to pierce any attorney-client privilege and fact work-product doctrine protection that would otherwise

protect (a) all six topics, as enumerated below, upon which the government seeks testimony from the Witnesses, with the exception, for [redacted] of the final topic, (b) documents withheld by Per. 18 reflecting his efforts to comply with the grand jury subpoena issued to the Office of Donald J. Trump on May 11, 2022, and (c) documents withheld by Per. 18 that may have informed his knowledge of the June 24, 2022 grand jury subpoena issued to the Trump Organization in advance of his conversation with the former president in the afternoon of June 24, 2022; and (3) Per. 18 may withhold certain responsive documents in their entirety and others in part from the government on the basis of his independent claim to opinion work product protection, which the government does not presently argue is vitiated by the crime-fraud exception, as set forth in the attached Appendices. Accordingly, it is hereby—

**ORDERED** that the government's Sealed Motion to Compel Testimony, ECF No. 1, is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that Per. 18 is to appear before the Grand Jury of the U.S. District Court for the District of Columbia and give testimony, which has previously been the subject of an assertion by the former president of the attorney-client privilege and work-product doctrine protection, as well as an assertion by Per. 18 of opinion work product protection as to his own testimony, relating, but not limited to, any communications and meetings regarding the following six topics, and any similar such communications or meetings:

(1) [redacted]

(2) [redacted];

(3) The identities of individuals involved in selecting Per. 12 [redacted]s, the reasons for Per. 12's selection, and communications (with Per. 12 and others) related to P. 12 selection;

(4) [redacted]

(5) [redacted]; and

(6) What Per. 18 discussed with former President Donald J. Trump in a phone call on June 24, 2022; and it is further

**ORDERED** that [redacted] is to appear before the Grand Jury of the U.S. District Court for the District of Columbia and give testimony, which has previously been the subject of an assertion by the former president of the attorney-client privilege and work-product doctrine protection, relating, but not limited to, the first five of the above-enumerated topics; and it is further

**ORDERED** that, by noon on March 20, 2023, Per. 18 shall produce to the government: (1) the documents listed in Appendix A, (2) the documents listed in Appendix B-1 with Per. 18's proposed redactions executed, and (3) the documents listed in Appendix B-2 as redacted by the Court, which are appended as Attachments 1 and 2 to a separate Order filed *ex parte* with disclosure only to Per. 18 and the government; and it is further

**ORDERED** that the government's motion is DENIED as to the single withheld document by [redacted] unless such document is a duplicate of any documents withheld by Per. 18 upon which this Court has ruled and ordered production, in part or in full; and it is further

**ORDERED** that, by 10 a.m. on March 20, 2023, the government shall redact the accompanying Memorandum Opinion as necessary to protect matters occurring before the grand jury and the ongoing investigation, and disclose the resulting redacted Opinion, through counsel, to the Witnesses and former president, and file the redacted Opinion on the docket by the same time.

**SO ORDERED.**

Date: March 17, 2023

BERYL A. HOWELL
Chief Judge

**APPENDIX A:**
**NON-PRIVILEGED DOCUMENTS**
**THAT MUST BE PRODUCED**

P. 18

| | |
|---|---|
| **1** | [redacted]PRIV-002 |
| **2** | [redacted]PRIV-003 |
| **3** | [redacted]PRIV-004 |
| **4** | [redacted]PRIV-005 |
| **5** | [redacted]PRIV-006 |
| **6** | [redacted]PRIV-007 |
| **7** | [redacted]PRIV-009 |
| **8** | [redacted]PRIV-010 |
| **9** | [redacted]PRIV-011 |
| **10** | [redacted]PRIV-012 |
| **11** | [redacted]PRIV-013 |
| **12** | [redacted]PRIV-014 |
| **13** | [redacted]PRIV-015 |
| **14** | [redacted]PRIV-016 |
| **15** | [redacted]PRIV-017 |
| **16** | [redacted]PRIV-021 |
| **17** | [redacted]PRIV-022 |
| **18** | [redacted]PRIV-023 |
| **19** | [redacted]PRIV-024 |
| **20** | [redacted]PRIV-025 |
| **21** | [redacted]PRIV-026 |
| **22** | [redacted]PRIV-028 |
| **23** | [redacted]PRIV-029 |
| **24** | [redacted]PRIV-030 |
| **25** | [redacted]PRIV-037 |
| **26** | [redacted]PRIV-038 |
| **27** | [redacted]PRIV-041 |
| **28** | [redacted]PRIV-042 |
| **29** | [redacted]PRIV-043 |
| **30** | [redacted]PRIV-044 |
| **31** | [redacted]PRIV-047 |
| **32** | [redacted]PRIV-050 |
| **33** | [redacted]PRIV-053 |
| **34** | [redacted]PRIV-055 |
| **35** | [redacted]PRIV-057 |
| **36** | [redacted]PRIV-058 |
| **37** | [redacted]PRIV-059 |
| **38** | [redacted]PRIV-060 |

P. 18

| | |
|---|---|
| **39** | [redacted]-PRIV-064 |
| **40** | [redacted]-PRIV-067 |
| **41** | [redacted]-PRIV-068 |
| **42** | [redacted]-PRIV-069 |
| **43** | [redacted]-PRIV-070 |
| **44** | [redacted]-PRIV-081 |
| **45** | [redacted]-PRIV-084 |
| **46** | [redacted]-PRIV-085 |
| **47** | [redacted]-PRIV-086 |
| **48** | [redacted]-PRIV-087 |
| **49** | [redacted]-PRIV-088 |
| **50** | [redacted]-PRIV-089 |
| **51** | [redacted]-PRIV-091 |
| **52** | [redacted]-PRIV-092 |
| **53** | [redacted]-PRIV-093 |
| **54** | [redacted]-PRIV-094 |
| **55** | [redacted]-PRIV-099 |
| **56** | [redacted]-PRIV-102 |
| **57** | [redacted]-PRIV-103 |
| **58** | [redacted]-PRIV-104 |

**APPENDIX B-1:**
**DOCUMENTS THAT MUST BE PRODUCED**
**WITH OPINION WORK PRODUCT REDACTIONS**
**AS PROPOSED BY [redacted] Per. 18**

The following documents must be produced with the redactions proposed by [redacted] Per. 18

P. 18

| | |
|---|---|
| **1** | [redacted]-PRIV-027 |
| **2** | [redacted]-PRIV-031 |
| **3** | [redacted]-PRIV-036 |
| **4** | [redacted]-PRIV-039 |
| **5** | [redacted]-PRIV-063 |
| **6** | [redacted]-PRIV-095 |
| **7** | [redacted]-PRIV-096 |
| **8** | [redacted]-PRIV-097 |
| **9** | [redacted]-PRIV-098 |
| **10** | [redacted]-PRIV-101 |

**

**APPENDIX B-2:**
**DOCUMENTS THAT MUST BE PRODUCED**
**WITH OPINION WORK PRODUCT REDACTIONS**
**AS MADE BY THE COURT**

The following documents must be produced as redacted by the Court in the versions attached to the separate *ex parte* Order.

P. 18

| | |
|---|---|
| **1** | [redacted]-PRIV-082 |
| **2** | [redacted]-PRIV-083 |

**APPENDIX C:**
**DOCUMENTS THAT MAY BE**
**ENTIRELY WITHHELD**

| | | Per. 18 | |
|---|---|---|---|
| **1** | | [redacted] | PRIV-001 |
| **2** | | [redacted] | PRIV-008 |
| **3** | | [redacted] | PRIV-018 |
| **4** | | [redacted] | PRIV-019 |
| **5** | | [redacted] | PRIV-020 |
| **6** | | [redacted] | PRIV-032 |
| **7** | | [redacted] | PRIV-033 |
| **8** | | [redacted] | PRIV-034 |
| **9** | | [redacted] | PRIV-035 |
| **10** | | [redacted] | PRIV-040 |
| **11** | | [redacted] | PRIV-045 |
| **12** | | [redacted] | PRIV-046 |
| **13** | | [redacted] | PRIV-048 |
| **14** | | [redacted] | PRIV-049 |
| **15** | | [redacted] | PRIV-051 |
| **16** | | [redacted] | PRIV-052 |
| **17** | | [redacted] | PRIV-054 |
| **18** | | [redacted] | PRIV-056 |
| **19** | | [redacted] | PRIV-061 |
| **20** | | [redacted] | PRIV-062 |
| **21** | | [redacted] | PRIV-065 |
| **22** | | [redacted] | PRIV-066 |
| **23** | | [redacted] | PRIV-071 |
| **24** | | [redacted] | PRIV-072 |
| **25** | | [redacted] | PRIV-073 |
| **26** | | [redacted] | PRIV-074 |
| **27** | | [redacted] | PRIV-075 |
| **28** | | [redacted] | PRIV-076 |
| **29** | | [redacted] | PRIV-077 |
| **30** | | [redacted] | PRIV-078 |
| **31** | | [redacted] | PRIV-079 |
| **32** | | [redacted] | PRIV-080 |
| **33** | | [redacted] | PRIV-090 |
| **34** | | [redacted] | PRIV-100 |

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENA<br>GJ 42-17 and GJ 42-69 | Case No. 23-gj-10 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL**<br><br>**EX PARTE TO GOVERNMENT ONLY** |

## MEMORANDUM OPINION

In November 2022 and January 2023, a grand jury sitting in this District issued subpoenas for testimony and documents to Per. 18 and [redacted], respectively, both of whom have served as attorneys for former president Donald J. Trump and his post-presidential office, as part of an investigation into whether the former president orchestrated a scheme unlawfully to retain and hide from the government documents bearing classification markings. In January 2023, Per. 18 appeared before the grand jury and declined to respond to certain questions by invoking attorney-client privilege and the work product doctrine, pursuant to directions by former president Trump and Per. 18 own independent claim of opinion work-product protection. He also produced a privilege log listing documents responsive to the subpoena that he withheld on these bases. [redacted] has not appeared before the grand jury. Instead, through counsel, she informed the government that she intended to adhere to the former president's instructions to withhold one document and decline to answer certain questions on the basis of attorney-client privilege and the work-product doctrine. The government now moves to compel both witnesses' withheld testimony and documents because the attorneys' client, the former president, used their services to further a criminal scheme.

For the reasons explained below, the government's motion is granted in part and denied in part.

## I. BACKGROUND

Summarized below is factual and procedural background relevant to consideration of the instant motion, with factual information distilled from a sworn affidavit supporting a search warrant issued in the Southern District of Florida, sworn grand jury testimony, and video, documentary, email and text evidence obtained by the government over the course of this investigation.

### A. The Former President's Document Retention System

According to several witnesses interviewed by the Federal Bureau of Investigation ("FBI"), during the former president's administration, his record-keeping system utilized "Bankers boxes," a type of white and blue cardboard box with a separate lid, to store records and review them at his convenience. *See* Gov't's *Ex Parte* Mem. in Supp. of Mot. Compel ("Gov't's *Ex Parte* Mem."), Ex. 1, Aff. of FBI Special Agent in Supp. Appl. Under Rule 41 for Search & Seizure Warrant at Mar-a-Lago (S.D. Fla. Aug. 5, 2022) ("MAL Warrant Aff.") ¶¶ 26–31, 32 (photograph of "FPOTUS [Former President of the United States] aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House"), ECF No. 2. The witnesses referenced are described as a representative of the former president, "WITNESS [redacted] *id.* ¶ 26; a former employee of the former president, "WITNESS [redacted] *id.* ¶ 27; two current employees of the former president, "WITNESS [redacted] and "WITNESS 5," *id.* ¶¶ 28, 31; and a current employee of Mar-a-Lago, "WITNESS [redacted] *id.* ¶ 30.[1] The former president's boxes commingled unclassified documents—including schedules, daily task lists, newspapers, memoranda, briefing books, economic reports, draft press statements, and draft letters—with classified documents—

[1] The witnesses described in the MAL Warrant Affidavit as WITNESSES [redacted] and [redacted] remain unidentified to this Court, but WITNESS [redacted] is [redacted] Per. 34 [redacted], and WITNESS 5 is Waltine Nauta, the former president's "body man" and personal aide, who was interviewed by the FBI on May 26, 2022, and later testified before the grand jury on June 21, 2022. *See* Gov't's *Ex Parte* Mem. at 9 & n.7; *id.*, Ex. 24, Transcript of Waltine Nauta Grand Jury Testimony (June 21, 2022) ("Nauta GJ Tr.") at 3, ECF No. 2. Other witness numbers mentioned in this opinion do not appear in the MAL Warrant Affidavit.

including daily briefing books that contained classified information, decision memo packages with classified material attached, talking points for State Department calls that were classified, and other documents bearing classification markings. *Id.* ¶¶ 28–29.

According to WITNESS [redacted] WITNESS [redacted] and WITNESS 5, at the end of the Trump Administration in January 2021, approximately 85 to 95 Bankers boxes were moved from the White House to Mar-a-Lago, the former president's residence in Palm Beach, Florida. *Id.* ¶¶ 30–33. WITNESS 5, who accompanies the former president in case he "needs something," Gov't's *Ex Parte* Mem., Ex. 7, Transcript of Witness 5 FBI Interview (May 26, 2022) ("Witness 5 FBI Interview") at 7, 11, ECF No. 2, described that period as "literally chaos" as he recalled "packing all the personal items" in the White House with another colleague while "everyone else was just shoving everything in a box," *id.* at 40.

Several months later, in May 2021, WITNESS [redacted] was aware that the former president directed his staff to locate a permanent storage location for the boxes, and in late August or early September 2021, boxes were kept in an unlocked storage room on the ground floor of Mar-a-Lago. MAL Warrant Aff. ¶ 34. WITNESS [redacted] described that room being in a hallway with other offices and storage spaces, behind an unmarked door, and accessible by several staircases. *Id.* ¶ 35. Also kept in that storage room were boxes containing challenge coins, garment bags, and memorabilia from Mar-a-Lago, including photograph frames, other décor items, and "gifts from the White House deemed too valuable to store off-site." *Id.* ¶¶ 36–37. WITNESS [redacted] observed that a lock was eventually installed on the storage room door. *Id.* ¶ 34.

### B. January 2022 Production of Documents and National Archives and Records Administration's Referral to U.S. Department of Justice

The Presidential Records Act requires, "[u]pon the conclusion of a President's term of office, . . . [that] the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President. 44 U.S.C. §

2203(g)(1). Pursuant to that authority, the National Archives and Records Administration ("NARA") communicated with the former president's staff throughout 2021 to coordinate the transfer of presidential records previously or still missing from NARA following the end of the Trump Administration. *See* Letter from David S. Ferriero, Archivist of the United States, to the Hon. Carolyn B. Maloney at 1 (Feb. 18, 2022), https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-letter.02.18.2022.pdf; *see also* Letter from Debra Steidel Wall, Acting Archivist of the United States, to Evan Corcoran ("Wall Letter") at 1 (May 10, 2022), https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf; MAL Warrant Aff. ¶ 25. Specifically, NARA made its initial request for missing records around May 6, 2021, and continued making requests until late December 2021, when NARA was informed that twelve boxes with missing materials were available for retrieval from Mar-a-Lago. *Id.* ¶ 39.

According to WITNESS [redacted] the former president "wanted to review the boxes before providing them to NARA," so WITNESS [redacted] WITNESS 5, and another employee of the former president collected, over time, a total of around fifteen boxes from the storage room and delivered them to the entryway of former president's personal residential suite at Mar-a-Lago, an anteroom known as Pine Hall. *Id.* From November 2021 to mid-January 2022, these three individuals brought two to four boxes at a time from the storage room and placed them just outside the former president's suite; WITNESS [redacted] believed that the former president would then review those boxes' contents. *Id.* ¶¶ 39, 40; Gov't's *Ex Parte* Mem., Ex. 2, Texts between WITNESS [redacted] and WITNESS 5 sent in Nov. 2021 ("WITNESS [redacted] and WITNESS 5 Texts"), ECF No. 2.[2] After receiving fifteen to seventeen boxes from the storage room, the former president

---

2 On November 25, 2021, for example, WITNESS [redacted] texted WITNESS 5 that she had "delivered some [boxes], but I think he may need more. Could you ask if he'd like more in pine hall?" to which Witness 5 replied

instructed WITNESS [redacted] WITNESS 5, and the other employee to stop, stating, "that's it." MAL Warrant Aff. ¶ 42.[3]

NARA scheduled to retrieve the boxes from the former president's possession on January 17, 2022. *Id.* ¶ 39. That day, WITNESS [redacted] observed fifteen boxes in Pine Hall, which WITNESS [redacted] and WITNESS 5 transferred to WITNESS 5's car and then delivered to the NARA contract driver. *Id.* ¶¶ 39, 41. Following that delivery, the former president informed his staff that the fifteen boxes were the only ones going to NARA and "there are no more," according to WITNESS [redacted] *Id.* ¶ 43. Around that time, the former president also directed WITNESS [redacted] to inform one of the former president's lawyers that there were no more boxes at Mar-a-Lago. *Id.* ¶ 44.

All the while, the former president was aware that more boxes were in the storage room that he had not reviewed. In November 2021, the former president was shown a photo of boxes stacked to the ceiling in the storage room, numbering far more than fifteen boxes. Gov't's *Ex Parte* Mem., Ex. 2, WITNESS [redacted] and WITNESS 5 Texts; *see also* MAL Warrant Aff. ¶ 46 (reproducing the photo). In fact, approximately 70 to 80 boxes remained in the storage room following the delivery of the fifteen boxes to NARA. *Id.* ¶ 45.

Upon receipt of the fifteen boxes, NARA reviewed their contents and uncovered "items marked as classified national security information, up to the level of Top Secret and including Sensitive Compartmented Information and Special Access Program materials," Wall Letter at 1, which were "unproperly [*sic*] identified," and interspersed with non-classified items, including

---

the same day that "[h]e has one he's working on in pine hall[.] Knocked out 2 boxes yesterday." Gov't's *Ex Parte* Mem., Ex. 2, WITNESS [redacted] and WITNESS 5 Texts.

3 In an interview with the FBI on May 26, 2022, WITNESS 5 engaged in patent dissembling. He denied ever having seen the boxes before delivering them to NARA on January 17, 2022, *see* WITNESS 5 FBI Interview at 25, 35; claimed not to know where the former president kept the boxes, *id.* at 17, 27, 36, 41; and denied knowing how the boxes got to Pine Hall. *Id.* at 3 (continuation of interview) (Q: "But you have no idea how those boxes got there or where they were before and you [*sic*]." WITNESS 5: "No.").



Subject to Protective Order 

"newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records," MAL Warrant Aff. ¶ 24. NARA notified the Department of Justice ("DOJ") about the discovery of classified documents, and DOJ requested that NARA provide access to the fifteen boxes for further investigation. Wall Letter at 1.

NARA alerted the former president, through counsel, of its intent to provide such access, but the former president objected, seeking additional time to review the boxes for any information protected by executive privilege. *Id.* at 2–4. After careful consideration and consultation with various agencies, NARA denied the former president's request, stating that the question of whether a former president "could successfully assert a claim of executive privilege to prevent an Executive Branch agency from having access to Presidential records for the performance of valid executive functions . . . in this case is not a close one." *Id.* at 3. NARA then informed the former president that it would provide the boxes to the FBI beginning on May 12, 2022. *Id.* at 4. According to the government, the former president "did not seek legal relief" following that decision. Gov't's *Ex Parte* Mem. at 6.

### C. Issuance of, and Response to, May 11, 2022 Grand Jury Subpoena

After receipt of NARA's referral, the government's subsequent investigation raised "concerns that additional documents with classification markings were in the possession of the former President or his post-presidential office." Gov't's Mot. Compel ("Gov't's Mot.") at 4, ECF No. 1. Consequently, a grand jury in this District issued a subpoena on May 11, 2022 to the custodian of records for the Office of Donald J. Trump ("the Office"). Gov't's Mot., Ex. 2, Subpoena to Testify Before a Grand Jury (May 11, 2022) ("May 2022 Subpoena"), ECF No. 1. The Office is statutorily authorized under the Former President's Act, which states that every former president may establish an office at a location of his choosing, with staff paid for by the

government, and extra funds made available "to pay fees of an independent contractor who is not a member of the staff of the office of a former President for the review of Presidential records of a former President in connection with the transfer of such records to the National Archives and Records Administration or a Presidential Library without regard to the limitation on staff compensation set forth herein." 3 U.S.C. § 102 note (b) (selection, compensation, and status of office staff to former presidents). A custodian of the Office would serve that statutory role.

Ensuring compliance with the May 2022 Subpoena has been slow-going, prompting the government to seek and execute a search warrant at Mar-a-Lago, additional government motions regarding inadequate compliance, repeat visits to this Court, and new searches conducted and updated certifications filed, with the compliance effort dragging into mid-December 2022, when additional classified documents were recovered from a closet in the Office's designated space at Mar-a-Lago. Key events in this compliance saga are summarized below.

**1. *May 11, 2022 Grand Jury Subpoena***

The subpoena required the following documents be produced by May 24, 2022:

> Any and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings, including but not limited to the following: Top Secret, Secret, Confidential, Top Secret/SI-G/NOFORN/ORCON, Top Secret/SI-G/NOFORN, Top Secret/HCS-O/NOFORN/ORCON, Top Secret/HCS-O/NOFORN, Top Secret/HCS-P/NOFORN/ORCON, Top Secret/HCS-P/NOFORN, Top Secret/TK/NOFORN/ORCON, Top Secret/TK/NOFORN, Secret/NOFORN, Confidential/NOFORN, TS, TS/SAP, TS/SI-G/NF/OC, TS/SI-G/NF, TS/HCS-O/NF/OC, TS/HCS-O/NF, TS/HCS-P/NF/OC, TS/HCS-P/NF, TS/HCS-P/SI-G, TS/HCS-P/SI/TK, TS/TK/NF/OC, TS/TK/NF, S/NF, S/FRD, S/NATO, S/SI, C, and C/NF.

May 2022 Subpoena at 1. In short, the subpoena demands production of documents with classification markings, regardless of any claim by the Office or the former president that the latter declassified documents before leaving office. The subpoena contains no geographic

limitation and therefore makes responsive all documents possessed by the Office or the former president that bear classification markings, including those potentially stored at Mar-a-Lago or elsewhere in their possession.

On May 11, 2022, the subpoena was served on counsel to the former president and the Office, Per. 18, who confirmed authority to receive it. Gov't's Mot., Ex. 3, Letter from Jay Bratt, DOJ, to Per. 18, counsel to the former president and the Office (May 11, 2022) ("May 2022 Bratt Letter"), ECF No. 1; *see also* Gov't's *Ex Parte* Mem., Ex. 6, Transcript of Per. 18 Grand Jury Testimony (Jan. 12, 2023) ("Per. 18 GJ Tr.") at 13, ECF No. 2 (Per. 18 confirming his representation). In lieu of personally appearing to produce responsive documents on May 24, 2022, the government offered that compliance with the subpoena could be accomplished "by providing any responsive documents to the FBI at the place of their location," leaving the FBI with the responsibility to ensure that "the agents retrieving the documents" had the proper clearances and training on the appropriate handling of classified documents. May 2022 Bratt Letter. Should this alternative method of compliance with the grand jury subpoena be used, the government directed that "[t]he custodian . . . provide a sworn certification that the documents represent all responsive records [and] [i]f there are no responsive documents, the custodian would provide a sworn certification to that effect." *Id.* The alternative method of subpoena compliance offered by the government—namely, FBI agents picking up any responsive classified documents and a custodian's certification—was the method the Office later adopted on June 3, 2022. *See infra* Part I.C.5.

Through subsequent correspondence, the Office requested additional time to respond to the subpoena, stating that classified documents "that were once in the White House" were "unknowingly included among the boxes brought to Mar-a-Lago by the movers" and then transferred to NARA, and stressing that "President Trump readily and voluntarily agreed" to

transfer boxes to NARA in communications that were "friendly, open, and straightforward" and part of "a voluntary and open process." MAL Warrant Aff., Ex. 1, Letter from Per. 18 [redacted], counsel to the former president and the Office, to Jay Bratt, DOJ (May 25, 2022), at 1.[4] The government granted the extension request, giving respondent fourteen additional days to comply with the subpoena, until June 7, 2022. Gov't's Mot., Ex. 4, Letter from Jay Bratt to Per. 18 [redacted] (June 2, 2022) at 1–2, ECF No. 1.

**2. *Movement of Boxes Out of the Storage Room Before* Per. 18 *Search***

Per. 18 and two other attorneys for the former president, [redacted] and Per. 5 [redacted], jointly worked on this matter. Per. 18 GJ Tr. at 27–28. [redacted] Per. 18 initially spoke with the former president about the subpoena the day he received it, on May 11, 2022. *Id.* at 30, 32. He then scheduled to meet with the former president and [redacted] on May 23, 2022, to discuss the subpoena further. *Id.* at 34, 37–38.

[redacted]

[4] Per. 18 letter went on "to note a few bedrock principles," regarding, *inter alia*, "[a]ny attempt to impose criminal liability on a President or former President" for handling of classified documents and to request that this defensively-framed letter be presented "to any judicial officer who is asked to rule on any motion pertaining to this investigation, or any application made in connection with any investigative request concerning this investigation," and as "exculpatory evidence to a grand jury." MAL Warrant, Ex. 1, Letter from Per. 18, counsel to the former president and the Office, to Jay Bratt, DOJ (May 25, 2022), at 3. The government has acceded to this request made on behalf of former president Trump and his Office, and the May 25, 2022 letter has been presented both to the magistrate judge issuing the MAL Warrant, as well as to this Court.

[redacted]

Between the May 23, 2022 counsel meeting with the former president and the June 2, 2022 search conducted by Per. 18, employees of the former president moved approximately 64 boxes from the storage room to the former president's personal suite and returned only 25 to 30 boxes to the storage room. MAL Warrant Aff. ¶ 66. On May 24, 2022, the day after the counsel meeting with the former president, an assistant emailed the former president's staff and the U.S. Secret Service informing them of a change in the former president's travel schedule: He would delay his scheduled departure from Mar-a-Lago to Bedminster, New Jersey from May 28, 2022, to June 5, 2022. *See* WITNESS 5 FBI Interview at 54 (testifying to the change in the former president's departure date); Gov't's *Ex Parte* Mem., Ex. 8, Email from WITNESS [redacted] (May 24, 2022, at 7:18 p.m.), ECF No. 2.

Security camera footage reveals that box movement began on May 22, 2022, the day before Per. 18 and [redacted]'s meeting with the former president; cameras capturing a partial view of the hallway outside of the Mar-a-Lago storage room show WITNESS 5 moving a box from the storage room. *See* Gov't's *Ex Parte* Mem. at 8; Transcript of Sealed Hearing (March 9, 2023) ("March 9, 2023 Hr'g Tr.") at 44:4–6 (government counsel noting, *ex parte*, that "you can't actually see [people] enter" the storage room "because of where the cameras are located"). Then, on May 24, 2022, the day after the meeting, WITNESS 5 moved three boxes from the storage room to the former president's suite. MAL Warrant Aff. ¶ 66. At some point that same day, WITNESS 5 also brought some boxes to the 45 Office within Mar-a-Lago, which WITNESS [redacted] who works for the former president's Office, assumed were intended "to move to

Bedminster." Gov't's *Ex Parte* Mem., Ex. 9, Transcript of WITNESS [redacted] FBI Interview (Jan. 13, 2023) ("WITNESS [redacted] Interview Tr.") at 172–74, ECF No. 2.[5]

WITNESS 5 was interviewed by the FBI on May 26, 2022 regarding "the location of boxes at Mar-a-Lago," Gov't's *Ex Parte* Mem. at 9, and four days later and within an hour of speaking with the former president by phone, WITNESS 5 moved approximately 50 boxes from the storage room to the former president's suite, MAL Warrant Aff. ¶ 66; *see also* Gov't's *Ex Parte* Mem. at 10 n.8 (noting a phone call, on May 30, 2022 at 9:08 a.m., between WITNESS 5 and the former president; a phone call shortly thereafter, at 9:29 a.m., between the former president and Per. 5 and security camera footage less than thirty minutes later, at 9:54 a.m., showing WITNESS 5 moving boxes from the storage room). On June 1, 2022, WITNESS 5 moved eleven boxes from the storage room, one of which appeared to contain papers. MAL Warrant Aff. ¶ 66. In WITNESS 5's words in a text to Per. 30, the former president wished to review the boxes and "pick from them." Gov't's *Ex Parte* Mem., Ex. 11, Texts between WITNESS 5 and Per. 30 (May 30, 2022), ECF No. 2. Then on June 2, 2022, WITNESS 5 and WITNESS [redacted] a Mar-a-Lago property manager, moved approximately 25 to 30 boxes from the former president's residential suite to the storage room, MAL Warrant Aff. ¶ 66; Gov't's *Ex Parte* Mem., Ex. 12, Transcript of WITNESS [redacted] Grand Jury Testimony (Jan. 20, 2023) ("WITNESS [redacted] GJ Tr.") at 52–55, 66–68, ECF No. 2, leaving unaccounted for about 34 to 39 previously moved boxes.[6]

---

[5] WITNESS [redacted] is Per. 10 at the Office of Donald J. Trump. *See* Aff. of FBI Special Agent in Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 11, Case No. 23-sw-7, ECF No. 1.

[6] WITNESS [redacted] is Carlos de Oliveira, a Mar-a-Lago employee. *See* Gov't's *Ex Parte* Mem., Ex. 12, Transcript of Carlos de Oliveira Grand Jury Testimony (Jan. 20, 2023) ("WITNESS [redacted] GJ Tr.") at 106–07, ECF No. 2.

Despite contrary evidence, WITNESS 5 told FBI investigators, on May 26, 2022, repeatedly that he had no knowledge of various locations of responsive records, nor any boxes in which they were kept, and that he was not aware of who would know that information. *See* WITNESS 5 FBI Interview at 24–25 (stating that he did not know where the former president could have kept boxes and listing other individuals who may know that information), 27 (repeating that he "wouldn't know" where boxes would be stored), 37–38 (claiming not to know from where boxes located in Pine Hall would have come), 41 (same). WITNESS [redacted] swore to the same, despite prior knowledge. *See* WITNESS [redacted] GJ Tr. at 66–68 (The government: "Sir, would [you] ever move the former president's boxes without his permission?" WITNESS [redacted] "I was never told to move any boxes."). During his subsequent grand jury testimony on June 21, 2022, when asked if he had moved items from the storage room at any time, WITNESS 5 replied that "within the last month" he moved a box of "challenge coins" from the storage room to the former president's office, *see* Gov't's *Ex Parte* Mem., Ex. 24, Transcript of WITNESS 5 Grand Jury Testimony (June 21, 2022) ("WITNESS 5 GJ Tr.") at 35–42, ECF No. 2, omitting any mention of the movement of boxes from the end of May to early June 2022.

**3. *June 2, 2022 Search of Storage Room***

[redacted]

[redacted]

[redacted]

[redacted]

[7] [redacted]

[redacted]

**4.** Per. 12 ***Agrees to Serve as Custodian of Records and Preparation of Custodian's Certification***

[redacted]



Subject to Protective Order 

[redacted]

[redacted]

[redacted] After speaking with Per. 12 Per. 18 informed the FBI that he found documents responsive to the subpoena and he scheduled for the FBI's retrieval of the documents the next day, June 3, 2022. Per. 18 GJ Tr. at 152–53.



Subject to Protective Order

[redacted]

5. ***The Office's June 3, 2022 Production of Documents***

[redacted]. [redacted]

[redacted]

Three FBI agents and a DOJ attorney arrived at Mar-a-Lago to accept receipt of responsive materials. MAL Warrant Aff. ¶ 55. At the meeting with the government officials, Per. 18 and Per. 12 provided the government with the sealed Redweld of responsive documents found by Per. 18 and the signed certification, which stated, in relevant part, "Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: [1] A diligent search was conducted of the boxes that were moved from the White House to Florida; . . . [2] This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; . . . [3] Any and all responsive documents accompany this certification; and . . . [4] No copy, written notation, or reproduction of any kind was retained as to any responsive document." Gov't's *Ex Parte* Mem., Ex. 13, Certification ("June 3, 2022 Certification"), ECF No. 2.

[redacted]. At the meeting with the DOJ official and FBI agents, Per. 18 stated that the documents were found in boxes inside a storage room in the basement of Mar-a-Lago, and that the boxes in this storage room were the

"remaining repository" of records from the White House. MAL Warrant Aff. ¶¶ 55–56; Per. 18 GJ Tr. 172. [redacted] Per. 12 GJ Tr. at 110–11. [redacted]

The former president also spoke with the government at the June 3 meeting at Mar-a-Lago before departing that day for Bedminster. Per. 18 GJ Tr. at 164–65; Per. 12 GJ Tr. at 118–21, 123, 128. [redacted] Per. 18 GJ Tr. at 166; Per. 12 GJ Tr. at 122. Per. 18 led the government officials to the storage room and permitted them to look inside the room but not to look inside any boxes stored inside. Per. 18 GJ Tr. at 166–67, 175–76; Per. 12 GJ Tr. at 123; MAL Warrant Aff. ¶ 56. The government estimated seeing 50 to 55 boxes inside the storage room, MAL Warrant Aff. ¶ 56, and Per. 18 [redacted] Per. 18 GJ Tr. at 95.

According to the FBI's subsequent review, the sealed Redweld contained 38 unique documents with classification markings, including those marked "TOP SECRET," "SECRET," and "CONFIDENTIAL" and documents with markings indicating that they contained information subject to additional compartmentalization and caveats. MAL Warrant Aff. ¶ 58.



Subject to Protective Order

[redacted].

**D. The June 24, 2022 Grand Jury Subpoena**

On June 24, 2022, the grand jury issued a subpoena to the Trump Organization, addressed to the custodian of records, seeking testimony and the production of "[a]ny and all surveillance records, videos, images, photographs and/or CCTV from internal cameras located on [the] ground floor (basement) and outside the room known as 'Pine Hall'" at Mar-a-Lago. Gov't's *Ex Parte* Mem., Ex. 14, Subpoena to Testify Before a Grand Jury (June 24, 2022) ("June 2022 Subpoena"), ECF No. 2. The government had transmitted a draft version of the subpoena to the Chief Legal Officer of the Trump Organization two days earlier, on June 22, 2022, *see also id.*, Ex. 15, Email from Jay Bratt, DOJ, to [redacted] (June 22, 2022, at 11:38 a.m.), ECF No. 2 (transmitting a draft of the June 2022 subpoena to counsel for the Trump Organization), who then emailed Per. 18 that day, *see* Per. 18 *Ex Parte* Suppl. Resp. to Court's March 11, 2023 Min. Order, Exhibit B, Third Revised Privilege Log ("Per. 18 Privilege Log") at 25, ECF No. 16-2.

On June 23, 2022, the following day, Per. 18 coordinated with an assistant of the former president and WITNESS 5 to schedule a phone call with the former president the next day. Gov't's *Ex Parte* Mem., Ex. 17, Emails between Per. 18, WITNESS [redacted] and WITNESS 5 (June 23, 2022), ECF No. 2. The former president and Per. 18 then spoke on the phone on June 24, 2022, at 1:25 p.m. for approximately nine minutes. Gov't's *Ex Parte* Mem. at 17.

Shortly after the call, WITNESS 5 rearranged his travel schedule, choosing to fly to Florida on June 25, 2022, instead of Illinois with the former president as previously scheduled. *See* Gov't's *Ex Parte* Mem., Ex. 18, Email from Per. 15, Office of Donald J. Trump, Regarding the Former President's Daily Schedule for June 25, 2022 (June 24, 2022, 5:16 p.m.), ECF No. 2 (showing that the former president was scheduled to travel from Bedminster to Mendon, Illinois with WITNESS 5 on June 25, 2022, at 4:10 p.m.); *id.*, Ex. 19, Email from JetBlue Reservations to WITNESS 5 (June 28, 2022, 9:29 p.m.), ECF No. 2 (showing WITNESS 5's flight reservations from New York to West Palm Beach, Florida on June 25, 2022, and from West Palm Beach to Newark, New Jersey on June 28, 2022). WITNESS 5 told colleagues that the change of plans was due to a family emergency, *id.*, Ex. 21, Texts between WITNESS 5 and Per. 15 (June 24, 2022), ECF No. 2; *id.*, Ex. 22, Texts between WITNESS 5 and [redacted] June 24–25, 2022), ECF No. 2; however, he later described the trip as work-related when seeking travel reimbursement, *id.*, Ex. 20, Texts between WITNESS 5 and [redacted] (June 24, 2022, 9:26 p.m.), ECF No. 2 ("Hi [redacted] I have to fly out tonight for work. I can't book a flight through the portal, can I do it on my personal then give you the receipt for reimbursement?").

At 4:10 p.m. on June 25, 2022, WITNESS 5 texted WITNESS [redacted] stating that he had landed in Florida and requesting that WITNESS [redacted] meet him at Mar-a-Lago at around 5:15 p.m. that day, to which WITNESS [redacted] agreed. *Id.*, Ex. 23, Texts between WITNESS 5 and WITNESS [redacted] (June 25, 2022), ECF No. 2. Security camera footage shows WITNESS 5 and WITNESS [redacted] entering the area near the Mar-a-Lago storage room at 5:50 p.m. for approximately 30–40 seconds on June 25, 2022. Gov't's *Ex Parte* Mem. at 17.

Then, in response to the June 24, 2022 subpoena, on July 6, 2022, the Trump Organization provided the government with a hard drive, which stored "video footage from four

cameras in the basement hallway of [Mar-a-Lago] in which the door to the STORAGE ROOM is located" spanning from April 23, 2022 to June 24, 2022. MAL Warrant Aff. ¶ 64.[8] The government's review of the footage revealed WITNESS 5 moving 64 boxes out of the anteroom leading to the storage room from May 24, 2022, to June 1, 2022, then moving 25 to 30 boxes into the anteroom on June 2, 2022. *Id.* ¶ 66. [redacted]

### E. Search Warrant Issued by the Southern District of Florida

Following the June 3, 2022 meeting between the government, Per. 18 and Per. 12 the government's investigation revealed a need to search Mar-a-Lago for any retained documents with classification markings that were responsive to the May 2022 Subpoena but were not provided to the government. Gov't's Mot. at 6; *see, e.g., supra* Part I.C.2 (describing witness accounts of boxes moved from the storage room shortly before Per. 18 review). Specifically, despite Per. 18 assurance that any responsive records would be in the storage room and the certification attesting that all responsive records were being turned over on June 3, 2022, the government uncovered video evidence of what appeared to be efforts to conceal and remove records from the storage room prior to Per. 18 search, raising concern about potential obstruction of the government's investigation. *See* Gov't's Mot. at 6; *see also, e.g.*, Part I.D

[8] The video footage produced in response to the June 24, 2022, subpoena ended on June 24, 2022, and the government obtained later video footage in response to subsequent legal process. Transcript of Sealed Hearing (Mar. 9, 2023) at 45–46.

(describing the video footage showing boxes moved from the storage room before Per. 18 review).

These developments of counsel's representations and the certification being demonstrably, at best, incorrect and unreliable, or, at worst, intentional misrepresentations, prompted the government, on August 5, 2022, to apply for a warrant to search and seize records responsive to the May 2022 Subpoena at Mar-a-Lago, which warrant was granted the same day by a magistrate judge in the U.S. District Court for the Southern District of Florida, upon finding that probable cause existed to believe that evidence of violations of 18 U.S.C. § 793 (gathering, transmitting, or losing of national defense information), 18 U.S.C. § 2071 (concealment, removal, or mutilation generally of government records), and 18 U.S.C. § 1519 (destruction, alteration, or falsification of records in federal investigations), would be on the property. Gov't's Mot., Ex. 1, Redacted Aff. of FBI in Supp. Appl. Under Rule 41 for Search & Seizure Warrant (S.D. Fla. Aug. 5, 2022) ("Redacted MAL Warrant Aff.") ¶ 6, ECF No. 1; *see generally* MAL Warrant Aff.

In executing the warrant on August 8, 2022, FBI seized thirteen boxes or containers that included over 100 unique documents with classification markings—ranging from "CONFIDENTIAL" to "TOP SECRET" levels with additional sensitive compartments signaling very limited distribution—all responsive to the May 2022 Subpoena. Gov't's Mot. at 7. Specifically, FBI agents found 76 documents with classification markings in the Mar-a-Lago storage room, despite Per. 18 statements and Per. 12 certification that no such documents were retained at that location. *Id.* Within the storage room, they discovered 73 boxes in total—exceeding the estimates by Per. 18 and FBI agents [redacted] and 50–55 boxes, respectively, located in the same room two months earlier, on June 3, 2022. Gov't's *Ex Parte* Mem. at 19 & n.14. In addition, agents recovered documents with classification markings in the nonpublic,



Subject to Protective Order 

more intimate locations within the former president's private residence at Mar-a-Lago—inside his desk and closet in his personal office. *Id.*

[redacted].

### F. Government's Motion to Compel Full Compliance with May 2022 Subpoena

The seizure of documents with classification markings from Mar-a-Lago revealed that the Office did not comply fully with the May 2022 Subpoena. Fearing that additional responsive records may exist beyond those uncovered through execution of the search warrant, the government contacted the Office, on September 15, 2022, offering another opportunity to provide responsive documents or certify that none remained in either the Office's or the former president's possession. *In re Grand Jury Subpoena*, Case No. 22-gj-40, Memorandum Opinion at 3 (Nov. 9, 2022), ECF No. 16 ("Nov. 2022 Mem. Op.") (opinion regarding the Court's grant of the government's motion to compel the Office to comply with the May 2022 grand jury subpoena). The Office refused either to conduct another search for responsive records or provide the requested certification, citing that the act of producing the documents violated its Fifth Amendment privilege against self-incrimination and challenging the validity of the subpoena's terms and scope. *Id.* Consequently, on October 4, 2022, the government filed a Motion to Compel Compliance with the Grand Jury Subpoena, arguing that the Fifth Amendment privilege against self-incrimination does not apply to the Office, a collective entity, and to the act of

producing government-owned documents, and that nothing about the subpoena is faulty. *Id.* at 11–12. The parties briefed the matter and appeared for a sealed hearing on the motion on October 27, 2022. *Id.* at 12–13.

Minutes before the hearing began, respondent's counsel circulated to the government and the Court a last-minute, undocketed declaration from Timothy C. Parlatore, presumably counsel for the Office (although his exact representation was unclear from the declaration), dated October 26, 2022. *Id.* at 13; *see In re Grand Jury Subpoena*, No. 22-gj-40, Declaration of Timothy C. Parlatore, Esq. ("Parlatore Decl."), ECF No. 9. After reiterating statements from respondent's opposition, the Parlatore Declaration, for the first time, advised that just two days before the scheduled hearing, "[o]n October 25, 2022, a search authorized by President Donald J. Trump was undertaken on the premises at Bedminster" by "elite" but unnamed "professionals[,] who have military training and experience as well as prior experience searching for sensitive documents and contraband" in national security matters, "supervised by legal counsel." Parlatore Decl. at 2. At the hearing, counsel for respondent, James Trusty, identified himself as the counsel referenced in the Parlatore Declaration as supervising the Bedminster search and he then elaborated on the search team's efforts to find responsive documents. *In re Grand Jury Subpoena*, No. 22-gj-40, Transcript of Sealed Hearing (Oct. 27, 2022) ("Oct. 2022 Hr'g Tr.") at 74:14–81:2. Additionally, respondent's counsel argued, *inter alia*, that the former president may unilaterally deem documents with classification markings generated by federal government agencies to be declassified and to be his personal property, and that unilateral action by the former president is sufficient to render those documents no longer the property of the federal government—an argument presented for the first time in opposition to the government's motion when made orally at the hearing. *See id.* at 68:23–71:2.

For its part, the government explained that the Office's proposal for the government to withdraw the motion to compel in exchange for the chance to observe the Office's search for responsive documents at the former president's Bedminster, New Jersey golf club was rejected as unacceptable. The proffered search was limited only to "a specific location within a property, that is, the office at Bedminster . . . one of a number of the former President's properties," without mention of whether this was the former president's personal office or a satellite location for the Office of Donald J. Trump. *Id.* at 29:10–20. In addition, the Office's offer did not include the submission of a sworn certification describing the search, which was necessary in the government's view given the "deficiencies" of the June 3, 2022 production and certification. *Id.* at 30:10–31:3. The government also articulated at the hearing what a fulsome certification would entail, namely "a declaration submitted by a custodian who had personal knowledge of the search that was conducted" in response to the subpoena. *Id.* at 23:9–13. The government added that the certification should "make clear that a diligent search was done at all locations where responsive documents to the subpoena may expect to be found," *id.* at 23:14–18, listing the specific locations searched, not limited to a single location or room, *id.* at 24:18–25. It should also certify that respondent retained no copies of the responsive documents. *Id.* at 24:14–17.

In view of the Office's newly raised arguments at the hearing, the Court permitted the parties to submit any supplemental briefing responding to or supporting those arguments, which had not been addressed in prior briefing. *See* Nov. 2022 Mem. Op. at 14. In an *ex parte* submission, the government provided certain evidence supporting concerns that responsive documents likely remained in the Office's possession, contrary to Per. 18 statements and Per. 12 certification on June 3, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's *Ex Parte* Suppl. Filing, ECF No. 12 (discussing information also outlined in *supra* Parts I.C–D). In comparison, the Office used the supplemental submission to complain bitterly about



Subject to Protective Order 

being given the opportunity to explain its arguments and reasoning, and simply ducked addressing any relevant case law to bolster new arguments asserted at the hearing or oppose any of the government's supplemental arguments. *See* Nov. 2022 Mem. Op. at 32.

After review of the parties' briefing and arguments presented at the hearing, the Court granted the government's motion to compel on November 9, 2022, holding that the May 2022 grand jury subpoena was valid and enforceable, no Fifth Amendment privilege applied to block the Office's custodian of records from complying with the subpoena, citing *Braswell v. United States*, 487 U.S. 99 (1988), and "a custodian with first-hand knowledge of the Office's diligent and comprehensive efforts to locate responsive documents and with the ability to certify that no additional responsive records remain in the Office's possession, must comply with the subpoena." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Order Granting Gov't's Mot. Compel Compliance Grand Jury Subpoena at 2 ("Nov. 2022 Order"), ECF No. 15. The November 2022 Order directed that, by November 18, 2022, the Office provide the government with a new certification and that a custodian be made available to appear before the grand jury. *Id.* at 2–3.

### G. The Office's Efforts to Comply with the Court's November 2022 Order

Following the Court's November 2022 Order to comply fully with the May 2022 Subpoena, the Office took another 37 days, an additional Order of this Court, and another sealed hearing in its apparent efforts to comply. Those efforts are described below.

#### 1. *November 15, 2022 Status Report*

On November 15, 2022, Parlatore—the individual who provided the surprise declaration at the October 2022 sealed hearing—filed a status report on behalf of the Office describing the Office's efforts to search for all documents responsive to the subpoena and, indeed, discovering two additional responsive records in an Office off-site, leased storage unit. *See In re Grand Jury*



Subject to Protective Order 

*Subpoena*, Case No. 22-gj-40, Status Report on the Court's Order (Nov. 15, 2022) ("Nov. 2022 Status Report") ¶ 12, ECF No. 19. [redacted] the November 2022 Report stated that the Office "identified five locations to search for potentially responsive documents": (1) the Office located at Mar-a-Lago along with the former president's residence at the same location; (2) the former president's private golf resort at Bedminster; (3) seven General Services Administration ("GSA") rental storage units in a commercial facility in West Palm Beach, Florida; (4) the Office's GSA-leased office space in West Palm Beach, Florida—a separate location than Mar-a-Lago; and (5) areas used by the former president in Trump Tower in New York City. *Id.* ¶ 4. It also described how the Office "assembled a team" of former DOJ employees "who possess security clearances and extensive training and experience in Sensitive Site Exploitation" to conduct searches for responsive documents at Bedminster, Trump Tower, the West Palm Beach GSA office, and the GSA storage units. *Id.* ¶¶ 5–6. Notably, the Office determined that Mar-a-Lago need not be searched again following the FBI execution of the August 5, 2022, search warrant. *Id.* As of November 15, 2022, the Office's search team, supervised by James Trusty, another attorney for the Office, searched Bedminster on October 25, 2022, the GSA storage units on November 14–15, 2022, and the GSA-leased office location on November 15, 2022, *id.* ¶¶ 6, 8–16, and found in a GSA-leased storage unit "[t]wo documents . . . which appear to be potentially responsive to the subpoena . . . in a box that appears to have been packed and shipped by GSA," *id.* ¶¶ 12. The report concluded that only Trump Tower remained to be searched by the team. *Id.* at 17.

### 2. *November 23, 2022 Revised Certification*

On November 17, 2022, on the eve of the Office's deadline to submit a final certification, the Office requested eleven additional days to complete a search of Trump Tower. *See In re*



Subject to Protective Order 

*Grand Jury Subpoena*, Case No. 22-gj-40, Resp't's Mot. Extension of Time (Nov. 17, 2022) at 1, ECF No. 20. The Office claimed that more time was needed to "bring the searchers and supervising attorney together at the additional search location" and to account for the intervening Thanksgiving holiday. *Id.* Opposing any extension, the government argued that, in the nearly six months that had passed since the Office received the May 2022 subpoena, the Office had multiple opportunities to comply and the two responsive documents found by the Office, as disclosed in the November 2022 Status Report, "underscores the critical need for prompt compliance with the subpoena and the Court's order" and illustrates "the national security risks present if documents bearing classification markings are stored in unsecure locations." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's Resp. in Opp'n Mot. for Extension at 1 (Nov. 18, 2022), ECF No. 21. The government requested that, if any extension were granted, the Office be required to submit another update on the status of compliance. *Id.* at 1–2.

The Office's extension request was granted in part and denied in part. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Nov. 18, 2022). Finding the Office's request to be "grossly excessive," given the six-month delay in responding to the May 2022 Subpoena, the two-month period since the government's filing of its motion to compel, and the "unacceptable" risk to national security of storing classified documents outside of appropriately secured conditions, plus the "obvious concern" that the Office's Nov. 2022 Status Report was submitted by an attorney who did not attest to be "a custodian of records with personal knowledge of respondent's efforts to comply with the grand jury subpoena"—a requirement of both the May 2022 Subpoena and the Court's November 2022 Order—the Office was given only five, rather than the requested eleven, additional days to comply in full, until November 23, 2022. *Id.* The Office was directed to report on the status of compliance that day, and to arrange for the "prompt

delivery of the materials to the government, which delivery must occur as soon as practicable upon the discovery of any materials—national holiday notwithstanding." *Id.*

On November 23, 2022, Parlatore submitted a "Certification on Behalf of Respondent," pursuant to the Court's Orders issued on November 9, 2022, and November 18, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Certification on Behalf of Respondent ("Nov. 23, 2022 Certification") (Nov. 23, 2022), ECF No. 22. Parlatore submitted the certification as an attorney for "President Donald J. Trump" with "personal knowledge of [the Office's] efforts with regard to the [May 2022] Subpoena." *Id.* ¶¶ 1–4. He did not claim to be a custodian of records for the Office.

Largely reiterating the information in the November 15, 2022 Status Report, the November 23, 2022 Certification stated that Parlatore's search team, led by Trusty, completed searches of Bedminster, the seven GSA-leased storage units in Florida, the GSA-leased office of the Office of Donald J. Trump in Florida, and Trump Tower. *Id.* ¶ 8. It confirmed that Mar-a-Lago was not searched pursuant to the Court's November 2022 Order given the government's August 8, 2022 search warrant execution. *Id.* ¶ 15. Adding to the details provided in the earlier November 2022 Status Report, the new certification summarized the contents of each storage unit—which contained furniture, clothing, gifts, photos, and documents—and detailed that the two documents responsive to the subpoena were found in Unit 2083. *Id.* ¶ 22. Those documents had "red 'Secret' covers" and "were secured in double-wrapped, sealed envelopes and kept within the locked unit until being turned over to FBI agents at approximately 6:00 a.m. on November 16, 2022," the morning after their discovery. *Id.* Also newly reported in the November 23, 2022 Certification was information about the search of Trump Tower, conducted on November 21, 2022. *Id.* ¶ 28. Due to a "scheduling conflict," Parlatore himself supervised that search instead of Trusty, which included searching the former president's office and his

personal residence, and no records responsive to the subpoena or the Court's Order were found. *Id.* ¶¶ 29–34.

The certification concluded with a section titled "Role of Certificant," explaining that the Office was under no obligation to use a custodian of records and, to the extent a custodian was used, that custodian was [redacted] Per. 12. *See id.* ¶¶ 35–41. Specifically, the certification stated that "nothing in the Former President's Act," the statute providing for the GSA-funded office space for former presidents, "requires that a custodian of records be designated," *id.* ¶ 35, and instead the Act merely "permit[s]" the Office to retain an independent contractor to coordinate with NARA on the transfer of presidential records, and that the Office had not retained such a contractor, *id.* ¶ 36 (emphasis omitted). Nonetheless, [redacted] Per. 12 "for purposes of testimony and documents subject to subpoena #GJ20222042790054" and had been "made available to the Government for interview and testimony," *id.* ¶ 37, which had been scheduled for December 1, 2022, *id.* ¶ 40. As of November 23, 2022, the Office "ha[d] no full-time custodian of records" and so the certification made by "an individual with personal knowledge of the searches and documents in the custody and control of the Respondent fulfills that role." *Id.* ¶ 39. Parlatore then offered to testify "to the limited information contained" in the certification, "without any further waiver of privilege[,]" although the Office's position was that "no further testimony should be necessary." *Id.* ¶ 40; *accord id.* ¶ 41.

No additional details were provided to clarify that qualifying language, leaving the government guessing as to what information exactly Parlatore would provide during any subsequent testimony—*e.g.*, whether his testimony would include details not specifically provided in the certification or whether the Office planned to instruct Parlatore to invoke privileges not previously asserted in this litigation, such as attorney-client privilege, work-

product privilege, or executive privilege, should he be questioned about any matter outside the four corners of the certification.

### 3. *Government's Motion for an Order to Show Cause and Subsequent Hearing*

Seven days after service of the revised certification, the government moved for an Order requiring the Office "to show cause why it should not be held in civil contempt for failure to comply with the Court's November 9, 2022 Order." *In re Grand Jury Subpoena*, Case No. 22-gj-40, Gov't's Mot. Order to Show Cause at 1 (Dec. 2, 2022), ECF No. 23. The government argued that the Office "blatantly ignored the Court's clear and explicit instructions regarding what is required in a custodial certification and who should serve as the custodian." *Id.* In particular, according to the government, the Office still had not (1) produced a custodian of records to attest to the Office's efforts responding to the subpoena, and instead provided "an attorney claiming not to waive privilege;" (2) attested to searching for responsive documents "wherever located" as required by the May 2022 Subpoena, and instead only searched certain locations; (3) provided sufficient details regarding the searches, instead offering only "disparate levels of detail on the search locations and methodology employed at each location;" and (4) produced a custodian to testify before the grand jury, instead stating that no further testimony was necessary and offering Parlatore's testimony without mention of whether he would testify to anything not expressly stated in the November 23, 2022 Certification. *Id.* at 4. Given that the Office had already delayed full compliance with the May 2022 subpoena for seven months, the government argued that any further delay to the investigation amounted to "deliberate lack of compliance with the [May 2022] Subpoena" and supported a holding of contempt. *Id.* at 5.

The government's motion to show cause why the Office should not be held in contempt was granted, along with a scheduling order for briefing and a sealed hearing on the motion on December 9, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Dec. 2,



Subject to Protective Order 

2022). The Office defended the steps taken to comply with the Court's November 2022 Order, which steps included conducting searches of certain locations the Office identified and submission of a certification from "a supervisory attorney with personal knowledge of the searchers, locations, and methods" as to these efforts. *In re Grand Jury Subpoena*, Case No. 22-gj-40, Resp't's Opp'n Mot. for Order to Show Cause at 2–3, 7–8 (Dec. 6, 2022), ECF No. 24. Further, the Office indicated that the supervisory attorney, Parlatore, Per. 12 [redacted] were both available to testify, *id.* at 4, 8–9, while complaining that the government did not "articulate[] exactly what would constitute full compliance" and chose not to weigh in on which locations still needed to be searched, instead deferring to the Office's determination of locations to be searched, *id.* at 6.

At the December 9, 2022, sealed hearing, both parties clarified the tasks yet to be done to constitute full compliance with the May 2022 Subpoena. *See generally In re Grand Jury Subpoena*, Case No. 22-gj-40, Transcript of Sealed Hearing (Dec. 9, 2022) ("Dec. 2022 Hr'g Tr.").[9] After much back-and-forth between the parties regarding what had and had not been provided by the Office thus far, the Court ascertained the following terms for the Office's full compliance: (1) Parlatore would testify before the grand jury regarding the Office's efforts and due diligence to respond to the May 2022 subpoena, including testifying to information not already mentioned in the revised certification and details regarding how Parlatore determined which locations needed to be searched and when, why certain locations were selected to be searched and others not, efforts by Per. 12 [redacted] to prepare to sign the June 3, 2022 certification, the

---

[9] The Court did not issue a contempt citation against the Office at that time, given the productive discussion about expectations for additional searches and the contents of a certification for compliance with the May 2022 subpoena and the Court's Orders issued on November 9 and 18, 2022, and the Office's apparent willingness to try to meet those expectations. *See* Dec. 2022 Hr'g Tr. at 2–9; *see also id.* at 9 (Government counsel: "[T]oday you want us to see where the areas of agreement and disagreement are. And if another hearing is necessary, you'll hold one, but perhaps we can come to a way forward that doesn't involve contempt proceedings. You view this as a motion for an order to show cause rather than contempt proceedings itself?" The Court: "Correct. That's how I view it.").

identities of the search-team members, and those members' exact search methodologies, *id.* at 12–13, 22, 31–32, 34–35, 38; (2) the revised certification as well as Parlatore's grand jury testimony would discuss accommodations the Office made for the "shell game," as coined by the government, whereby documents could be moved between locations based on scheduled dates for searches of those locations, to avoid detection of those responsive records, *id.* at 14–15, 37; and (3) Parlatore, or any individual put forward to the grand jury regarding the May 2022 subpoena, need not be labeled a "custodian" as long as they possess all the required first-hand information, *id.* at 18–19. The Court suggested that the Office add Mar-a-Lago to the list of locations to be searched again, *id.* at 37–38 (Court, to counsel for the former president: "I think it would be incumbent on you to do another diligent search of Mar-a-Lago just to make sure.").

The scope of information the government sought had one clear sticking point. The government made clear that Parlatore, or any other witness made available to testify about the conduct of the search for responsive documents, might be asked questions about the content of direct conversations with the former president. *See, e.g., id.* at 24 (The Court: "[A]re you going to be asking about direct conversations with the former President and about where he may or may not have put or seen or took with him classified marked records?" The government: "I think those are fair questions to ask of a purported custodian."), 25 (The Court: "[T]his one piece of information about what Donald J. Trump told the certifier or declarant, that's going to be a difficult pillar to support a whole contempt finding." The government: "I think we would have to make that decision based on what other information we are able to obtain in the grand jury."), 31 (Respondent's counsel: "[Parlatore] is willing to . . . testify in the grand jury and address each of the items that you have identified today. If a question comes up with regard to specific conversations with [Parlatore's] client, President Trump, that may involve a different issue.").



Subject to Protective Order 

The parties acknowledged the potential need for additional litigation regarding counsel testifying to conversations with the former president. *See id.* at 25, 31.

The hearing concluded with issuance of an Order requiring the Office to supplement the November 23, 2022 Certification by December 16, 2022, with all additional details discussed at the hearing. *Id.* at 47; *see also In re Grand Jury Subpoena*, Case No. 22-gj-40, Min. Order (Dec. 9, 2022) (directing the Office to submit the supplemental certification by December 16, 2022, by 5 p.m.).

**4. *December 16, 2022 Revised Certification***

The Office filed its final Certification of Compliance on December 16, 2022. *See In re Grand Jury Subpoena*, Case No. 22-gj-40, Certification of Compliance (Dec. 16, 2022) ("Dec. 16, 2022 Certification"), ECF No. 34. The certification, sworn by Parlatore on behalf of the Office, details the June 2, 2022 search of the Mar-a-Lago storage room, *id.* ¶¶14–18, the locations and methods of other searches conducted, including the expertise of the two former-government agents hired to perform the searches at Bedminster, GSA-leased storage units, GSA-leased office space, and Trump Tower, *id.* ¶¶ 20, 25–47, and noted that an additional search of Mar-a-Lago was conducted on December 15–16, 2022, including searching the living quarters of the former president and his family, the former president's office, and the storage room, *id.* ¶¶ 48–50.[10] Attached to the certification were 49 pages of reports summarizing the searches

[10] In subsequent litigation, during a holiday period, from December 21, 2022 to January 4, 2023, the Court denied the Office's request to supplement the existing Protective Order to permit the Office to keep secret the full names of the two members of the search team. *See generally In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Sealed Mot. for Supplemental Protective Order (Dec. 21, 2022), ECF No. 28; *In re Grand Jury Subpoena*, No. 22-gj-40, Order Denying Resp't's Mot. for Supplemental Protective Order (Dec. 29, 2022), ECF No. 30. The Court further denied the Office's motion to reconsider that ruling, *In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Mot. for Reconsideration (Dec. 30, 2022), ECF No. 31; *In re Grand Jury Subpoena*, No. 22-gj-40, Memorandum Opinion & Order Denying Resp't's Mot. for Reconsideration (Jan. 4, 2023), ECF No. 35, and pursuant to that Order, the Office provided a Notice of Compliance on January 4, 2023, confirming the disclosure of the searchers' full identities to the government that day, *In re Grand Jury Subpoena*, No. 22-gj-40, Resp't's Notice of Compliance (Jan. 5, 2023), ECF No. 37.



Subject to Protective Order 

conducted, including the dates of the searches; the exact search locations including rooms, offices, and pieces of furniture; individuals present for the search; all search methods down to whether both sides of documents were examined and whether sealed items were opened and analyzed; and whether responsive records were uncovered. *See generally* Dec. 16, 2022 Certification, Exs. A–D, ECF Nos. 34-1–34-4. The reports note that no responsive records were found at Bedminster and in the GSA-leased spaces other than the two previously uncovered documents from a GSA-leased storage unit and provided to the government in November 2022. *See* Dec. 16, 2022 Certification, Ex. A at 1 (no responsive records found at Bedminster); *id.*, Ex. B at 6 (regarding GSA-leased storage units and office space, only two responsive documents found in total from those two locations); *id.*, Ex. C at 1–6 (no responsive records found at Trump Tower).

Remarkably, the report regarding the Mar-a-Lago search, conducted on December 15–16, 2023, uncovered four more responsive records. *See id.*, Ex. D at 1–15 (four responsive records found at Mar-a-Lago on December 15–16, 2022). The certification misleadingly refers to these documents as "low-level ministerial documents" without any explicit mention whether they had classification markings, indicating only that one document includes "an explanation that it was no longer deemed 'classified' if not connected to the attachment, and this document had no attachment." *Id.* ¶ 49. To be clear, the four documents were responsive to the May 2022 subpoena: "On or about December 15, 2022," the former president's counsel informed the government that "a box containing four documents or partial documents, totaling six pages, with classification markings were found in a closet" of the Office's designated space at Mar-a-Lago and "[t]hose documents contained markings at the Secret level." Aff. of FBI Special Agent in Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 54, Case No. 23-sw-7, ECF No. 1.



Subject to Protective Order 

The Office provided the entire box in which the four responsive records were located to the FBI on approximately January 5, 2023, in compliance with another subpoena. *Id.*[11] That was still not the end of the production of responsive records. In complying with the subpoena to produce that box, the Office also provided the FBI with two additional documents responsive to the May 2022 subpoena: "one empty folder and another mostly empty folder marked 'Classified Evening Summary'" that were found in the former president's bedroom at Mar-a-Lago. *Id.*

**H. Per. 18 Grand Jury Testimony**

On January 12, 2023, Per. 18 testified before the grand jury in response to a subpoena. *See generally* Per. 18 GJ Tr. He also produced over 300 documents to the government as requested by the subpoena, *id.* at 12, as well as a privilege log detailing documents withheld from the government based on attorney-client privilege and the work-product doctrine, *see generally* Per. 18 Privilege Log, ECF No. 16-2. During Per. 18 nearly six-hour testimony, the government identified the following six topics over which Per. 18 asserted privilege:

> (1) [redacted]
>
> (2) [redacted]
>
> (3) the identities of individuals involved in selecting Per. 12 [redacted]s, the reasons for Per. 12 selection, and communications (with Per. 12 and others) related to Per. 12 selection;
>
> (4) [redacted]
>
> (5) [redacted]

---

[11] Relatedly, on January 6, 2023, the former president's counsel informed the government that, in 2021, WITNESS [redacted] scanned the contents of the box—produced on January 5, 2023, and previously containing classified documents—onto a laptop in her possession owned by the Save America Political Action Committee ("PAC"), a PAC formed by the former president in 2020. *See* Aff. of FBI Special Agent in Supp. of Appl. for a Search Warrant (D.D.C. Jan. 12, 2023) ¶ 55, Case No. 23-sw-7. The former president's counsel saved those scans onto a thumb drive and provided the thumb drive to the government that day.

[redacted]

> (6) what Per. 18 discussed with the former President in a phone call on June 24.

Gov't's *Ex Parte* Mem. at 20–21; *see also id.* at 21–24 (providing more details about each topic). Those topics include Per. 18 own understanding animating his actions, individuals with whom he spoke to inform his understanding and the factual bases on which to advise his clients, and direct communications with the former president about the May 2022 subpoena and subpoena compliance efforts. *See id.*

### I. Grand Jury Subpoena Issued to [redacted]

On January 25, 2023, the government issued a grand jury subpoena to [redacted] for testimony and documents relevant to her representation of the former president and the Office in response to the May 2022 subpoena. *See supra* Part I.C.2. [redacted] informed the government, through counsel, that the former president will invoke attorney-client privilege over her testimony and that she will withhold testimony based on that privilege. Gov't's Mot. at 8. [redacted] did not comply with the subpoena by its February 9, 2023, return date, *see* Former President Donald J. Trump's Sealed Opp'n to Gov't's Sealed Mot. Compel ("Resp't's Opp'n") at 4–5, ECF No. 6, and informed the government that she would withhold one responsive document, Gov't's Reply at 6, ECF No. 7.

### J. Procedural History

Following the witnesses' refusal to comply in full with their subpoenas for testimony and records, the government filed the instant Motion to Compel, ECF No. 1. Along with the motion, the government simultaneously requested a protective order authorizing limited disclosure and imposing protection for the purpose of guarding grand jury litigation and secrecy, under Federal Rule of Criminal Procedure 6(e) and Local Criminal Rule 6.1. Gov't's Sealed Mem. Regarding

Mot. Compel Filings & Mot. for Order Authorizing Limited Disclosure and Imposing Protection, ECF No. 1-1. The Court issued the protective order that day. *See* Order Authorizing Limited Disclosure, Imposing Protection, and Entering Briefing Schedule ("Protective Order"), ECF No. 3.[12]

On February 21, 2023, Per. 18 and the former president filed separate oppositions to the motion to compel, both requesting a hearing on the motion, *see* Sealed Resp. of Per. 18 [redacted] to Gov't's Sealed Mot. Compel ("Per. 18 Opp'n"), ECF No. 5; Resp't's Opp'n, which request was granted with a hearing held on March 9, 2023. In advance of the hearing, the Court ordered additional briefing by Per. 18 to identify which documents he withheld on the basis of opinion work product and the degree to which such opinion work product is severable from any fact work product in the documents, as well as to clarify why the "Revised Privilege Log" submitted as Exhibit A to his opposition was approximately half the size of the privilege log he provided the government in January. Court's Min. Order (March 4, 2023). The government was directed to supplement the record with the subpoena issued to Per. 18 as well as to clarify its position on (1) the application of the crime-fraud exception to Per. 18 own opinion work product and (2) whether Per. 18 "Revised Privilege Log" comprised the full extent of the documents sought by the government. *Id.* On March 6, 2023, Per. 18 and the government filed separate responses to the Court's Minute Order. Sealed Resp. of Per. 18 [redacted] to Court's March 4, 2023 Min. Order ("Per. 18 Resp."), ECF No. 8; Gov't's Sealed Resp. to Court's Request for Clarification ("Gov't's Resp."), ECF No. 9; Gov't's Sealed *Ex*

---

[12] The Protective Order permits the government to serve on Per. 18 [redacted] the former president, and the Office, through counsel, the Protective Order, the government's motion to compel, and proposed order granting the motion to compel. Protective Order ¶¶ 1–2. The Protective Order forbids the parties from disclosing to the public "the existence of this proceeding, any papers or orders filed in this proceeding, or the substance of anything occurring in this proceeding." *Id.* ¶ 4. The Order also restricts attorneys of record from disclosing this proceeding, and related papers and orders, to anyone other than their clients and individuals necessary to litigate the issues presented, and any further disclosure requires a court order. *Id.* ¶ 5.

*Parte* Suppl. to Resp. to Court's Request for Clarification ("Gov't's *Ex Parte* Suppl. Resp."), ECF No. 10.

Counsel for Per. 18 former President Trump, and the government attended a sealed hearing on March 9, 2023. The nearly three-hour hearing, though largely adversarial, also included a series of *ex parte* arguments: (1) from the government, in the presence of counsel for the former president, but without Per. 18 or his counsel; (2) from the government alone, and (3) from Per. 18 counsel, in the presence of counsel for the former president, but without the government. At the conclusion of the hearing, the Court issued an oral ruling finding that the government had satisfied its evidentiary burden set out in *United States v. Zolin*, 491 U.S. 554 (1989), permitting the Court to review Per. 18 withheld documents *in camera.*

After the hearing, the Court ordered additional briefing by all three parties before the Court, *see* Court's Min. Order (March 9, 2023), as follows: (1) the government was ordered to file supplemental briefing setting out the elements of each of the criminal violations alleged to serve as the basis for application of the crime-fraud exception to the attorney client privilege; (2) the former president was ordered to clarify the legal basis for his invocation of the attorney-client privilege in response to questions seeking purely logistical information about Per. 18 search in response to the May 2022 Subpoena and to supplement the record with the transcript of attorney Timothy Parlatore's December 22, 2022 grand jury testimony, which is quoted in the former president's opposition; and (3) Per. 18 was ordered to provide for *in camera* review the withheld documents listed on his January 11, 2023-dated privilege log. *Id.* The parties complied on March 10, 2023. Gov't's Suppl. *Ex Parte* Mem. Supp. Mot. Compel ("Gov't's March 10, 2023 *Ex Parte* Suppl. Mem."); Former President Donald J. Trump's Sealed Suppl. Opp'n to Gov't's Mot. Compel ("Resp't's Suppl. Mem."), ECF No. 12; Sealed *Ex Parte* Suppl. Filing of Per. 18 Resp. Court's March 9, 2023 Min. Order ("Per. 18 March 10, 2023 *Ex*

*Parte* Suppl. Mem."), ECF No. 14. Finally, at the Court's direction, Per. 18 filed an updated privilege log, formatted to permit the Court to determine which claims corresponded to which documents submitted for *in camera* review. Court's Min. Order (March 11, 2023); Sealed *Ex Parte* Suppl. Filing of Per. 18 Resp. Court's March 11, 2023 Min. Order ("Per. 18 March 12, 2023 *Ex Parte* Suppl. Mem."), ECF No. 16.

The government's motion is now ripe for review.

## II. APPLICABLE LEGAL PRINCIPLES

"Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena." *In re Sealed Case ("In re Sealed Case (1982)")*, 676 F.2d 793, 806 (D.C. Cir. 1982). "Only a very limited number of recognized privileges provide legitimate grounds for refusing to comply with a grand jury subpoena, and each of these is firmly anchored in a specific source—the Constitution, a statute, or the common law." *Id.* The attorney-client privilege and work-product doctrine are two such grounds, but such "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974); *see also Federal Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1269 (D.C. Cir. 2018) (Pillard, J., concurring) (noting that the "attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle" (quoting *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998))); *United States v. Zubaydah*, 142 S. Ct. 959, 994 n.12 (2022) (Gorsuch, J. dissenting) (observing that privileges generally "should be recognized only within the narrowest limits defined by [the] principle[s]" animating them (internal quotation marks omitted)).

The attorney-client privilege protects communications between attorneys and their clients. It is "the oldest of the privileges for confidential communications known to the common law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v.*

*United States*, 449 U.S. 383, 389 (1981)). As the Supreme Court explained, "[b]y assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation," and "[t]his, in turn, serves 'broader public interests in the observance of law and administration of justice.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Upjohn Co.*, 449 U.S. at 389). Thus, the privilege covers a communication "between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) (Kavanaugh, J.).

The work-product doctrine protects a different category of materials: only "documents and tangible things that are prepared in anticipation of litigation" by a party or its representative, including the party's attorney. *United States v. Deloitte LLP*, 610 F.3d 129, 135 (D.C. Cir. 2010) (quoting FED. R. CIV. P. 26(b)(3)(A)). Unlike the attorney-client privilege, which is held only by the client, "the work product privilege protects both the attorney-client relationship and a complex of individual interests particular to attorneys that their clients may not share," *In re Sealed Case (1982)*, 676 F.2d at 809, and resultantly, work product's protection "belongs to the lawyer as well as the client." *Id.* at 812, n.75. The doctrine emerged as a common law privilege in the civil litigation context, *see generally Hickman v. Taylor*, 329 U.S. 495 (1947), and has been extended to apply to criminal matters, *see United States v. Nobles*, 422 U.S. 225, 236–38 (1975), with codification in both the federal civil and criminal procedural rules, *see* FED. R. CIV. P. 26(b)(3) and FED. R. CRIM. P. 16(b)(2). The D.C. Circuit has not clarified whether FED. R. CIV. P. 26(b)(3)—which by its own terms applies to discovery—creates the substance of the work-product doctrine in the context of grand jury subpoenas, but "[b]ecause of [the] apparent identity between the common law standard and that of Rule 26(b)(3), it appears to make little difference" where the work product doctrine in this context is substantively rooted. *In re Sealed*



Subject to Protective Order 

*Case ("In re Sealed Case (August 1997)")*, 124 F.3d 230, 236 n.7 (D.C. Cir. 1997), *rev'd on other grounds by Swidler & Berlin v. United States*, 524 U.S. 399 (1998); *see also In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 185 (2d Cir. 2007) (explaining that neither rule "is a perfect fit in the grand jury context").

"[T]he showing of need required to discover another party's work product depends on whether the materials at issue constitute 'fact' work product or 'opinion' work product." *United States v. Clemens*, 793 F. Supp. 2d 236, 244 (D.D.C. 2011). Opinion work product, comprising written materials prepared by counsel that reflect the attorney's "mental impressions, conclusions, opinions, or legal theories," is "virtually undiscoverable," *Deloitte*, 610 F.3d at 135 (quoting *Dir., Off. Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997)). In contrast, "[t]o the extent that work product contains relevant, nonprivileged facts, the *Hickman* doctrine merely shifts the standard presumption in favor of discovery and requires the party seeking discovery to show 'adequate reasons' why the work product should be subject to discovery." *In re Sealed Case (1982)*, 676 F.2d at 809.

The crime-fraud exception at issue here pierces the shields of both the attorney-client privilege and work-product doctrine upon the proper showing that "a privileged relationship [was] used to further a crime, fraud, or other fundamental misconduct." *Id.* at 807. "Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case ("In re Sealed Case (1985)")*, 754 F.2d 395, 399 (D.C. Cir. 1985)). "To establish the exception . . . the court must consider whether the client 'made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act,' and establish that the client actually 'carried out the crime or fraud.'" *In re Sealed Case ("In re Sealed Case (2000)")*, 223 F.3d 775, 778 (D.C. Cir. 2000) (quoting *In re Sealed Case ("In re Sealed Case*



Subject to Protective Order

*(March 1997)")*, 107 F.3d 46, 49 (D.C. Cir. 1997)). "To establish the exception to the work-product privilege, courts ask a slightly different question, focusing on the client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication: 'Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?'" *In re Sealed Case (2000)*, 223 F.3d at 778 (quoting *In re Sealed Case (March 1997)*, 107 F.3d at 51).

To satisfy its burden of proof as to the crime-fraud exception, the government must offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Grand Jury*, 475 F.3d at 1305 (quotation marks omitted). It "need not prove the existence of a crime or fraud beyond a reasonable doubt." *In re Sealed Case (1985)*, 754 F.2d at 399. Instead, the D.C. Circuit has "described the required showing in terms of establishing a 'prima facie' case," *In re Sealed Case (March 1997)*, 107 F.3d at 49 (tracing this "formulation . . . to the Supreme Court's opinion" in *Clark v. United States*, 289 U.S. 1, 14 (1933)). "The determination that a prima facie showing has been made lies within the sound discretion of the district court," *In re Sealed Case (1985)*, 754 F.2d at 399, which must "independently explain what facts would support th[e] conclusion" that the crime-fraud exception applies. *Chevron Corp. v. Weinberg Grp.*, 682 F.3d 96, 97 (D.C. Cir. 2012).

While recognizing that "*in camera, ex parte* submissions generally deprive one party to a proceeding of a full opportunity to be heard on an issue," *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998) (quotation marks omitted), the D.C. Circuit has approved the use of that process "to determine the propriety of a grand jury subpoena or the existence of a crime-fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings," *id; see also Zolin*, 491 U.S. at 556

(holding that *in camera* review may be used to probe crime-fraud challenges to attorney-client privilege).

### III. DISCUSSION

The government contends that the application of the crime-fraud exception prevents Per. 18 and [redacted] from standing on the attorney-client privilege or work product doctrine to withhold testimony and documents regarding the lawyers' efforts, taken on behalf of the former president, to comply with a grand jury subpoena commanding the production of all documents with classification markings in the former President's or office of the former President's possession. According to the government, Per. 18 and [redacted] client, former President Trump, "engaged in a crime, fraud, or other fundamental misconduct and communicated and consulted with Per. 18 and [redacted] on these six topics in furtherance of that conduct," vitiating any claims of attorney-client privilege or work-product doctrine protection. Gov't's Mot. at 9. The former president urges that no crimes were contemplated, and that his consultations with lawyers in seeking to comply with a grand jury subpoena "simply are not, in and of themselves, evidence that they are in furtherance of any crime." Resp't's Opp'n at 11. Per. 18 for his part, additionally argues that, because he has asserted his own claim to work-product protection, and because the government has not argued that Per. 18 was complicit in the alleged crimes of his client, his work product cannot be pierced by the operation of the crime-fraud exception. *See* Per. 18 Opp'n at 2.

This discussion proceeds in four parts. The first part clarifies the nature of this proceeding by addressing—and rejecting—Trump's argument that he has a due process right to review the government's *ex parte* submission in support of its motion to compel. Second, before addressing the thrust of the parties' briefings as to the application of the crime-fraud exception, the threshold inquiry is considered of whether the withheld documents and testimony should be

considered privileged at all. Next, the focus turns to the heart of the dispute: whether the crime-fraud exception applies to pierce the privileged communications and work-product subject to the government's November 21, 2022 and January 25, 2023 subpoenas to Per. 18 and [redacted] respectively, given the nature of the prima facie burden that the government must satisfy to invoke the crime-fraud exception. As part of this analysis, the first prong of the crime-fraud exception is examined to conclude that the government has sufficiently demonstrated that former President Trump's apparent actions or omissions in response to the May 11, 2022 grand jury subpoena may trigger criminal culpability, followed by consideration of the exception's second prong requiring a nexus between the privileged communications or work product and the previous prong's criminal conduct, and a finding that this second prong is also satisfied as to the withheld testimony and most of the withheld documents. Finally, because the government presently agrees not to seek to compel production of attorney opinion work product, the final part defines the proper scope of that doctrine as applied to the withheld testimony and documents.

### A. Due Process and *Ex Parte* Proceedings

As a threshold matter, Trump contends that his inability to review the government's *ex parte* submission in support of its motion to vitiate his claims of attorney-client privilege and work-product protection is unfair, urging that "[c]onstitutional due process requires that President Trump and the Office receive notice of the facts the Government relies upon to make its extraordinary request." Resp't's Opp'n at 11. To be sure, *in camera, ex parte* submissions "'generally deprive one party to a proceeding of a full opportunity to be heard on an issue' . . . and thus should only be used where a compelling interest exists," but the D.C. Circuit has held that proceedings attendant to ongoing grand jury investigations—where secrecy is paramount—satisfy that high bar. *In re Sealed Case No. 98-3077*, 151 F.3d at 1075 (quoting *In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)).

The grand jury is an institution separate from the courts and government prosecutors—"a constitutional fixture in its own right," *United States v. Williams*, 504 U.S. 36, 47 (1992) (internal quotation marks omitted)—that depends on secrecy in order to "serv[e] as a kind of buffer or referee between the Government and the people," *id.* Among the reasons for the grand jury's need for secrecy are the following:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.

*Douglas Oil v. Petrol Stops Northwest*, 441 U.S. 211, 219 (1979). As a result, courts have consistently held that submissions in support of motions to apply the crime-fraud exception in the context of a grand jury subpoena are appropriately filed *ex parte*. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1179–80 (D.C. Cir. 2006) (Tatel, J., concurring) ("In this circuit . . . we have approved the use of '*in camera, ex parte* proceedings to determine the propriety of a grand jury subpoena or the existence of a crime-fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings.'" (quoting *In re Sealed Case No. 98-3077*, 151 F.3d at 1075); *In re Grand Jury Subpoena*, 223 F.3d 213, 217–19 (3d Cir. 2000); *In re John Doe, Inc.*, 13 F.3d 633, 635–36 (2d Cir. 1994); *In re Grand Jury Proceedings*, 33 F.3d 342, 352–53 (4th Cir. 1994).

Having reviewed the government's *ex parte* memorandum and exhibits submitted in support of its motion, the Court is satisfied that maintenance of secrecy is necessary to safeguard the grand jury's ongoing investigation. The former president's citation to *United States v. Rezaq* is inapposite as this case merely stands for the undisputed principle that "[*e*]*x parte* communications between a district court and the prosecution in a criminal case are greatly discouraged," 899 F. Supp. 697, 707 (D.D.C. 1995). At present, *there is no criminal case*—only

a grand jury proceeding, which "is not an adversary hearing where guilt or innocence is adjudicated but an *ex parte* investigation to determine if there is probable cause to believe a crime has been committed." *In re Grand Jury Subpoena*, 223 F.3d at 216. Should the government proceed by asking the grand jury to return an indictment and should the grand jury decide to return an indictment and a criminal prosecution ensue, the bar for any evidence to be presented *ex parte* will be far higher, in accordance with the principle articulated in *Rezaq*. Nor does the former president's status as a former president or presidential candidate earn him across-the-board special treatment, *see* Resp't's Opp'n at 9—an argument advanced by the former president that appears to be more offensive to the rule of law than the use of *ex parte* proceedings. To be sure, courts sometimes make particularized accommodations for sitting presidents based on carefully balancing the principle that the "President . . . does not stand exempt from the general provisions of the constitution" against the need to safeguard the "President's ability to perform his vital functions." *See generally Trump v. Vance*, 140 S. Ct. 2412 (2020) (internal quotation marks omitted). This does not amount to a carte-blanche entitlement to exceptional treatment.[13]

Doubling-down on his status as the former president, the former president accuses the government of a "common goal of damaging the political viability of one person, President Donald J. Trump," who is "a major political opponent of the current president," and characterizes the pending motion as asking the Court "to ignore that context and receive an *ex*

[13] The former president further urges that the government's *ex parte* submissions not be relied upon because, in the examination before the grand jury of another of the former president's attorneys, Timothy Parlatore, a prosecutor repeatedly attempted to elicit testimony protected by the attorney-client privilege and, at one point, asked why the former president would not waive his privilege if he really were "so cooperative." Resp't's Suppl. Mem. at 2. The former president is correct that "[i]f a witness exercises some right or privilege, it is generally agreed that it is improper to suggest that adverse inferences should be drawn." SARAH SUN BEALE, GRAND JURY LAW & PRACTICE § 9:2 (2d ed. 2022). The relationship between this single exchange with a different lawyer before the grand jury and the instant matter is attenuated, however, and does not justify the former president's request for unfettered access to the government's *ex parte* submission.

*parte* submission from the Government as gospel." Resp't's Opp'n at 9–10. This argument is long on theatrics and short on substance. Taking an assertion "as gospel" is generally understood as accepting it as true on the basis of *faith*, without other factual evidence as support. That is a far cry from what is occurring here. The government's *ex parte* submission consists of documentary and sworn testimony, the normal forms of evidence, and any inferences to be drawn from that evidence are not based on faith or speculation, as the former president fears, but stem from reason, context, and facts. The former president expresses concern about being personally targeted by the executive branch in the course of this investigation, but the design of the criminal justice system sets out checks and balances, including the roles of the grand jury and this Court, two institutions that sit outside of the executive branch. Moreover, the government has provided ample insight into its theory supporting the application of the crime-fraud exception—that the subject communications may reveal a deliberate scheme by the former president to provide the government a false certification that no classified documents remained in the former president or his office's possession—for him to have provided rebuttal evidence to the Court *ex parte*, offering an innocent explanation for the government's indication that "government records were likely concealed and removed from the storage room . . . to obstruct the government's investigation." Gov't's Mot. at 6. No such explanations have been offered and, while, certainly, the burden rests with the government to justify application of the crime-fraud exception, the former president's suggestion that he has *no* "notice of the factual basis for asserting the crime/fraud exception," Resp't's Opp'n at 13—is simply incorrect.

**B. Attorney-Client Privilege as a Threshold Matter**

In moving to compel the witnesses' testimony and documents, the government avoids the more painstaking approach of arguing which subject communications are not protected at all by the attorney-client privilege by instead arguing that, "[e]ven assuming the testimony and

documents withheld by Per. 18 and [redacted] otherwise meet the requirements for the attorney-client or work-product privileges," the crime-fraud exception vitiates those privileges regardless. Gov't's Mot. at 1. At the same time, the government urges in a footnote that "much of" Per. 18 testimony does not concern privileged communications at all because the testimony would not reveal communications seeking or providing legal advice. *See id.* at 14 n.4. Though not entirely clear due to the lack of specifics, the government appears to overstate the degree to which Per. 18 testimony falls outside the privilege.

Certainly, not all exchanges between an attorney and his client fall within the protection of the attorney-client privilege—particularly where, as here, the attorney performs both legal and non-legal functions. The attorney-client privilege protects only communications for which "obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication." *Boehringer*, 892 F.3d at 1267 (quoting *Kellogg*, 756 F.3d at 759) (emphasis in original). *Matter of Feldberg* is particularly instructive for defining the contours of the privilege when a lawyer is closely involved in the mechanics of a search in response to a grand jury subpoena. *See* 862 F.2d 622 (7th Cir. 1988). In *Matter of Feldberg*, an attorney played a key role in the search for documents in response to a subpoena, which search yielded a suspiciously incomplete return of the client's files. Judge Easterbrook held that "[t]here is no need for a privilege to cover information exchanged in the course of document searches, which are mostly mechanical yet which entail great risks of dishonest claims of complete compliance. Dropping a cone of silence over the process of searching for documents would do more harm than good." *Id.* at 627. At the same time, when the attorney served both "mechanical and advisory" functions, line-drawing as to privilege protection might not be clear-cut, since "questions about the mechanics (who, how, when, where) of the search" fell outside the privilege, but other questions about the search—such as the substance of the attorney's conversation with the client,



Subject to Protective Order 

or how the attorney concluded that the files produced were complete, might be protected. *Id.* at 628 (remanding as to the latter questions).

Contrary to the government's cursory assertion, many of the questions that Per. 18 declined to answer on the basis of the privilege appear to elicit privileged attorney-client communications of an advisory, rather than mechanical, nature. [redacted] At the same time, most questions seeking what Judge Easterbrook would call mechanical information about Per. 18 task, such as how, when, and where he conducted the search, were properly answered without an invocation of privilege, *see, e.g., id.* at 94:25–95:11; 96:10–100:8.

On the other side of the line, however, rest the government's inquiries as to the identities of the individuals with whom Per. 18 spoke to determine the location of potentially responsive documents. *See, e.g., id.* at 58:1–20. This assertion of attorney-client privilege fails because the



Subject to Protective Order

fact that Per. 18 sought out the input of certain individuals—without revealing the substance of those interactions—does not reveal "any litigation strategy or other specifics of the representation or any confidential client communications." *United States v. Naegele*, 468 F. Supp. 2d 165, 171 (D.D.C. 2007) (holding that billing statements not privileged for this reason); *United States v. Halliburton Co.*, 74 F. Supp. 3d 183, 190 (D.D.C. 2014) (noting that "the fact of the consultation" between an attorney and client is not privileged). Perhaps Per. 18 invoked the attorney-client privilege in this context because he contacted individuals recommended by his client, and revealing those identities would thus reveal the contents of a client communication—but this justification fails, too. The attorney-client privilege protects only the "*communication* of facts" when those facts are conveyed for the purpose of seeking legal advice, not the "underlying facts" themselves. *Boehringer*, 892 F.3d at 1268; *see also Alexander v. FBI,* 192 F.R.D. 12, 16 (D.D.C. 2000) (Lamberth, J.) (holding no attorney-client privilege where privilege claimant failed to provide factual basis that "questions would 'necessarily' reveal the content of [privileged] communications"). The prosecutor does not over-step on the attorney-client privilege by querying the identities of individuals with whom Per. 18 spoke in his efforts to respond to the May 2022 Subpoena; the prosecutor would only elicit privileged communications if she asked whom the former President told Per. 18 to contact, or what the resultant conversations entailed.[14] In short, whether the crime-fraud exception applies, Per. 18 must answer questions about the identities of the persons with whom he spoke to prepare for responding to the May 2022 Subpoena.

[14] The former president further urges that the list of individuals questioned by Per. 18 constitutes opinion work product, even if the attorney-client privilege does not attach. *See* Resp't's Suppl. Mem. at 3–5. As discussed *infra* in Part III.D, Per. 18 opinion work product is not sought by the government, and the scope of testimony and documents properly shielded behind this doctrine is addressed in that part of this Memorandum Opinion.

### C. Application of the Crime-Fraud Exception

The crime-fraud exception involves a two-pronged inquiry, requiring first that the movant make a prima facie showing that the client committed a crime or fraud, and second, that the attorney-client communications or work product at issue furthered the criminal scheme. A discussion of how the exception's requirements are met here follows review of the nature of the prima facie standard against which the government's evidence is measured.

#### 1. *The Prima Facie Standard*

The crime-fraud exception applicable to overcome the attorney-client privilege was first set out by the Supreme Court in *Clark v. United States*, which held that, "[t]o drive the privilege away, there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact." 289 U.S. at 15 (quotation marks omitted). Thereafter, the D.C. Circuit and Supreme Court have both acknowledged the "confusion" arising from the "prima facie" standard for finding the crime-fraud exception. *See, e.g., In re Sealed Case (March 1997),* 107 F.3d at 49 ("What was the nature of [the government's burden to apply the crime-fraud exception]? Here we encounter some confusion."); *Zolin*, 491 U.S. at 564 n.7 (noting, without offering resolution, that the *Clark* Court's concept of a "prima facie" standard had "caused some confusion," because this standard is typically used in civil litigation as merely a burden of production, which when satisfied, shifts the burden of proof to the opposing party—rather than a standard that, as in the crime-fraud exception context, "is used to dispel the privilege altogether"). The prima facie standard is "among the most rubbery of all legal phrases; it usually means little more than a showing of whatever is required to permit some inferential leap sufficient to reach a particular outcome." *In re Grand Jury*, 705 F.3d 133, 152 (3d Cir. 2012) (quoting *In re Grand Jury Proceedings*, 417 F.3d 18, 22–23 (1st Cir. 2005)).

Tasked with applying the standard in practice, federal courts have offered a range of interpretations as to the burden the movant must satisfy. The First and Third Circuits have required a "reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." *In re Grand Jury Proceedings*, 417 F.3d at 23; *see also In re Grand Jury*, 705 F.3d at 153 (adopting reasonable basis standard in the Third Circuit). Other courts have described the standard as one of more rigorous probable cause. *See United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *In re Grand Jury Proceedings, G.S., F.S.,* 609 F.3d 909, 913 (8th Cir. 2010). Yet others have conceived of the standard in terms of burden-shifting between the parties, where the movant must "produc[e] evidence that will suffice until contradicted and overcome by other evidence" as to the applicability of the exception. *In re Boeing Co.*, Case No. 21-40190, 2021 WL 3233504, *2 (5th Cir. July 29, 2021); *see also United States v. Boender*, 649 F.3d 650, 655–56 (7th Cir. 2011) (describing that, after the government presents its prima facie case, the defendants may "come forward with an explanation for the evidence," an explanation that the district court then accepts or rejects). The D.C. Circuit, for its part, has rejected the probable cause articulation, instead requiring the government to offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *In re Sealed Case (March 1997),* 107 F.3d at 49–50 (quotation marks omitted) (criticizing the D.C. Circuit's earlier dicta in *In re Sealed Case (1985),* 754 F.2d at 399 n.3, indicating that "there was little practical difference" between its stated prima facie standard and the Second Circuit's probable cause standard).

What is clear is that the invocation of the crime-fraud exception is not an invitation for the Court to usurp the role of a petit jury in finding that the government has proven its case beyond a reasonable doubt, nor even the task of a grand jury in finding probable cause to believe that a crime was committed and the person charged committed that crime. As the D.C. Circuit



Subject to Protective Order

has written in the context of the application of the crime-fraud exception to materials subject to a grand jury subpoena, "[t]he point is not to convict anyone of a crime or to anticipate the grand jury, but only to determine whether the possibility that a privileged relationship has been abused is sufficient to alter the balance of costs and benefits that supports the privilege." *In re Sealed Case (1982),* 676 F.2d at 814; *see also Matter of Feldberg*, 862 F.2d at 626 ("The question here is not whether the evidence supports a verdict but whether it calls for inquiry.") The Circuit has acknowledged certain practical realities, including that "[i]n making this determination courts will not be able to receive a complete adversary presentation of the issues, since one of the parties will not be privy to the information at issue," and, further, that "[a]ny system that requires courts to make highly refined judgments—perhaps concerning volumes of documents—will most likely collapse under its own weight." *In re Sealed Case (1982),* 676 F.2d at 814. Consequently, "courts do not require proof beyond a reasonable doubt that someone has committed a crime or fraud." *Id.*

Thus, the government's evidentiary showing in this posture is "not a particularly heavy one," *In re Grand Jury,* 705 F.3d at 153 (internal quotation marks omitted), and it does not require the Court to conduct a "minitrial," *In re Sealed Case (1985),* 754 F.2d at 402 n.7. Indeed, a grand or petit jury, having heard the evidence presented by the government and the former president on a more fulsome record, assessed the credibility of the witnesses, and weighed potential defenses asserted, including by any claimant of the privilege, may reasonably come to a different conclusion than this Court.

### 2. *Prong One: Evidence of Criminal Violations*

The government has satisfied its burden of showing "evidence that if believed by the trier of fact would establish the elements" of criminal violations. *In re Grand Jury*, 475 F.3d at 1305. The government contends that the former president "orchestrated a scheme to hide from the



Subject to Protective Order

government and the grand jury documents with classification markings that he unlawfully retained," including by knowingly misleading his attorneys—including Per. 18 —and causing those attorneys to provide the government with a false certification in response to a grand jury subpoena. Gov't's *Ex Parte* Mem. at 1; *accord* Gov't's Reply at 8–9. Specifically, the government cites as the criminal statutes the former president may have violated: 18 U.S.C. §§ 793(e) (willful and unauthorized retention of national defense information), 1001(a)(1)–(2) (false statements), 1512(b), 1512(c)(1), and 1519 (obstruction of justice), as well as 18 U.S.C. § 2 (liability for causing crime to be committed). Gov't's *Ex Parte* Mem. at 33; *see generally* Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. The elements of the unauthorized retention statute, followed by the elements of the obstruction statutes, are considered in turn.

*a) Unauthorized Retention of National Defense Information*

Section 793(e) criminalizes the "unauthorized possession of . . . any document . . . relating to the national defense" when an individual "willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it." 18 U.S.C. § 793(e). As a result, proof of this criminal violation requires evidence that (1) the defendant "lack[ed] authority to possess, access or control (2) information relating to the national defense (3) in either tangible or intangible format, and (4) willfully (5) [undertook] the [] conduct" proscribed by the statute, including failing to deliver the information. *United States v. Aquino*, 555 F.3d 124, 130–31 (3d Cir. 2009); *see also* Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. at 2 (describing the same elements with a slightly different formulation).

The first element—whether the former president "lack[ed] authority to possess, access or control" the documents—is not dispositive, because a prima facie violation of a crime is made out either way: Section 793(d) criminalizes exactly the same conduct where the perpetrator is in lawful possession of the documents. *Compare* 18 U.S.C. 793(d) *with* 793(e); *see also* Gov't's

March 10, 2023 *Ex Parte* Suppl. Mem. at 4, n.3; *United States v. Kiriakou*, 898 F. Supp. 2d 921, 923 n.2 (E.D. Va. 2012) (noting the minor difference that, under Section 793(e), failing to return the documents is criminalized even when there has been no demand for their return). In any case, the government has made a sufficient prima facie showing that the former president was not authorized to retain the documents. The former president would have been authorized to possess classified information only upon the current administration's waiver of the need-to-know requirement and only so long as the "information [was] safeguarded in a manner consistent with" Exec. Order No. 13, 526, but the classified documents were stored in unauthorized and unsecured locations. Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. at 4 n. 2 (quoting Nov. 2022 Mem. Op. at 30–31); *see also* MAL Warrant Aff. ¶ 61(noting that government counsel sent Trump's counsel a letter that "reiterated that [Mar-a-Lago] [is] not authorized to store classified information")..

The government has proffered sufficient evidence that the former president possessed tangible documents containing national defense information (elements two and three), and further that he failed to deliver those documents to an officer entitled to receive them (element five). The former president's Office received a subpoena on May 11, 2022 for all documents with classification markings in his and his office's possession; in response, they provided the government—via Per. 18 and Per. 12—only a small fraction of the classified documents in his possession, as outlined *supra,* in Parts I.C. & E. Two months after the former president yielded 38 unique classified documents to the government on June 3, 2022, the government discovered over 100 additional classified documents stored in Mar-a-Lago during execution of the August 8, 2022 search warrant that the former president had failed to deliver. The documents were classified to levels as high as TOP SECRET, with some documents bearing additional sensitive compartment indications, *see supra* Part I.C; undoubtedly, these documents contained national



Subject to Protective Order

defense information. *See United States v. Abu-Jihaad*, 630 F.3d 102, 135 (2d Cir. 2010) (holding that, because document related to Navy ship movements was classified as "confidential," there "can be no question that this information related to the national defense"); Gov't's Suppl. *Ex Parte* Mem. at 5 n.4 (representing that "[d]ozens of documents recovered by the government on August 8" would be "potentially damaging to the United States" if disclosed). More classified-marked documents still were uncovered in November 2022 in a leased storage unit, in December 2022 in the Office at Mar-a-Lago, and apparently sometime thereafter in the former president's own bedroom at Mar-a-Lago.

As to the *mens rea* element of the statute, which requires that the former president retained the classified documents "willfully," the government has also provided sufficient evidence to meet its burden. As detailed *supra* in Part I.C.3, the government provided evidence that the former president knew that Per. 18 limited his search for responsive documents on June 2, 2022 to Mar-a-Lago's storage room: he met with Per. 18 both before and after the lawyer's search. The former president also knew that all of the boxes potentially containing classified information were not located in the storage room at the time of Per. 18 search. Between May 22, 2022 and June 1, 2022, WITNESS 5 moved over sixty boxes from the storage room to the former president's suite. *See supra* at Part I.C.2. By June 1, 2022, the boxes in the suite had grown so numerous that Per. 30 expressed concern to WITNESS 5 that their plane would not have room for them—to which WITNESS 5 responded that the former president "told [him] to put them in the room," where he believed "Trump wanted to pick from them," rather than bring them on the plane. Gov't's *Ex Parte* Mem., Ex. 11, Texts between WITNESS 5 and Per. 30 (May 30, 2022). The next day, mere hours before Per. 18 arrived to search the storage room, WITNESS 5 and WITNESS [redacted] returned only about 25 to 30 of the boxes back to the storage room. The timing of this choreography of box movements—which



Subject to Protective Order USA-01288892

WITNESS 5 directly attributed to the former president's orders—is strong evidence that the former president intended to hide boxes from his attorney's search efforts to comply with the grand jury subpoena, and resultantly, unlawfully to retain any classified documents contained inside any of the boxes purposely removed from the attorney search.

Other evidence demonstrates that the former president willfully sought to retain classified documents when he was not authorized to do so, and knew it. First, even before the issuance of the May 11, 2022 subpoena, he deliberately curtailed his staff's efforts to comply with NARA's requests to return missing presidential records. As described *supra* in Part I.B, in the months leading up to January 2022, the former president reviewed only fifteen to seventeen of the boxes retrieved from his storage room before telling his staff, "that's it," and instructing WITNESS [redacted] to tell one of the former president's lawyers that no more boxes remained at Mar-a-Lago. The former president knew at the time that he had only reviewed a fraction of the total boxes in the storage room, because his staff had showed him a picture of the floor-to-ceiling stacks numbering over sixty boxes. *See* MAL Warrant Aff. ¶ 46. The former president's misdirection of NARA was apparently a dress rehearsal for his actions in response to the May 11, 2022 subpoena.

Second, the documents submitted by Per. 18 for the Court's *in camera* review reveal the former president's desire to conceal classified information in his possession from the government in response to the subpoena—as well as his being advised that doing so was wrongful. *See Zolin,* 491 U.S. at 569–70 (holding that communications considered *in camera* may be used for the purpose of establishing the crime-fraud exception). [redacted] "we just don't respond at all or don't

play ball with them," and asked, "wouldn't it be better if we just told them we don't have anything here?" *See* P. 18-PRIV-082 at 15–16, 22.[15] [redacted] "she didn't get in any trouble." *Id.* at 24. [redacted] he recounted that the former president "made a funny motion" [redacted] "if there's anything really bad in there, like, you know, pluck it out." P. 18 [redacted]083 at 6.

Without discussing any criminal statute specifically, the former president contends that the "mere fact that the [June 3, 2022 Certification] post hoc is claimed by the Government to be inaccurate" does not suffice for the crime-fraud exception to apply. Resp't's Opp'n at 12. This Court agrees, but the problem for the former president is that the first inaccurate certification is not the sole factual basis presented by the government to invoke the exception.

At the March 9th hearing, his counsel urged that the former president's later efforts to comply with the May 11, 2022 subpoena—including the searches of five different locations, including Mar-a-Lago, across October through December of 2022, *see supra* Part I.G—demonstrate the former president's diligent efforts to provide the government "everything they could ever ask"—even if those efforts were admittedly undertaken "under the shadow of Court contempt." March 9, 2023 Hr'g Tr. at 60:8–24. He urged that the December 2022 discovery of

15 A key principle of the crime-fraud exception, as discussed *infra*, is that it does not strip the attorney-client privilege from consultations in which "a client seeks counsel's advice to determine the legality of conduct before the client takes any action," *United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989). If a client expresses an interest in an illegal course of conduct, is advised against it by his lawyer, and then decides to take his lawyer's advice, then the attorney-client relationship has worked exactly as intended and deserves the utmost protection. For this reason, one of the crime-fraud exception's requirements is that client must have "actually 'carried out the crime or fraud.'" *In re Sealed Case (2000)*, 223 F.3d at 778 (quoting *In re Sealed Case (March 1997)*, 107 F.3d at 49). The former president's statements to Per. 18 taken alone may be insufficient to establish the applicability of the crime-fraud exception—but they are relevant in resolving the discrete question here: whether evidence is sufficient for a prima facie showing that Trump acted willfully in retaining the classified documents.

four documents with classification markings in the Office's designated space within the Mar-a-Lago compound did not demonstrate the former president's intent to retain the records, emphasizing that the box was in the possession of a young staffer who believed it contained "essentially daily summaries of the President's activities," and who stored it in a closet, apparently of her own accord. *Id.* at 63:16–65:3.

To be sure, the government has not provided direct evidence that the former president deliberately retained, or was even aware of, the particular classified-marked documents located by his counsel at Mar-a-Lago in December 2022. Again, if the uncovering of these four classified-marked documents, even combined with the inaccurate June 3, 3022 Certification, were the only evidence of the former president's retention of classified documents, the government would have failed to make a prima facie showing of willfulness. That is not the limited scope of the factual record before this Court, however. Notably, no excuse is provided as to how the former president could miss the classified-marked documents found in his own bedroom at Mar-a-Lago. Instead, the government has provided evidence to demonstrate that the full arc of the criminal violation had already concluded more than six months before this search of Mar-a-Lago, when the evidence demonstrates that the former president intentionally failed to provide all of the classified documents in his possession to the government with the June 3, 2022 Certification. As the government correctly argues, the former president's later efforts to uncover additional classified documents do not undermine that showing. *See* Gov't's Suppl. *Ex Parte* Mem. at 15.

Accordingly, the Court finds that the government has made a sufficient prima facie showing that the former president violated 18 U.S.C. § 793(e).

*b) Obstruction of Grand Jury Investigation*



Subject to Protective Order USA-01288895

The government contends that the former president's conduct in responding to the May 11, 2022 subpoena can be viewed through another lens of criminal liability: obstruction of justice. By apparently causing Per. 18 to provide the government with the June 3, 2022 Certification, the government argues, the former president obstructed a grand jury's ongoing investigation and made false statements to government officials, in violation of 18 U.S.C. §§ 1001(a)(1), 1001(a)(2), 1512(b)(2)(A), 1512(c)(1), and 1519.

First, making deliberate false representations to the government is criminalized under 18 U.S.C. §§ 1001. The first two subsections of the statute prohibit "knowingly and willfully . . . falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact" or "mak[ing] any materially false, fictitious, or fraudulent statement or representation" in matters within the jurisdiction of any branch of the United States government. 18 U.S.C. §§ 1001(a)(1)–(2). The elements of these criminal violations that the government must satisfy are that: (1) "the defendant had a duty to disclose material information," *United States v. Craig*, 401 F. Supp. 3d 49, 62–63 (D.D.C. 2019) (quoting *United States v. White Eagle*, 721 F.3d 1108, 1116 (9th Cir. 2013)); (2) the defendant either falsified, concealed, or covered up such a fact by trick, scheme, or fraud, for § 1001(a)(1), or the defendant made "any . . . false, fictitious, or fraudulent statement or representation," for § 1001(a)(2); (3) "the falsified, concealed, or covered up fact was material," *Craig*, 401 F. Supp. 3d at 62–63; (4) "the falsification and/or concealment was knowing and willful," *id.*; and (5) "the material fact was within the jurisdiction of the Executive Branch," *id.*

The government has sufficiently demonstrated all four *actus reus* elements of the two offenses. First, the former president had a duty to disclose his possession of any classified documents in response to the May 11, 2022 subpoena, which sought "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump

bearing classification markings." May 2022 Subpoena at 1. The June 3, 2022 Certification, however, represented that, after a "diligent search was conducted of the boxes that were moved from the White House to Florida . . . Any and all responsive documents accompany this certification." June 3, 2022 Certification at 1. In this way, the certification satisfies the second element of both (a)(1) and (a)(2) of the statute by both covering up the fact that the former president continued to retain the documents, and effecting that cover-up in the form of a false statement. *See Craig*, 401 F. Supp. 3d at 63 ("[T]he law is clear that both the making of false statements and the deliberate withholding of material facts in the face of a duty to disclose them can be among the necessary affirmative acts" for the purposes of proving a violation of Section 1001(a)(1).) As to the third and fifth elements, the misrepresented fact was clearly material to the grand jury and FBI's investigation of whether additional classified-marked documents remained unlawfully in the former president's possession. *See* Gov't's *Ex Parte* Suppl. Mem. at 9–10.

As to whether the former president made or aided and abetted the making of the false statements contained in the June 3, 2022 Certification knowingly and willfully, the same reasons that support the Court's finding that his retention of the classified documents was willful support a parallel finding of intent here. In the context of this particular violation, however, the former president might claim that he did not know what Per. 18 and Per. 12 wrote in the June 3, 2022 Certification. After all, the certification was signed by Per. 12 not the former president, and no documentation or testimony to date indicates that the former president was shown or told about the contents of the certification. The extent of the former president's awareness of the substance of the certification is one of the precise topics upon which the government presently seeks Per. 18 testimony. *See supra* Part I.H. Still, even without proof that the former president read or was advised about the contents of, the certification, the government has sufficiently

demonstrated that he knew Per. 18 intended to inform the government that the responsive documents located in the storage room provided a comprehensive response to the May 2022 Subpoena—a representation that the former president, for the reasons already detailed, knew to be wrong.

The *in camera* submissions bear this conclusion out. [redacted]. The government has provided evidence to demonstrate that, at the time of that June 2, 2022 conversation, the former president knew that Per. 18 understanding of the existence of responsive documents was blinkered, and his certification concerning the results of a search limited to the storage room could not possibly be accurate. As a result, the former president's willfulness as to this violation has been adequately demonstrated.

Second, Section 1519 criminalizes altering or destroying records in order to obstruct justice. The statute prohibits "knowingly alter[ing], destroy[ing], mutilat[ing], conceal[ing], cover[ing] up, falsif[ying], or mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of" the United States government. 18 U.S.C. § 1519. This offense has three elements, as relevant here: the defendant (1) knowingly, (2) concealed or covered up a record, document, or tangible object, (3) with the intent to "impede, obstruct or influence [an] investigation." *United States v. Hassler*, 992 F.3d 243, 247 (4th Cir. 2021) (quoting *United*

*States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012)); *accord* Gov't's March 10, 2023 *Ex Parte* Suppl. Mem. at 12–13 (articulating a slightly different formulation).

The government has sufficiently demonstrated all three elements of this obstruction statute by providing evidence that the former president intentionally concealed the existence of additional documents bearing classification markings from Per. 18 knowing that such deception would result in Per. 18 providing an unknowingly false representation to the government. As a result, the former president's actions were intended to impede the FBI's investigation of his unlawful retention of classified documents—establishing a prima facie violation of Section 1519.[16]

### 3. *Prong Two: The "In Furtherance" Requirement*

A prima facie showing of unlawful or fraudulent conduct alone does not strip away the attorney-client privilege; rather, the government must also establish "some relationship between the communication at issue and the prima facie violation" for the privilege's protection of the communications to be pierced. *In re Sealed Case (1985)*, 754 F.2d at 399. This second requirement "defines the extent to which the privilege is lost once the exception is shown to apply, because only those individual documents that a court finds to have been prepared in preparation for, or in furtherance of, fraudulent activity are excepted from the privilege's protection." PAUL RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 8:14 (2022) (footnote omitted). For this condition to be satisfied, "the client must have made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," *In re Sealed Case (March 1997)*, 107 F.3d at 49. *See also Zolin*, 491 U.S. at 556 (noting the exception only applies to "communications in furtherance of future illegal conduct").

---

16 The Court need not address the government's arguments that it has also demonstrated prima facie showings that the former president violated Sections 1512(b)(2)(A) and (c)(1), given its satisfactory showing as to the other criminal statutes cited.



Subject to Protective Order USA-01288899

The D.C. Circuit has staked two clear guideposts in the proper application of this nexus requirement. At one end, as an upper limit on the movant's burden, the government need not "make a specific showing of the client's intent in consulting the attorney," *In re Sealed Case (1985)*, 754 F.2d at 402; nor a "specific showing of . . . the attorney's intent in performing his or her duties," *In re Sealed Case (1982),* 676 F.2d at 815. Any stiffer burden would "lead to either the kind of 'minitrial' forbidden by the Supreme Court in *United States v. Dionisio*, 410 U.S. 1 (1973), or a near evisceration of the exception." *In re Sealed Case (1985)*, 754 F.2d at 402 n.7. At the other end, the D.C. Circuit has repeatedly affirmed that merely "[s]howing temporal proximity between the communication and a crime is not enough." *In re Sealed Case (March 1997)*, 107 F.3d at 50; *accord In re Sealed Case (1985)*, 754 F.2d at 402 ("mere coincidence in time" not sufficient to link crime and communications).

In addition, the crime-fraud exception pierces the attorney-client privilege even when the attorney is an unknowing tool of his client. The attorney need not have the intent of furthering the misconduct; rather, "[t]he privilege is the client's, and it is the client's fraudulent or criminal intent that matters." *In re Sealed Case (March 1997),* 107 F.3d at 49. In *In re Sealed Case (1985)*, for example, a tax-exempt non-profit destroyed and altered evidence sought by subpoenas and civil discovery requests, and through its lawyers, filed false declarations and presented perjured testimony and altered documents in civil litigation. *See* 754 F.2d at 396–98. In holding that the crime-fraud exception applied to require two of the organization's lawyers to testify before a grand jury about the destruction and alteration of evidence, the D.C. Circuit held that the lawyers' "knowledge of the cover-up . . . need not be established in order for the government to sustain its burden," because the law is "well settled that an attorney's ignorance of his client's misconduct will not shelter that client from the consequences of his own wrongdoing." *Id.* at 402. The key is that the lawyers were "instrumentalities in the ongoing

cover-up whether they realized it or not," and thus, the privilege was defeated as to communications regarding criminal violations that occurred while the lawyers represented the organization. *Id.* at 402–403.

The nexus requirement operates differently in the context of the work-product doctrine in two key ways. First, the D.C. Circuit has articulated a looser standard for work product, requiring that a court only "find some valid relationship between the work product under subpoena and the prima facie violation," emphasizing that "the standard [need] not be too precise or rigorous." *In re Sealed Case (1982)*, 676 F.2d at 814–15. Courts focus on the "client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication." *In re Sealed Case (2000)*, 223 F.3d at 778. Second, as Per. 18 correctly argues, the work-product doctrine, unlike the attorney-client privilege, is held—and may be independently invoked—by both the client and the attorney. Per. 18 Opp'n at 2, 8–11.

Here, the government does not seek attorney opinion work product, *see* Gov't's Resp. at 1–2, ECF No. 9, and thus the focus is on fact work product.[17] Several courts of appeals have held that while an innocent attorney may independently stand on the work-product doctrine as to his opinion work product, "fact work product . . . may be discovered upon prima facie evidence of a crime or fraud as to the client only and thus even when the attorney is unaware of the crime or fraud." *In re Grand Jury Proceedings #5*, 401 F.3d 252, 252 (4th Cir. 2005). *See also In re Green Grand Jury Proceedings*, 492 F.3d 976, 981 (8th Cir. 2007); *In re Grand Jury*

[17] Nor does the government appear to dispute that the work-product doctrine applies as a threshold matter in this context, even though litigation was not pending at the time of the materials and topics subject to the government's motion. The Court assumes for the purposes of this decision that, in the wake of the receipt of the May 2022 Subpoena, Per. 18 work product was created "in anticipation" of litigation, *Deloitte*, 610 F.3d at 135. *See In re Sealed Case*, 29 F.3d 715, 718 (D.C. Cir. 1994) (holding that attorney work product may be created with an eye toward litigation even before a grand jury investigation has begun, such as in the context of an attorney investigating suspected criminal violations). This conclusion is supported by Per. 18 reference to potential "motion[s] pertaining to this investigation" in his May 25, 2022 letter to a Department of Justice official regarding the May 2022 Subpoena. *See* MAL Warrant Aff., Ex. 1, Letter from [redacted] Per. 18 [redacted], to Jay Bratt, DOJ (May 25, 2022) at 3.

*Proceedings*, 867 F.2d 539, 541 (9th Cir. 1989); *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 52 (7th Cir. 1980)). As a result, whether claimed by the former president, Per. 18 or [redacted] the fact work-product sought by the government may be disclosed upon the proper showing of relatedness.

With the contours of the nexus requirement established, Per. 18 and [redacted] withheld testimony, followed by their withheld documents, are each evaluated.

*a)* Per. 18 *Withheld Testimony*

As described *supra* in Part I.H, Per. 18 withheld testimony from the grand jury regarding five topics related to his efforts to respond to the May 11, 2022 subpoena and his creation of the June 3, 2022 certification, as well as a sixth topic regarding Per. 18 June 24, 2022 phone call with Trump. The government has made a sufficient showing that his testimony as to all six of these topics reflects communications "made in furtherance of a crime." *In re Grand Jury*, 475 F.3d at 1305. Consequently, so long as the government tailors its questions to elicit only testimony regarding fact work product and communications that would otherwise be attorney-client privileged, the crime-fraud exception vitiates Per. 18 claims.

The former president contends that Per. 18 actions were "undertaken in an effort to appropriately respond to the Government's subpoena," Resp't's Suppl. Mem. at 7, ECF No. 12, and where an attorney's advice is "'intended to prevent unlawful conduct' . . . even inaccurate or wavering advice does not constitute a communication rendered in furtherance of a crime or fraud," *id.* (quoting *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989)). Trump leans heavily on *United States v. White,* a bribery case in which the D.C. Circuit reversed a criminal conviction because key evidence presented at trial was protected by the attorney-client privilege. There, a former government official defendant Lester Finotti introduced evidence that, during a meeting with a co-defendant William White—one of the businessmen accused of bribing him—



Subject to Protective Order 

and White's lawyer, the lawyer had told Finotti that the scheme would be legal with Finotti's superiors' approval. 887 F.2d at 269. The government introduced evidence that, later that day, the same lawyer privately told White the opposite: that the arrangement was illegal regardless. *Id.* The district court had ruled pretrial that the crime-fraud exception was inapplicable to the afternoon conversation, but at trial reversed course, citing the exception as a basis for permitting the government to introduce testimony regarding the afternoon conversation. *Id.* at 271–72. On appeal, the D.C. Circuit rejected the application of the crime-fraud exception to the afternoon conversation, writing that the district court's "second thoughts on the crime-fraud exception would deny White the privilege where even its stern critics acknowledge that the justifications for the shield are strongest—where a client seeks counsel's advice to determine the legality of conduct *before* the client takes any action." *Id.* at 272 (emphasis in original).[18]

*White* does not bear the weight that the former president attempts to assign it. As the district court's decision makes clear, the lawyer's involvement in the scheme was limited to "what essentially amounts to a single conversation or consultation . . . [that] began . . . with White and others before lunch, and [that] went on immediately after lunch . . . with White alone." *United States v. Finotti*, 701 F. Supp. 830, 834 (D.D.C. 1988). *White* illustrates the

[18] The D.C. Circuit was plainly troubled by the procedural history in the case, where the district court had a change of heart mid-trial as to the crime-fraud exception's applicability to the afternoon attorney-client consultation. Before trial, the trial Judge granted a motion *in limine* by White and a fellow corporate executive co-defendant that sought to exclude consultations with the lawyer as protected by the attorney-client privilege. *See United States v. Finotti*, 701 F. Supp. 830, 832 (D.D.C. 1988). The morning consultation, however, was not privileged due to the presence of third parties, and Finotti was permitted to elicit testimony at trial regarding that exchange. In response, the government sought to elicit testimony regarding the afternoon consultation, prompting the two corporate executive co-defendants to seek exclusion of that evidence in reliance on the pretrial ruling. The Judge denied their motion on the basis of waiver, though no such waiver occurred, and by holding that the "door was opened," *id.* at 833, which was door-opening was done by Finotti, not the privilege-holder defendants, and, thirdly, noted that "if there were no other way to prevent the unjust result of permitting the defendants to place before the jury legal advice that was retracted within an hour or two . . . the Court would be prepared to reexamine its [pre-trial] ruling" and hold that the afternoon consultation was "in furtherance of the criminal enterprise." *Id.* at 836. The D.C. Circuit's discomfort with the ends-justified flip by the district court permeates the D.C. Circuit opinion. *See White*, 887 F.2d 267 at 269 (noting the trial court's "readiness to overturn an earlier ruling"); *id.* at 271 (holding that the lawyer's advice did not further the crime, "in line with the district court's initial ruling"); *id.* at 272 (describing the district court's "second thoughts on the crime-fraud exception").



Subject to Protective Order 

principle that, where an attorney's advice vis-à-vis a proposed criminal scheme is the type a Magic 8 Ball might provide (*e.g.,* "yes," "no," "try again"), the crime-fraud exception does not apply. As the Third Circuit has explained, if a client who intends to undertake an illegal course of action "tells the attorney the proposed course of action, and the attorney advises that the course of action is illegal," the consultation remains privileged; so too when the same client shops out the idea to another attorney, who says the course of conduct is legal. *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014). In both cases, "because the attorneys merely opined on the lawfulness of a particular course of conduct, [] this advice cannot be used 'in furtherance' of the crime." *Id.*

An attorney's services further his client's crime, however, where the attorney does something more, such that "the lawyer's advice or other services were misused." *In re Grand Jury Investigation*, 445 F.3d at 279. Courts have found this requirement satisfied where an attorney elaborated upon his advice by "provid[ing] information about the types of conduct that violate the law" such that the client could "shape the contours of conduct intended to escape the reaches of the law." *In re Grand Jury Subpoena*, 745 F.3d at 693. Also sufficient was an attorney's communications with his client informing her of the government's interest in certain emails, which advice she used to delete (or acquiesce in the deletion of) them. *See In re Grand Jury Investigation*, 445 F.3d at 279. Other courts, including the D.C. Circuit, have been satisfied where a client "took advantage of his attorney's expertise in aid of his endeavor to mislead others with a false cover-story regarding his conduct." *In re Green Grand Jury Proceedings*, 492 F.3d at 986; *see also In re Sealed Case (1985)*, 754 F.2d at 402; *see also In re Grand Jury Investigation*, Case No. 17-mc-2336 (BAH), 2017 WL 4898143, *7–10 (D.D.C. Oct. 2, 2017) (applying the crime-fraud exception where an attorney submitted false Foreign Agent

Registration Act filings on behalf of her clients, based on the clients' material omissions and misleading information).

Per. 18 "legal advice or other services" in his efforts to comply with the May 11, 2022 subpoena, unlike the lawyer's advice in *White*, "were misused" by the former president omitting to alert Per. 18 that the Mar-a-Lago storage room was not the only repository with boxes transferred from the White House. *In re Grand Jury Investigation*, 445 F.3d at 279. The government has proffered sufficient evidence to show that the former president—much like the non-profit organization in *In re Sealed Case (1985)*—used Per. 18 as an "instrumentalit[y]" or a "front m[a]n" to obstruct the government's investigation and perpetuate the former president's unlawful retention of any classified documents contained in boxes transferred from the White House that he knew had been removed from the storage room at the time of Per. 18 search. 754 F.2d at 402.

As described *supra* in Part I.C.2–5, Per. 18 and Per. 12 provided the government with a response to the May 11, 2022 subpoena that turned out to be wholly inaccurate. Contrary to the June 3, 2022 Certification's attestations, Per. 18 had not searched all of the boxes moved to Florida from the White House—instead, many had been surreptitiously removed from the storage room before his arrival—[redacted] paled in comparison to the over 100 documents responsive to the subpoena that the government ultimately located as the result of executing a search warrant on Mar-a-Lago two months later. *See supra* Part I.E. The government has not demonstrated that Per. 18 was aware his search was incomplete, but it has shown that his legal services to his client between May 11, 2022 and the provision of the June 3, 2022 Certification—[redacted]—may have directly

furthered his client's criminal conduct. Thus, to the extent that the first five topics of testimony sought by the government reveal attorney-client privileged communications, [redacted] all actions that, unknowingly or not, furthered his client's criminal actions. To the extent this withheld testimony reveals any fact work-product—such as information Per. 18 collected as to the potential locations of responsive documents, *see, e.g.,* Per. 18 GJ Tr. 58:21–23 (withholding testimony on this issue)—the even lower standard of "some valid relationship between the work product under subpoena and the prima facie violation," *In re Sealed Case (1982)*, 676 F.2d at 814–15, is satisfied.

The sixth topic—the substance of Per. 18 phone call with the former president on June 24, 2022—stands alone as occurring outside the period of Per. 18 efforts to respond to the May 11, 2022 subpoena and at a time that Per. 18 was likely considering a response to a different subpoena, issued on June 24, 2022 for security camera footage from within Mar-a-Lago. The government contends that this conversation furthered a different stage of the former President's ongoing scheme to foil the government's attempts to retrieve all classified-marked documents responsive to the subpoena. During an *ex parte* portion of the March 9, 2023 hearing, the government explained its view of the linkage between the June 24, 2022 phone call and ongoing criminal violations as follows.

As recounted *supra* in Part I.D, shortly after Per. 18 phone call with the former president, and on the same day as service of the government's subpoena for Mar-a-Lago security footage from the area around the storage room, WITNESS 5 rearranged his travel to fly to West Palm Beach the following day, falsely telling his colleagues that the change in plans was for personal reasons. Within two hours of landing in Florida, WITNESS 5 and WITNESS [redacted] entered



Subject to Protective Order 

the storage room, and WITNESS [redacted] can be seen gesturing toward the camera. March 9, 2023 Hr'g Tr. at 44:4–12. The government urged that this scramble to Mar-a-Lago in the wake of the June 24, 2022 phone call reflects the former president's realization that the removal of the boxes from the storage room before Per. 18 search was captured on camera—and his attempts to ensure that any subsequent movement of the boxes back to the storage room could occur off-camera. *Id.* at 44:13–45:2. This theory draws support from the curious absence of any video footage showing the return of the remaining boxes to the storage room, which necessarily occurred at some point between June 3, 2022—when the room had approximately [redacted] boxes, according to FBI agents and Per. 18—and the execution of the search warrant on August 8, 2022—when agents counted 73 boxes. *Id.* at 44:8–22 (Government counsel: "We have the footage from the relevant time period. And at least on those cameras—and we have requested additional footage—we never see the boxes or the documents being returned to the storage room." (*ex parte*)); Gov't's *Ex Parte* Mem. at 19 n.14 ("The security footage reviewed by the government to date does not depict movement of boxes into the storage room between June 3 and August 8.").

The government has provided sufficient evidence to demonstrate that the June 24, 2022 phone call may have furthered the former president's efforts to obstruct the government's investigation. The Third Circuit's *In re Grand Jury Investigation* case, 445 F.3d at 278–280, is directly on point. There, the attorney informed his client about the contents of a new government subpoena—information which the client then used to delete, or acquiesce in the deletion of, responsive emails. *Id.* [redacted], setting into motion WITNESS 5's

frenzied return to Mar-a-Lago.[19] [redacted] Per. 18 provided information to the former President that he could misuse to "shape the contours of conduct intended to escape the reaches of the law," *In re Grand Jury Subpoena*, 745 F.3d at 693—specifically, as the government urges, by likely instructing his agents to avoid the surveillance cameras he then understood to have been deputized by the government. Indeed, just four days before his trip to Mar-a-Lago, WITNESS 5 had testified before a grand jury that he was aware of the use of security cameras there, but he did not "know exactly where they're all at." WITNESS 5 GJ Tr. at 42–43. As a result, the government has sufficiently demonstrated that the final topic reflects communications that furthered the criminal scheme.

*b)* Per. 18 *Withheld Documents*

As described *supra* in Part I.J, Per. 18 has submitted for the Court's *in camera* review the 104 documents that he determined to be responsive to the grand jury subpoena but withheld on the basis of attorney-client privilege or the work-product doctrine.[20] Having reviewed these

---

19 More than mere "temporal proximity between the communication and a crime" has been demonstrated here. *In re Sealed Case (March 1997)*, 107 F.3d at 50. [redacted] *See, e.g.,* P. 18-PRIV-037 (Per. 18 [redacted]). *See also Zolin,* 491 U.S. at 569–70 (holding that communications considered *in camera* may be used for the purpose of establishing the crime-fraud exception).

20 Five different privilege logs prepared by Per. 18 have been submitted in the record and clarification is in order as to the privilege log used by the Court in making the determinations described in the text. First, the government provided to the Court, as Exhibit 16 of the *ex parte* supplement to its motion to compel, what it described as the privilege log provided by Per. 18 to the government in response to the subpoena. *See* Gov't's *Ex Parte* Mem., Ex. 16, Privilege Log, ECF No. 2. Later, in a March 6, 2023 supplemental filing, the government clarified that its earlier submission actually reflected a privilege log Per. 18 provided the government on January 6, 2023—which contained a mistake corrected by Per. 18 in a new privilege log on January 11, 2023—and submitted the correct, January 11, 2023 privilege log. Gov't's *Ex Parte* Suppl. Resp., ECF No. 10. Third, in opposition to the government's motion, Per. 18 attached a "Revised Privilege Log" listing approximately 52 documents, winnowing down the January 11, 2023 privilege log to list only documents Per. 18 counsel understood to be responsive to the six topics of withheld testimony described in the government's motion. *See* Per. 18 Opp'n at 4–5; Per. 18 Opp'n, Ex. A, Revised Privilege Log, ECF No. 5-1. This "Revised Privilege Log" also reflected withdrawn assertions of attorney work product doctrine as to four documents. In response to this Court's March 4, 2023 Minute Order, Per. 18 submitted a fourth privilege log, the "Second Revised Privilege Log," identifying whether each withheld document on the "Revised Privilege Log" contained fact or opinion work product, and whether any opinion work product was severable. Per. 18 Resp., Ex. A, Second Revised Privilege Log, ECF No. 8-1. Then, the government, in response to this Court's order, clarified that it sought "all withheld documents that satisfy the crime-fraud exception, *i.e.*, all documents listed in Per. 18 privilege log from January

documents, and in light of the Court's findings *supra* in Part III.C.2 regarding the nature of the former president's prima facie criminal violations, and the sufficiency of the evidence showing the former president's misuse of Per. 18 legal services to perpetrate those violations, the Court is satisfied that eighty-eight of the documents withheld by Per. 18 were sufficiently "in furtherance" of the former president's criminal scheme that any attorney-client privilege or fact work-product is vitiated by the crime-fraud exception.

i. *Communications and Work Product in Furtherance of May 2022 Subpoena Compliance*

Of the 104 records withheld, 81 clearly concern Per. 18 representation of the former president in connection with the May 2022 Subpoena. *See generally* Per. 18 *Ex Parte* Suppl. Resp. to Court's March 11, 2023 Min. Order, Ex. B, Third Revised Privilege Log ("Per. 18 Privilege Log"), ECF No. 16-2.[21] Any attorney-client privilege or fact work-product protection that would shield these documents from production is vitiated by the crime-fraud exception.

These documents cover the lifespan of Per. 18 work in response to the May 2022 Subpoena, including correspondence, handwritten notes, invoices reflecting his work on the matter, and transcriptions of his audio recordings. [redacted]

11, 2023—except for those documents or portions of documents that contain opinion work product—that reflect communications and consultations intended to further or facilitate the prima facie violations identified in the government's motion." Gov't's Resp. at 2–3. Given the coterminous subject matter of the subpoena document request and the six topics of Per. 18 withheld testimony and records, the Court ordered Per. 18 to provide *all* withheld documents on his January 11, 2023 privilege log for *in camera* review, Min. Order (March 9, 2023), and a privilege log for each of those documents with the same information reflected on the Second Revised Privilege Log, Min. Order (March 11, 2023). Per. 18 then filed a fifth log, titled "Third Revised Privilege Log," providing the same information as to all 104 documents, and further, identifying each document on the privilege log by the file names with which they were submitted to the Court. Per. 18 March 12, 2023 *Ex Parte* Suppl. Mem., Ex. B, Third Revised Privilege Log, ECF No. 16-2. The upshot of this tortured process is simple: the operative privilege log is the fifth, final one.

[21] These documents are identified by their file names—given that they were submitted without Bates stamps or other identifying markings on the face of the documents—as the following: P. 18-PRIV-002 to –7; P. 18-PRIV-009 to –17; P. 18-PRIV-021 to -27; P. 18-PRIV-031 to –36; P. 18-PRIV-039; P. 18-PRIV-043 to –70; P. 18-PRIV-079 to –89; P. 18-PRIV-091 to -99; and P. 18-PRIV-0101 to –104.



Subject to Protective Order 

[redacted]. After the May 23, 2022 meeting, Per. 18 recorded audio notes, the transcription of which is included in this tranche as well, *see* P. 18-PRIV-082. Other documents reflect Per. 18 draft and actual correspondence with Department of Justice officials regarding compliance with the subpoena. *See, e.g.,* P. 18-PRIV-023 to –25 [redacted]). [redacted] Finally, Per. 18 recorded another set of audio notes describing his work on the May 2022 subpoena response from June 1 through June 3, 2022, the transcription of which is included in the documents as P. 18-PRIV-083.[22]

The government has adequately demonstrated that all 81 of these documents were "in furtherance of future illegal conduct," *Zolin*, 491 U.S. at 556, because they reflect Per. 18 services on behalf of the former president to respond to the May 2022 Subpoena—the very work that the government has shown that the former president appears to have subverted in service of his own criminal scheme. The scope of the crime-fraud exception's reach in *In re Sealed Case (1985)* is instructive: there, the D.C. Circuit affirmed the lower court's order requiring the "front men" attorneys to answer "any questions which the grand jury may ask in connection with the

[22] The document is titled "May 24, 2022 Attorney Notes of Per. 18," but this appears to be an attorney error, as [redacted]-PRIV-082 is titled the same. The contents of this document recount Per. 18 activities during June 1 through June 3, 2022, and Per. 18 describes these events as taking place [redacted] giving rise to the inference that the recording was made sometime during the week of June 6, 2022.

alleged violations," which the D.C. Circuit interpreted to refer only to violations occurring at the time that the attorneys represented (and were misused by) the organization. 754 F.2d at 402–03. In order to distinguish between testimony regarding "prior acts or confessions beyond the scope of the continuing fraud," which remained privileged, and "prior acts forming the basis of the ongoing cover-up," the D.C. Circuit further held that a "question-by-question determination" was required. *Id.* at 403. Here, too, the crime-fraud exception properly pierces any privilege that would otherwise protect all documents arising from Per. 18 work on behalf of the former president and his Office in response to the May 2022 Subpoena—a determination that this Court has made upon review of each of these documents.

[redacted] Per. 18 Privilege Log at 30, but the Court is unable to discern any connection between this out-of-context screenshot and Per. 18 efforts to comply with the May 2022 Subpoena. Rather, as the privilege log indicates, this exchange occurred over a month after Per. 18 provided the government with the June 3, 2022 Certification. As a result, the Court can discern no basis to pierce the attorney-client privilege or fact work product claims protecting this communication.

*ii. Communications and Work Product Related to June 24 Subpoena*

Twenty-two of the withheld documents reflect Per. 18 communications or work product related to the June 2022 Subpoena seeking video footage from Mar-a-Lago.[23] In contrast to the subverted nature of the attorney-client relationship in Per. 18 representation of

[23] These documents are identified in their file names—though they were submitted without Bates stamps or other identifying markings on the face of the documents—as the following: P. 18-PRIV-001; P. 18-PRIV-008; P. 18-PRIV-018 to -20; P. 18-PRIV-028 to -30; P. 18-PRIV-037 to -38; P. 18-PRIV-040 to -42; P. 18-PRIV-071 to -78; and P. 18-PRIV-090.

the former president in connection with the May 2022 Subpoena—where the government has demonstrated the former president used Per. 18 as an unknowing instrumentality of his apparent criminal scheme—the case for the former president's misuse of Per. 18 work in response to the June 2022 Subpoena is far narrower, mainly turning on a single phone call. As a result, Per. 18 communications concerning the June 2022 Subpoena only furthered the former president's criminal violations to the extent that they informed Per. 18 conversation with the former president on June 24, 2022.

Resultantly, the crime-fraud exception only pierces any attorney-client privilege and fact work product protection over a small fraction of this category of documents. The six documents labeled as P. 18-PRIV-028, -29, -37, -38, -41, and -42 comprise six emails in the same chain. [redacted]. [redacted]. These seven documents (comprising the emails and the attachment) informed Per. 18 preparations for his phone call with the former president that the government has sufficiently demonstrated provided his client with information furthering the former president's ongoing scheme to misrepresent full compliance with the May 2022 Subpoena, and thus, lose protection due to the application of the crime-fraud exception. The remaining fifteen documents in this tranche may be withheld as not in furtherance of the criminal scheme for which a prima facie showing has been made.

*c)* [redacted] *Intent to Withhold Testimony and Document*

The findings that vitiate the former president's asserted privilege over Per. 18 testimony apply with equal force to [redacted] whose role in the efforts to comply with the May 2022 Subpoena was more circumscribed. Consequently, she may not stand on the attorney-client privilege to withhold testimony regarding the five topics related to the May 2022 Subpoena.[24] There is no indication on the record, however, that [redacted] had any connection to the sixth topic, concerning Per. 18 June 24, 2022 phone call with the former president, *see* Gov't's *Ex Parte* Mem. at 25, n. 16 (indicating the government only has reason to believe that [redacted] can testify as to the first two topics for which testimony is sought, based on her attendance at the May 23, 2022 meeting). Thus, what privileged communications, exactly, the government seeks to pierce—and whether those communications furthered the apparent criminal scheme—are unclear.

Also too underdeveloped by the government is the single document withheld by [redacted] The government has not indicated on the record to what topic the withheld document pertains, nor even provided to the Court the subpoena issued to [redacted] to clarify the scope of the documents responsive to the subpoena. The crime-fraud exception cannot be wielded in the dark, and here, the record supplied by the government is an insufficient basis for the Court to make a *Zolin* finding as to this mystery document. Accordingly, although the former president's privilege claims cannot shield [redacted] testimony on the five topics related to efforts to comply

---

[24] The former president's contention that the government's motion to compel is not ripe as to [redacted] is unpersuasive. Resp't's Opp'n at 5. [redacted] has declared her intent to withhold testimony on the basis of the former president's attorney-client and work-product privileges and to withhold a responsive document. Gov't's Reply at 6. The former president's assertion that the Court would be compelling a witness to respond to "hypothetical questions" is a mischaracterization, Resp't's Opp'n at 5, given that the topics about which [redacted] is compelled to testify are clearly set out, and the Court has made "a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976) (cited in Resp't's Opp'n at 5). The cases cited in support of the former president's argument concern the privilege against self-incrimination, which is not relevant here.

with the May 2022 Subpoena, the government failed it discharge its burden to overcome any privilege protecting the final topic of testimony and withheld document.[25]

### D. The Appropriate Scope of Per. 18 Withheld Opinion Work Product

Having determined the legitimate metes and bounds of the crime-fraud exception's application to the attorneys' withheld testimony and documents, a final question arises: the validity of Per. 18 claims in defense of his own opinion work-product—materials Per. 18 prepared reflecting his own "mental impressions, conclusions, opinions, or legal theories . . . concerning the litigation," *Deloitte*, 610 F.3d at 135. The government does not seek Per. 18 opinion work product, *see* Gov't's Resp. at 2; as a result, the question here is not whether the attorney's opinion work product claims may be pierced by the crime-fraud exception, but rather, whether the doctrine is properly invoked at the outset.

The opinion work product doctrine emerged to create a zone of privacy in which attorneys could strategize for litigation. The work product doctrine's originating case, *Hickman v. Taylor*, 329 U.S. 495 (1947), did not distinguish fact from opinion work product, but its emphasis on the need for an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference" laid the groundwork. *Id.* at 511. The Supreme Court in *Hickman*, and later, in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), evinced particular protectiveness over oral statements by witnesses memorialized in an attorney's notes, writing that such documents "tend[] to reveal the attorney's mental processes," *id.* at 399, such as "what he saw fit to write down," *id.* (quoting *Hickman*, 329 U.S. at 513). As the D.C. Circuit has written, the key

---

[25] A small number of the documents withheld by Per. 18 and reviewed by the Court *in camera* are communications involving [redacted] If the mystery document withheld by [redacted] is merely a duplicate of any of these documents, for which the Court has already ruled that the crime-fraud exception applies to vitiate the former president's privilege claims, then that finding applies.



Subject to Protective Order 

distinction between opinion and fact work product—including in the context of an attorney's written recollections of witness interviews—is whether "the lawyer has [] sharply focused or weeded the materials." *In re Sealed Case (Aug. 1997)*, 124 F.3d at 237 (holding that portions of a lawyer's notes from a meeting with his client "could be classified as opinion only on a virtually omnivorous view of the term"). *See also Clemens*, 793 F. Supp. 2d at 244–53 (exhaustively mapping the boundaries between fact and opinion work product).

This Part first evaluates the former president's claim that the identities of the individuals Per. 18 contacted regarding the potential whereabouts of responsive documents fall within this protected category, then proceeds to Per. 18 document-by-document redactions on the basis of his own invocation of opinion work-product.

**1. Per. 18 *Withheld Testimony on Pre-Search Contacts***

During his grand jury appearance, Per. 18 repeatedly declined to reveal the identities of the individuals with whom he spoke to determine the location of potentially responsive documents, citing attorney-client privilege and the work-product doctrine. Per. 18 GJ Tr. at 58:1–20; 134:2–8. Having determined, *supra,* in Part III.B, that the attorney-client privilege does not shield Per. 18 testimony in response to this question, the Court further holds that this testimony does not reveal opinion work product.

The former president urges adoption of the reasoning in the forfeiture action *United States v. All Assets Held at Bank Julius Baer & Co.,* where the government's request was denied for an interrogatory answer from a claimant to disclose the identities of the individuals the claimant interviewed, holding the answer was shielded by the work product doctrine. 270 F. Supp. 3d 220, 222–26 (D.D.C. 2017). *See* Resp't's Suppl. Mem. at 3–5. The former president described Per. 18 as "adopt[ing] a legal strategy by undertaking a diligent search for responsive documents," which "guided his decision to consult with certain individuals regarding



Subject to Protective Order 

the search [for] potentially responsive documents." *Id.* at 5. In so arguing, the former president seeks to distinguish *Savignac v. Jones Day*, which reached the opposite conclusion in the context of a defendant seeking the identities of the individuals consulted by plaintiff in anticipation of the civil litigation. 586 F. Supp. 3d 16, 17–22 (D.D.C. 2022).

The former president has it backwards. In *All Assets Held at Bank Julius Baer*, the government's request sought "to narrow a list of several hundred individuals that Claimant has identified as knowledgeable about the facts of this case by identifying for Plaintiff those individuals that Claimant's counsel determined were worth interviewing." 270 F. Supp. 3d at 225. There, government's sole justification was to "cull[] down the voluminous number of witnesses" identified by the parties—an attempt to discern which witnesses its adversary had deemed "most important, or problematic" to use as a "valuable filter." *Id.* at 225. Clearly, this is not the reason for the government's queries in the instant matter, which are motivated by the government's need to discern [redacted] Unlike in *All Assets Held at Bank Julius Baer*, the identities of the individuals Per. 18 contacted would not reveal whom Per. 18 deemed more or less important or problematic for his legal strategy; for all the government knows, many of the individuals he contacted may have provided no useful information. Nor would the list serve the purpose of giving the government a chance to leapfrog off its adversary's work. Rather than serving the improper purpose of helping the government "cull" potential witnesses, the information sought is directly relevant to a key issue in the pending investigation—whether Per. 18 was intentionally misled by the former president into believing only the storage room contained potentially responsive documents. *Accord Savignac*, 586 F. Supp. 3d at 20 (holding that list of contacted individuals was not work product where the list would neither "reveal anything about [plaintiffs'] strategy for the case," nor "borrow the benefit of Plaintiffs' trial preparation to save



Subject to Protective Order 

Defendants from engaging in the litigation-related leg work that Plaintiffs have previously devoted to their cause"); *Alexander*, 192 F.R.D. at 18–19 ("[C]ertain information, such as whether investigators have talked to certain individuals in the course of their investigations, is not protected by the attorney work-product doctrine").

Thus, Per. 18 has no valid basis to withhold testimony in response to the government's queries as to the identities of the individuals with whom he spoke to discern the location of potentially responsive documents.

**2. *Documents Withheld on Basis of Opinion Work Product***

In Part III.C.3.b., the Court determined that the crime-fraud exception vitiated any attorney-client privilege or fact work-product claims protecting 88 of Per. 18 withheld documents from disclosure. Per. 18 has one final card to play, however, because the government concedes that it does not seek the lawyer's independent opinion work product. Of these 88 documents, Per. 18 peels off 18 more that consist entirely of his opinion work product, which may be withheld. A further twelve documents contain severable opinion work product and must be disclosed with redactions.

Most of Per. 18 claims that the documents contain opinion work product are valid, but the Court disagrees with several of his proposed redactions—minor instances of overreach that can largely be attributed to Per. 18 attempt to shield statements that fail to reveal any substantive opinions or legal theories related to his legal services. The proposed redactions within the documents titled P. 18-PRIV-012, P. 18-PRIV-047, and P. 18-PRIV-059—all emails in the same chain between Per. 18 and an associate at his law firm—illustrate. [redacted] The most generous interpretation of Per. 18 attempt to withhold this

sentence is that the sentence reveals that [redacted]. Opinion work product does not protect "an attorney's mental impressions [when they] are those that 'a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description 'legal theory,''" *Federal Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 153 (D.C. Cir. 2015) (quoting *In re HealthSouth Corp. Secs. Litig.*, 250 F.R.D. 8, 11 (D.D.C. 2008) (Bates, J.)). The same flaw undermines Per. 18 claims to the opinion work product's protection for P. 18-PRIV-023, P. 18-PRIV-024 and P. 18-PRIV-025 [redacted] and for P. 18-PRIV-050, P. 18-PRIV-053, P. 18-PRIV-055, P. 18-PRIV-057, and P. 18-PRIV-058 ([redacted]

Per. 18 claims that the document titled P. 18-PRIV-089, containing Per. 18 undated, brief handwritten notes is entirely protected as opinion work product, but he has failed to meet Per. 18 burden to claim the doctrine's protection. *See United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127 (D.D.C. 2012) ("It is well established that the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability." (quoting *In re Subpoena Duces Tecum Issued to Commodity Future Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006)). No context is provided to understand whether this document entirely reflects Per. 18 "mental processes," or comprises "purely factual material." *In re Sealed Case (Aug. 1997)*, 124 F.3d at 236.

Finally, Per. 18 has proposed redactions to two documents, P. 18-PRIV-082 and P. 18-PRIV-083, that contain transcriptions of Per. 18 audio recordings reflecting on Per. 18 work related to the May 2022 Subpoena. [redacted]. Per. 18 proposed redactions are rooted in three bases, all of which the Court finds valid and largely adopts: Per. 18 own opinion work product, [redacted] opinion work product, and highly personal details. The few instances in which the Court departs from Per. 18 redactions are explained in brief.

[redacted] Nothing distinguishes this exchange—which largely comprises Per. 18 quotations of the former president—from Per. 18 many recollected quotations of the former president in the same document over which no opinion work product claim is asserted. Instead, in the context of Per. 18 apparently comprehensive attempt to memorialize Per. 18 experiences, Per. 18 straightforward recounting of this particular exchange—with the minimal redactions retained by the Court— does not reflect any particular "sharply focus[ing] or weed[ing]" of the materials. *In re Sealed Case (Aug. 1997),* 124 F.3d at 236.

The document titled P. 18-PRIV-083 contains several instances of overextended opinion work product claims. [redacted]. An

attorney's logistical updates to his client may fall within the ambit of the attorney-client privilege, but such statements hardly fall within the uniquely private domain of an attorney's materials reflecting his or her preparation for litigation via the assembly and analysis of information or preparation of legal theories or strategy. *See Hickman*, 329 U.S. at 511. [redacted] description of the contents of the boxes he searched, located on pages four and five, is also not opinion work product, as it merely recounts his visual observations rather than revealing any of the attorney's opinions, theories, or impressions regarding the litigation. So too for [redacted] recollection of the former president's communicative hand "motion" located on page six. Finally, one sentence of [redacted] proposed redaction on page nine is not necessary, as it reveals nothing about [redacted] mental impressions regarding the matter.

The Court's document-by-document determinations of what may be withheld or redacted are reflected in the accompanying Order's appendices.

## IV. CONCLUSION

Based on the foregoing analysis, the crime-fraud exception entirely vitiates the attorney-client and work-product privileges that [redacted] has invoked to withhold testimony regarding the six topics identified by the government; the exception vitiates any privileges intended to be invoked by the former president as to [redacted] testimony on the first five of those topics. Further, 58 of the documents over which [redacted] claimed privilege have been pierced by the crime-fraud exception and do not comprise opinion work-product. An additional twelve documents that [redacted] withheld have been pierced by the crime-fraud exception, but contain severable opinion work product that may be redacted before disclosure.

Accordingly, the government's motion to compel testimony from these two grand jury witnesses is GRANTED IN PART AND DENIED IN PART.

Date: March 17, 2023

BERYL A. HOWELL
Chief Judge

Case 1:25-mc-00010-JEB-JSB Document 44 Filed 03/26/25 Page 1 of 38

* **THIS PAGE LEFT INTENTIONALLY BLANK** *

**SEALED MATTER ENCLOSED**

**AUTHORIZED PERSONS ONLY**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: GRAND JURY SUBPOENA GJ 42-17 AND GJ 42-69 — Case No. 23-GJ-10

UNITED STATES OF AMERICA, Interested Party, — March 20, 2023, Washington, D.C.

[redacted], Interested Party,

DONALD J. TRUMP, Interested Party.

---

SEALED HEARING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

FOR THE UNITED STATES:

John Pellettieri, Esquire
Julie Ann Edelstein, Esquire
Special Counsel's Office
950 Pennsylvania Avenue Northwest
Room B-206
Washington, D.C.20530

Cecil Woods VanDevender, Esquire
United States Attorney's Office
719 Church Street
Suite 3300
Nashville, Tennessee 37203

FOR [redacted]:

Michael Nathaniel Levy, Esquire
Paul F. Enzinna, Esquire
Ellerman, Enzinna, Levy, PLLC
1050 30th Street Northwest
Washington, D.C. 20007

Elizabeth Lauren Martin, Esquire
Ellerman, Enzinna, Levy, PLLC
[redacted]

APPEARANCES (Cont.):

FOR DONALD J. TRUMP: James M. Trusty, Esquire
IFRAH, PLLC
1717 Pennsylvania Avenue Northwest
Suite 650
Washington, D.C. 20006

REPORTED BY: Tammy Nestor, RMR, CRR
Official Court Reporter

The following proceedings began at 9:31 a.m.:

THE COURT: Good morning, everybody. Nice to see you.

THE COURTROOM DEPUTY: Good morning, Judge. Good morning. We are on the record in sealed matter 23-GJ-10, Grand Jury Subpoena, GJ-42 through 17, and GJ-42 through 69; Interested party, United States of America, [redacted], and Donald Trump.

[redacted]

[redacted]

[redacted]e

[redacted]

[redacted]

Case 1:25-mc-00010-JEB Document 44 Filed 06/25/25 Page 9 of 38

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Case 1:25-mc-00100-JEB-JEB Document 44 Filed 09/25/25 Page 14 of 38

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Case 1:23-gj-00010-JEB-JLB Document 11-18 Filed 06/25/23 Page 18 of 38

[redacted]

Case 1:25-mc-00010-JEB Document 44 Filed 09/26/25 Page 19 of 38

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

THE COURT: All right. Thank you very much.

I am going to deny the request for a stay, but I will give [redacted] 48 hours, in fact, until noon on Wednesday to comply with Judge Howell's order, which gives you time, Mr. Levy, and you, Mr. Trusty, to seek Court of Appeals assistance and administrative stay in the Court of Appeals.

Again, I am not giving you 5 hours or 3 hours or even 24 hours. I am giving you 48 hours, which I think is enough time to get to the Court of Appeals and seek an administrative stay. And you may well get that, and it may well go -- you may well get an appeal.

My reasons are as follows. And you both make good arguments, Mr. Levy and Mr. Trusty. And I think if it does go on appeal, I will be very interested to see what the Court of Appeals says, Mr. Levy, on some of these nuanced and difficult issues that you raised.

But the four stay factors everybody knows. They are set forth in the briefs. As to the first, the likelihood of prevailing on appeal, and again, it doesn't have to be likely

or probable, but in my reading, my careful reading, of Judge Howell's lengthy opinion, which also the government argues is reviewed on an abuse of discretion standard -- and I'm not sure that's right, but it may be. But I find her opinion to be strong and convincing and clear, and I don't believe that the defense has sufficiently -- it's somewhat difficult to show that she's wrong without more time to digest and look at her opinion. But my review of the opinion, it seems to me a strong opinion and one that is not likely to be overturned on appeal.

As to irreparable harm, again, this is interesting. I'm not sure I would go so far as the government does in saying that Mohawk would say you could never have irreparable harm in this situation, because there's always a post-judgment remedy. I'm not prepared to go that far. But I do think here that where it is likely that the Court of Appeals would rule before any trial occurred and the Court of Appeals could bar the use of [redacted] testimony or the documents that he has to produce under this order and the fact that this is secret in a grand jury and is not going to be publicly available, that his fact work product is not the disclosure of that at this stage which again can be clawed back from the government ultimately is not irreparable.

I think that Mr. Levy makes an interesting argument that it's all opinion work product and Judge Howell's distinction between fact and opinion isn't tenable. But at

this point, I don't think that that's correct. I think that lots of opinion has been redacted, and she's done that carefully.

And even if I didn't agree with every single sentence in the red box about where it went, I think that this distinction is sufficient, that it is not irreparable to [redacted] that he has to testify and that these documents be disclosed given the likelihood that, if Judge Howell was wrong, that he wouldn't have to testify at trial and the documents would be taken back, and this is secret so he's not -- his work product is not disseminated into the public domain.

Finally, the last two factors merge, as everyone agrees, which is harm to others and the government and also the public interest. Here this tips strongly in favor of the denial of the stay given that the case is of great importance. There is a premium on moving this case through with expedition. There have been lengthy delays already, which I place at the feet of the former President, not the government. And the fact that there is a special counsel and a desire in the great public interest to move this case along quickly, that favors not staying the matter.

So I will, as I said, deny the stay. But I will order that [redacted] need not comply with Judge Howell's order in terms of testifying or producing documents until Wednesday, May 22 at noon.

32

Any questions or clarifications that anybody wishes, Mr. Pellettieri?

MR. PELLETTIERI: Yes, Your Honor. We would just like a clarification. Does this also include the former President's motion for a stay as well?

THE COURT: Thank you. Yes. I'm sorry. I did not make that clear as I should have. For the same reasons that I deny [redacted] motion for a stay, I deny former President Trump's motion.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(The hearing concluded at 10:22 a.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

3/21/2023

s/ Tammy Nestor
Tammy Nestor, RMR, CRR
Official Court Reporter
333 Constitution Avenue NW
Washington, D.C. 20001
tammy_nestor@dcd.uscourts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS | Case No. 23-gj-12 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL** |

**ORDER**

[redacted] ("the Witnesses"), [redacted], received grand jury subpoenas and declined to comply in full because of the former president's invocation of executive privilege. The government filed the instant Motion to Compel Grand Jury Testimony, [redacted] seeking an order to compel the Witnesses to give testimony previously objected to by the former president.

Upon consideration of the government's Motion [redacted] and the entire record herein, the Court finds that (1) the testimony the government seeks from the Witnesses is assumed to be presumptively protected by the presidential communications privilege arising from the former president's generalized interest in confidentiality and the former president's invocation of the presidential-communications privilege; (2) the grand jury has a demonstrated, specific need for testimony from the Witnesses about communications and meetings that overcomes the former president's assertion of the presidential-communications privilege; and (3) the government has sufficiently demonstrated that evidence of these

Case 1:22-mc-00100-JEB Document 32-14 Filed 10/28/24 Page 2 of 3

communications is important and relevant to the grand jury's investigation and that the evidence is not available with due diligence elsewhere. Accordingly, it is hereby—

**ORDERED** that the government's Sealed Motion to Compel Grand Jury Testimony, [redacted], is **GRANTED**; it is further

**ORDERED** that [redacted] are to appear before the Grand Jury of the U.S. District Court for the District of Columbia and give testimony, which has previously been the subject of an assertion by the former president of the presidential communications privilege, relating, but not limited to, any communications and meetings regarding the following topics, and any similar such communications or meetings:

[redacted]

Case 1:23-mc-00012-BAH *SEALED* Document 10 Filed 03/15/23 Page 3 of 3

[redacted]

**ORDERED** that the government shall submit to the Court, by 5 p.m. on [redacted] proposed redactions outlined in red box to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion, through counsel, to the witnesses and the former president.

**SO ORDERED.**

Date: March 15, 2023



BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE GRAND JURY SUBPOENAS | Case No. 23-gj-12 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL**<br><br>[redacted] |

## MEMORANDUM OPINION

From [redacted], a grand jury sitting in this District issued subpoenas for testimony and documents to [redacted], relevant to an investigation into conduct culminating in the attack on the U.S. Capitol on January 6, 2021, and the concomitant temporary halt of the constitutionally mandated congressional certification of the Electoral College vote for the 2020 presidential election. [redacted] those witnesses appeared separately either before the grand jury or submitted to interviews with the government and declined to respond to certain questions by invoking executive privilege at the direction of the former president. The government now moves to compel the witnesses' full compliance with the subpoenas because the grand jury's need for the important information overcomes the former president's privilege claim.

For the reasons explained below, the government's motion is granted.

## I. BACKGROUND

The [redacted] individuals subject to the instant motion ("the Witnesses") [redacted]

[redacted], the relevant period of the government's investigation. Their titles during that relevant period are as follows:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

The grand jury's need for testimony and documents from the Witnesses stems directly from their knowledge of events leading up to the certification of Electoral College votes by a Joint Session of Congress on January 6, 2021. [redacted] Investigation into these events has been ongoing and described at length in three prior opinions relevant to compelling the grand jury testimony of [redacted] individuals: [redacted], *see In re Grand Jury Subpoenas*, No. 22-gj-25, Memorandum Opinion ([redacted]) at 2–12, ECF No.

18 ("Sept. 2022 Mem. Op."); [redacted], *see In re Grand Jury Subpoenas*, No. 22-gj-33, Memorandum Opinion ([redacted]) at 1–14, ECF No. 13 ("Nov. 2022 Mem. Op."); and [redacted] *see In re Grand Jury Subpoena*, No. 22-gj-39, Memorandum Opinion ([redacted]) at 1–16, ECF No. 15 ("Dec. 2022 Mem. Op."). The events leading up to and including January 6, 2021, have also been diligently recounted by the D.C. Circuit in *Trump v. Thompson*, 20 F.4th 10, 17–19 (D.C. Cir. 2021), and described by witnesses under oath at public hearings before the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("House Select Committee" or "HSC"). Those facts relevant to the [redacted] Witnesses are summarized below.

### A. 2020 Presidential Election and Other Events Leading to January 6, 2021, Joint Session of Congress

In the November 2020 presidential election, more than 81 million Americans, or 51.31% of the electorate, voted for Joseph Biden as president, overcoming approximately 74 million votes cast for Donald J. Trump. *See* FED. ELECTION COMM'N, OFFICIAL 2020 PRESIDENTIAL GENERAL ELECTION RESULTS 2, 8 (2020), https://www.fec.gov/resources/cms-content/documents/2020presgeresults.pdf. Nonetheless, the former president "refused to concede" and proclaimed that the election was "rigged" and subject to "tremendous voter fraud and irregularities." *Thompson*, 20 F.4th at 17 (citing President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Mar. 15, 2023)). Those theories of voter fraud and election irregularities circulated by the former president and his team included, among others, foreign interference in the election, tampering of vote counts by Chinese infiltrators using Nest home thermostats, use of Italian satellites to alter

voting equipment, and inconsistencies in Dominion and Smartmatic voting machines.[1] Intelligence agencies repeatedly rejected those claims, some of which can only be described politely as far-fetched, for lack of evidence. The former president and his allies also filed numerous legal challenges to election results across the country, none of which proved successful. *Id.*

In a last-ditch effort, individuals associated with the former president, the White House, and the former president's election campaign team attempted to influence the Electoral College vote scheduled for December 14, 2020, by urging the former president's supporters in closely contested states, in which candidate Biden won, to self-declare as duly appointed and qualified electors and cast votes for the former president on December 14 on fraudulent elector certificates. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (June 21, 2022) ("HSC Hr'g Tr. (June 21, 2022)") at 54:46–1:04:32, available at https://www.c-span.org/video/?521075-1/fourth-hearing-investigation-january-6-attack-us-capitol (last accessed on Mar. 14, 2023) (describing the fake elector scheme).[2] The former president's supporters took steps towards this desired end

---

1 [redacted]

2 [redacted]

in Arizona, Georgia, Michigan, Nevada, Wisconsin, New Mexico, and Pennsylvania—all seven states won by President Biden. *See id.* This effort failed in those seven states after all duly appointed electors cast votes on December 14, 2020, for President Biden. *See id.*[3]

The former president and his operatives then shifted strategy, moving their focus from the Electoral College vote to the electoral vote certification. As constitutionally required by the Twelfth Amendment, the Electoral College votes cast on December 14, 2020, were to be certified by a Joint Session of Congress convened on January 6, 2021, in a proceeding presided

[redacted]

3 [redacted]

over by the former vice president, who was to call for objections to the vote and, after all objections were resolved by the two congressional houses and the count was complete, announce the results. U.S. CONST. amend. XII; *see also id.* art. II, § 1, cl. 3 (describing the congressional meeting of electors and vote certification); 3 U.S.C. § 15 (process describing the counting of electoral votes in Congress). The former president, "[i]n anticipation of that event, . . . had sent out a Tweet encouraging his followers to gather for a '[b]ig protest in D.C. on January 6th'" that he claimed would be "'wild.'" *Thompson*, 20 F.4th at 17 (quoting Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM)).

[redacted]

4 [redacted]

Case 1:23-gj-00004-... SEALED* Document 1... Filed ...23 Page 7 of 46

[redacted]

[redacted]

---

5 [redacted]

6 [redacted]

[redacted]

[redacted]

7 [redacted]

8 [redacted]

9 [redacted]

[redacted][10] [redacted][11]

[redacted]

[redacted]

---

[10] [redacted]

[11] [redacted]

[redacted]

"Shortly before noon on January 6th, President Trump took to the stage at a rally of his supporters on the Ellipse" and, during his "more than hour-long speech," repeated his claims of a "rigged" election. *Thompson*, 20 F.4th at 17–18. During that speech, the former president specifically urged the former vice president "to 'do the right thing' by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden." *Id.* at 18 (quoting Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed on Mar. 15, 2023) ("January 6th Rally Speech")). The former president also encouraged his supporters to go to the Capitol to "demand that Congress do the right thing" by refusing to certify the votes and to "fight like hell" or else "you're not going to have a country anymore." *Id.* (citing January 6th Rally Speech at 3:47:20–3:47:42, 4:41:17–4:41:33). At that rally, Giuliani told the crowd that then-Vice President Pence had the authority to refuse the electoral vote certification under the Electoral Count Act and called for "trial by combat." John Eastman and Rudolph Giuliani, January 6th Rally Speech at 2:22:07–2:22:10. Eastman added that "all we are demanding of Vice President Pence is that this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom

[12] [redacted]

of it and the American people know whether we have control of the direction of our government or not." *Id.* at 2:26:54–2:27:12.

As widely publicized, a large crowd then descended onto U.S. Capitol grounds, violently broke into the Capitol building, overwhelmed and attacked law enforcement, and delayed Congress's vote certification. *Thompson*, 20 F.4th at 18–19. Due to the catastrophic security breach represented by this attack on the Capitol, then-Vice President Pence was evacuated from the building while "[s]ome members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence." *Id.* at 18. The House Select Committee concluded that the former president did not request support for law enforcement members, many of whom were assigned to protect the former vice president. *See Hr'g on Jan. 6th Investigation Before the H. Select Comm. to Investigate the Jan. 6th Attack on the United States Capitol*, 117th Cong. (July 21, 2022) ("HSC Hr'g Tr. (July 21, 2022)") at 34:48–36:02, available at https://www.c-span.org/video/?521771-1/eighth-hearing-investigation-january-6-attack-us-capitol (last accessed on Mar. 15, 2023). [redacted]

[redacted][14]

[redacted]

As the events unfolded at the Capitol and in the days following, federal law enforcement authorities initiated investigations to identify those responsible for attacking the U.S. Capitol and to obtain evidence of multiple federal law violations, including of 18 U.S.C. §§ 1752(a)(1)–(4) (unlawful entry on restricted buildings or grounds); 1512(c)(2) (obstruction of official proceeding of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 930 (possession of firearms and dangerous weapons in federal facilities); 641 (theft of government property); 1361 (destruction of government property); 2101 (interstate travel to participate in riot); 1752(b)(1)(A) (using or carrying a weapon on restricted buildings or grounds); and 40 U.S.C. § 5104(e)(2) (violent entry,

---

13 [redacted]

14 [redacted]

disorderly conduct, and other offenses on Capitol grounds)). *See United States v. Bledsoe*, No. 21-204 (BAH), 2022 WL 3594628, at *4 (D.D.C. Aug. 22, 2022). Since then, hundreds of individuals have been investigated, charged, and convicted in this District for their criminal conduct in planning for and participating in the breach of the Capitol that resulted in disruption of the official proceeding of Congress to certify the results of the 2020 presidential election.

**B. Instant Grand Jury Investigation**

[redacted]

**C. Procedural History**

[redacted] seeking their testimony related to "possible violations of federal criminal laws." [redacted] The subpoenas served on [redacted]

[redacted] The Witnesses were scheduled to testify [redacted]. [redacted]

Anticipating the former president's privilege assertions over the Witnesses' subpoena compliance, [redacted], the government sought, with the consent of the Witnesses' counsel, orders from this Court allowing the government to discuss the subpoenas with counsel for the incumbent and former presidents. *See In re Grand Jury Subpoena*, No. 22-gj-45, [redacted]; *In re Grand Jury Subpoena*, No. 22-gj-46, [redacted]; *In re Grand Jury Subpoenas*, No. 23-gj-2, [redacted]; *In re Grand Jury Subpoena*, No. 23-gj-9, [redacted] Such discussions would enable the government to "ascertain whether any potential privilege holder – including the incumbent and former Presidents – intends to instruct the witnesses not to testify in the grand jury based on an assertion of executive privilege[,]" [redacted], and thereby remove "the onus of these consultations" from the Witnesses, [redacted]

[redacted]

The government's motions were granted. *See In re Grand Jury Subpoena*, No. 22-gj-45, Order Authorizing Disclosure of Grand Jury Material ([redacted]) [redacted], ECF No. 7; *In re Grand Jury Subpoena*, No. 22-gj-46, Order Authorizing Disclosure of Grand Jury Material ([redacted], ECF No. 4; *In re Grand Jury Subpoenas*, No. 23-gj-2, Order Authorizing Disclosure of Grand Jury Material [redacted], ECF No. 2; *In re Grand Jury Subpoena*, No. 23-gj-9, Order Authorizing Disclosure of Grand Jury Material [redacted], ECF No. 2.

Accordingly, on [redacted], the government notified the White House Counsel's Office of the Witnesses' subpoenas and inquired whether President Biden would assert executive privilege to bar the Witnesses' testimonies. [redacted] On [redacted], the White House Counsel's Office responded that President Biden "will not assert executive privilege" with respect to the Witnesses' testimonies. [redacted] The White House Counsel's letters elaborated that "President Biden recognizes the importance of candid advice in the discharge of a President's constitutional responsibilities and believes that, in appropriate cases, executive privilege should be asserted to protect either current or former White House senior staff from having to testify about conversations concerning the President's exercise of his duties." [redacted]). That said, given "the extraordinary events surrounding" the January 6 attack on the Capitol and the "unique circumstances" presented by such an unprecedented event, President Biden determined "that an assertion of executive privilege is not in the public interest with respect to the efforts to thwart

the orderly transition of power under our Constitution.” [redacted] The President articulated that his waiver of executive privilege applied to “events within the White House on or about January 6, 2021; efforts to use the Department of Justice to advance a false narrative that the 2020 election was tainted by widespread fraud; and other similar efforts to alter valid 2020 election results or obstruct the transfer of power.” [redacted].

The government communicated the same request to the former president’s counsel by letters [redacted] In each letter, the government identified [redacted] topics about which the Witnesses were to be questioned before the grand jury[redacted] On [redacted], the former president’s counsel sent letters directly to counsel for the Witnesses instructing that they were “to the fullest extent permitted by law, . . . not to provide testimony about, or reveal in any forum, communications and correspondence” with him or his advisors, “including those that are privileged” because of each Witness’s role in the White House or the Executive Branch. [redacted] These letters express the view that “there is an

---

15 [redacted]

expectation of confidentiality in a President's conversations and correspondence with those who advise and assist him," which "confidentiality is protected under the United States Constitution and all such presidential communications are presumptively privileged." [redacted] The letters clarify that the former president specifically invokes the presidential communications privilege. [redacted]

[redacted]. During those testimonies and interviews, each Witness declined to answer multiple questions, citing executive privilege, consistent with their understanding of the former president's instruction. [redacted]

16 [redacted]

17 [redacted]

On [redacted], the government moved to compel the Witnesses to comply fully with the grand jury subpoenas, listing the former president as the respondent. [redacted].[redacted]

Simultaneous with these filings, the government requested permission for limited disclosure of the sealed motion to the former president, subject to certain protections. [redacted] The government also requested that the Witnesses only be informed in this ongoing litigation without revealing any filings in this matter to prevent each Witness from identifying others, which would violate grand jury secrecy required by Federal Rule of Criminal Procedure 6(e). [redacted]. The government's request for a disclosure and protective order was granted on [redacted], pursuant to Local Criminal Rule 6.1 and Federal Rule of Criminal Procedure 6(e), which rules together prohibit the public release of proceedings on a motion connected with a grand jury subpoena or matter before the grand jury unless ordered by the Court to "advance the important public and private interests served by the

18 [redacted]

grand jury secrecy requirement." Order Authorizing Limited Disclosure, Imposing Protection and Entering Briefing Schedule ("Protective Order") at 1, ECF No. 3.[19]

The Protective Order also set a briefing schedule consistent with the time requirements of Local Criminal Rule 47(b), giving the former president fourteen days to respond to the government's motion and the government seven days to submit a reply. *Id.* ¶ 3.[20] The government's motion is now ripe for review.

## II. DISCUSSION

Given the former president's invocation of only the presidential communications privilege, that species of executive privilege is solely at issue here. *See In re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997) (describing the expansive doctrine of executive privilege). This privilege is first described generally and in the grand jury context before turning to the separate issues of whether the former president's invocation of the presidential communications privilege operates to bar the Witnesses' compliance with the subpoenas. Upon review, the former president's privilege claim fails because the significant need for the important evidence outweighs any interest in keeping information from the grand jury.

---

19 [redacted]

20 [redacted]

**A. Executive Privilege Generally**

Executive privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Nixon v. GSA*, 433 U.S. 425, 447 (1977). Article II of the Constitution vests in the president powers ranging from command of the military, U.S. CONST. art. II, § 2, cl. 1, to pardons for offenses against the United States, *id.*, to foreign diplomacy, *id.* § 2, cl. 2; *id*. § 3, to name a few. Decisionmaking in areas of such great importance to this nation requires deep thought, vigorous debate, and wise counsel on the part of the president and his trusted staff. As such, both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736.

The privilege granted to the Executive Branch has two distinct species, each derived from the same recognized need to protect Executive Branch decisionmaking, but with different scopes and prerequisites for application: the deliberative process privilege and the presidential communications privilege. *See id*. at 745. The former is a creation of the common law and protects from disclosure "records documenting the decisionmaking of executive officials generally." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 885 (D.C. Cir. 2021) (citing *In re Sealed Case*, 121 F.3d at 745). It covers "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," and thus, to qualify for confidentiality, "the material must be predecisional and it must be deliberative," regardless of whether the president is involved. *In re Sealed Case*, 121 F.3d at 737 (internal citations omitted); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974). The latter presidential communications privilege is a "constitutionally based privilege," *Protect Democracy Project*, 10 F.4th at 885, that applies to (1) "communications

directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the president or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal citations omitted); and (2) communications that reflect "presidential decisionmaking and deliberations," meaning "communications in performance of a President's responsibilities . . . of his office . . . and made in the process of shaping policies and making decisions," *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 708, 711, 713) (cleaned up).

As both parties confirm, at issue in this motion is the presidential communications privilege. [redacted]. That privilege is all-encompassing in that it shields from public view communications "in their entirety, including post-decisional and factual material within a record," not merely "pre-decisional and deliberative material" as covered by the more limited deliberative process privilege. *Protect Democracy Project*, 10 F.4th at 885–86 (quoting *In re Sealed Case*, 121 F.2d at 745–46). This distinction is important because of what the presidential communications privilege seeks to do. "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708. Yet "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *accord Trump v. Vance*, 140 S. Ct. 2412, 2424 (2020). To ensure the rigorous honesty and due diligence required of presidential policymaking, the presidential communications privilege thus serves as a shield to disclosure of those most trusted deliberations—those "rooted in the President's need for confidentiality in the communications of his office, . . . in order to effectively and faithfully carry out his Article II

duties and to protect the effectiveness of the executive decision-making process." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1115 (internal citations omitted). That purpose justifies a presumptive privilege that is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.

Yet, like its deliberative process privilege cognate, the presidential communications privilege is a qualified, not absolute, privilege of immunity from the judicial process. *Id.* at 706; *GSA*, 433 U.S. at 446; *see also Protect Democracy Project*, 10 F.4th at 886. First, executive privilege, like attorney-client privilege, is subject to waiver by disclosure, although the "high bar" for such waiver "should not be lightly inferred" and only waives the privilege "for the document or information specifically released, not for related materials." *Id.* at 890 (quoting *In re Sealed Case*, 121 F.3d at 741). Second, throughout its history of shaping executive privilege, the Supreme Court has made clear that, "[i]n our judicial system, the public has a right to every man's evidence [and] [s]ince the earliest days of the Republic, 'every man' has included the President of the United States." *Trump v. Vance*, 140 S. Ct. at 2420 (cleaned up); *see also United States v. Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (C.C.D. Va. 1807) (regarding a subpoena *duces tecum* served on President Jefferson, Chief Justice John Marshall explained that "the king can do no wrong[,]" but a president is "elected from the mass of the people" and is thus subject to the "general provisions of the constitution" including the Sixth's Amendment's compulsory process for obtaining witnesses by the defense). Consequently, any presumption of immunity conferred to a president "must be considered in light of [the Supreme Court's] historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . for they are in derogation of the search for truth," *In re Sealed Case*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at 710) (internal quotations omitted).

Case 1:23-jm-00001-BAH *SEALED* Document 1 Filed /23 Page 23 of 46

In practice, that qualified status means that the privilege does not apply to all forms of presidential communications with the same levels of deferential protection. Rather, three separate categories of presidential communications exist with varying levels of, or no, such protection. "Core communications," the most protected category, refers to communications regarding military, diplomacy, or sensitive national security secrets that are entitled to the most deference for privileged nondisclosure. *See GSA*, 433 U.S. at 446–47; *Nixon*, 418 U.S. at 706, 710; *In re Sealed Case*, 121 F.3d at 743 n.12 (noting the Supreme Court has "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, and expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This would certainly include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). In descending order of protection, next is the "generalized communications" category, which extends the privilege beyond the nation's most guarded information aforementioned to also cover communications relating to "the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711; *see also GSA*, 433 U.S. at 446–47. Finally, communications with the president, even directly, fall completely outside of the protection of the presidential communications privilege when the matters do not involve policy discussions with and decisionmaking by the president in the performance of his official duties. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (noting premise of presidential communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'" (quoting *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (en banc) (per curiam)); *cf. Nixon*, 418 U.S.

Case 1:23-jm-00002-*SEALED* Document 1 Filed 10/24/23 Page 24 of 46

at 705. Certainly, for instance, the president's lunch order is in the last category and is entitled to no privilege protection because such a presidential communication would in no way chill candid discussion in the performance of the president's official duties.

**B. Presidential Communications Privilege Covers the Compelled Testimony at Issue**

The parties dispute which category, and thus which level of deference, if any, applies to the communications the government seeks to compel from the Witnesses, and whether any level of privilege has been waived or inadequately asserted. The government first posits that no presidential communications privilege applies because the communications in question were not made in the process of arriving at presidential decisions, given that the president had no official duties pertaining to the electoral vote certification on January 6, 2021, and thus are not presidential communications at all. [redacted]

The former president responds that "Communications And Documents Implicating Executive Privilege On Matters Of National Security Demand Absolute Protection From Disclosure." [redacted] He adds that "the executive privilege may transform into an '*absolute, unqualified* Presidential privilege of immunity from judicial process[,]'" and in such instances, "this Court must *at the very least* require *the most compelling* showing of need" when reviewing the instant motion for testimony and documents. [redacted] (quoting *Nixon*, 418 U.S. at 706) (emphasis in original). Focusing on the roles certain Executive Branch officials played in advising him on national security issues during his presidency, [redacted], the former president contends that "the testimony of [redacted]—

21 [redacted]

[redacted] must be presumed to implicate the most sensitive issues protected at the core of executive privilege[,]” [redacted] Likewise, the former president views the [redacted] Witnesses—[redacted] with President Trump.” [redacted]

At the outset, the former president’s position that the communications at issue involve matters of the utmost confidentiality, entitled to nearly “absolute” protection under the presidential communications privilege is incorrect. The communications and documents at issue do not involve confidential military or diplomatic secrets, as mentioned in *Nixon*, 418 U.S. at 706. Nor does the former president claim that the communications and documents concern classified information that would risk damage to national security upon unauthorized disclosure. To say that discussions with the Witnesses involved national security secrets is inaccurate. None of the communications the government seeks involves national security or classified—top secret, secret, or confidential—information per the designation of such according to Executive Order No. 13,526, the latest, and thus authoritative, order detailing a uniform system for classifying, protecting, and disclosing national security information. *See* 75 Fed. Reg. 707 (Dec. 29, 2009). The former president provides no evidence beyond bald allegations that the communications at issue involved election security rising to the level of risks to this nation’s security.

The former president’s best argument is that communications and documents concerning, what he identifies as, “(1) the integrity of the national election; (2) providing National Guard support to avoid violence in Washington, D.C., on January 6, 2021; and (3) the content of President Trump’s public statements, in speech and on social media platforms, including on January 6, 2021, urging peace” are national-security focused and thus any knowledge the

Witnesses have regarding these topics is privileged. [redacted] This argument is unavailing for at least three reasons, however. First, the events on January 6, 2021—including, among other things, the rally that day, its planning and organization, law enforcement's response, Congress's conduct in an official proceeding, and the former president's public statements and social media posts on January 6, 2021, [redacted]—were all matters either highly public or generating public debate and scrutiny, far different from classified matters kept confidential due to the risk that disclosure could cause damage to national security. The former president acknowledges this: He mentions the three aforementioned "national security matters under consideration by [him] and his top advisors during the timeframe covered by the subpoenas" and then cites a *published* book that he describes as "detailing President Trump's suggestion to his Acting Secretary of Defense to have significant National Guard resources ready to deploy to ensure the safety and security of the Capitol on January 6, 2021, which went unheeded by Congressional leadership." [redacted]. No topic of potential grand jury inquiry demands "absolute" protection barring testimony when the same subject matter has been disclosed in a book as well as in public speeches and posted commentary on Twitter and Facebook.

Second, the government does not seek to investigate matters of election security or integrity implicating national security secrets. Rather, under investigation are, *inter alia*, [redacted]

[redacted].[22] Those topics do not involve secrets nor classified information such that revelation within the confines of the grand jury would cause harm to the country.[23]

Finally, the fact that certain of the Witnesses held positions in the Trump presidential administration that involved national security does not automatically deem communications with those individuals as implicating national security secrets. As explained previously, the presidential communications privilege is not a blanket protection over all communications with the president, *see supra* Section II.A (explaining the qualified nature of the privilege), and the scope of its protection certainly does not rise and fall on an individual's job title or nexus to the president. The content of the communications dictates the level of protection they deserve. For instance, the president may have regular meetings with the Director of the CIA about foreign hostilities or unsecure diplomatic relations—topics sure to demand enhanced protection—but if communications instead involved the president's lunch order or the CIA Director's style of clothing, the presidential communications privilege does not apply to those conversations. Therefore, the former president may certainly acknowledge that he had conversations with the Witnesses about national security generally and even national security secrets, but the government's submissions thoroughly detail that the communications and documents sought do not involve any founded or reasonable risks to this nation's safety and security, let alone those involving national security secrets, and so, near "absolute" protection is not appropriate here.

---

22 [redacted]

23 [redacted]

That said, the communications at issue implicate the former president's generalized interest in confidentiality because they speak to his efforts to execute effectively the duties of the office—in this case, the integrity of a national election and certification of such—and thus are presumptively privileged as presidential communications subject to limitation through a showing of specific need. *See infra* II.C and II.D.

The government next contends that President Biden's decision not to invoke executive privilege over the Witnesses' subpoena compliance requires the former president's assertion of privilege to "yield." [redacted] The former president highlights correctly, however, that the Supreme Court recently and expressly held this question open, [redacted] (citing *Trump v. Thompson*, 142 S. Ct. 680 (2022) (Mem.)), and counters that if a presidential successor could waive the privileged communications of his predecessor, "the presidential communications privilege would be destroyed," [redacted]

The government then proffers that the former president's privilege invocation was "too generalized and vague to qualify as an assertion" of the presidential-communications privilege. [redacted]. [redacted] The former president retorts that his privilege invocation was made in "clear and unambiguous terms." [redacted]

The Court need not enter either fray because the presumption that the communications are privileged quickly disposes of these disputes. Therefore, the question addressed next is whether the government has sufficiently overcome the presidential communications privilege to warrant compelling the Witnesses to testify fully before the grand jury. [redacted]

---

24 [redacted]

25 [redacted]

26 [redacted]

### C. Presidential Communications Privilege Does Not Bar Compelled Testimony

Under the presumption that the compelled testimony at issue is protected from disclosure by the presidential communications privilege, the resolution of this motion falls squarely—and dispositively—under the binding and comprehensive guidance of the D.C. Circuit's decision in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). There, the Circuit considered whether executive privilege barred compliance with a grand jury subpoena *duces tecum* served on the Counsel to the President for records prepared in connection with an investigation of the former Secretary of Agriculture. In recounting the history and scope of the presidential communications privilege, the Circuit acknowledged Supreme Court and its own precedent that the presidential communications privilege yields to a demonstrated specific need in certain settings, such as congressional hearings and legislation, *see id.* at 743–44 (citing *Senate Select Comm.*, 498 F.2d at 731 ("[W]e think the sufficiency of the Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions."), and *GSA*, 433 U.S. at 454 ("claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes")); civil trials, *see id.* at 744 (citing *Dellums v. Powell*, 642 F.2d 1351, 1362 (D.C. Cir. 1980) (summarizing and applying the Circuit's holding in *Dellums v. Powell*, 561 F.2d 242, 248 (D.C. Cir. 1977), that the presidential communications privilege "is not an absolute evidentiary privilege, and it may be overcome by a sufficiently strong showing of litigating need")); and most relevant to the pending motion, criminal proceedings, *see id.* at 753–54 (citing *Nixon*, 418 U.S. at 713, and *Sirica*, 487 F.2d at 717 ("[T]his presumption of privilege premised on the public interest in confidentiality must fail

---

[redacted]

in the face of the uniquely powerful showing made by the Special Prosecutor in this case.”)). The Circuit then posited “what type of showing of need” was necessary “to overcome the privilege” in the grand jury context. *Id*. at 753.

What resulted is the standard of need test, *id.* at 753–54, which both the government and former president agree applies here, [redacted]. The test directs that “[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere.” *In re Sealed Case*, 121 F.3d at 754; *see also id.* at 759–62 (application of the two-prong test). Under the first prong, “important evidence” is “directly relevant to issues that are expected to be central to the trial” and is of clear evidentiary value, not merely with the purpose of impeachment of witnesses or discussion of tangential issues. *Id.* at 754–55; *see also Nixon*, 418 U.S. at 701. The second prong requires a showing of “unavailability,” that the evidence sought “should not be treated as just another source of information,” but rather that efforts were made to obtain the information elsewhere and why those efforts were not fruitful. *In re Sealed Case*, 121 F.3d at 755.

The two prongs of the test also account for the context-specific balance between the public interest in protecting the executive’s unique use of highly confidential information and need for candor and the public interest in disclosing material helpful and relevant to criminal investigations. In establishing the qualified nature of executive privilege, the Supreme Court in *Nixon* noted that “a generalized claim of the public interest in confidentiality of nonmilitary and nondiplomatic discussions would upset the constitutional balance of a ‘workable government’ and gravely impair the role of the courts under Art. III” in a criminal proceeding. 418 U.S. at 707. Preceding that holding, in *Sirica*, the D.C. Circuit reasoned that the public interest in disclosure to a grand jury outweighed the public interest in protecting executive privilege.

*Sirica*, 487 F.2d at 716–17. Given that those cases "clearly establish that the presidential communications privilege can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding, [the court's] task is not to weigh anew the public interest in preserving confidentiality against the public interest in assuring fair trials and enforcing the law." *In re Sealed Case*, 121 F.3d at 753.[27] In short, the public interests at stake in determining whether the presidential communications privilege should yield in a particular case is inherent in the two-prong test from *In re Sealed Case*.

**D. Application of the Standard of Need Test**

According to the standard of need test, the government has established that the grand jury's specific need for the presumptively privileged communications overcomes the former president's assertion of the presidential communications privilege.

Assessing the grand jury's specific need for the Witnesses' testimonies involves examining both the matters under investigation by the grand jury and whether compliance with the subpoenas could potentially shed important light on those matters. The matters under investigation by the grand jury include the most obvious: On January 6, 2021, the seat of the legislative branch of the federal government at the U.S. Capitol became a crime scene. Hundreds of rioters attacked federal government property and successfully delayed the scheduled certification of Electoral College votes cast for the president—an official proceeding of a Joint Session of Congress. *See Thompson*, 20 F.4th at 15–16. Such actions amounted to an unprecedented display of obstruction of an official government proceeding, which was merely the culmination of a long trail of federal felony and misdemeanor criminal violations. Those that

[27] *Cf. U.S. Dep't of Treasury v. Black*, 719 F. App'x 1, *2–*3 (D.C. Cir. 2017) (Mem.) (vacating the district court's grant of a third-party's motion to compel documents from the Office of the President in a civil case because the district court failed to balance "the public interests at stake," which differed from grand jury or criminal contexts that have justified disclosure in the face of an assertion of executive privilege).

unlawfully trespassed on the Capitol building, engaged in violent confrontations with law enforcement along the way, damaged property, and delayed the certification of the 46th President have, and continue to be, prosecuted in this District to vindicate the nation's fundamental interest in the peaceful transition of power and the Constitution's promise of democratic elections.

The grand jury seeks information about specific activity leading up, and possibly contributing, to the criminal conduct that occurred on January 6, 2021. The government disclosed to the former president topics of investigative interest, [redacted]

[redacted]

### 1. *Witnesses' Testimonies and Subpoenaed Materials Likely Contain Important and Directly Relevant Evidence*

As to whether the Witnesses' compliance could shed important light on those matters, the answer is clearly affirmative. Each Witness participated directly in presidential communications, enabling them to provide first-hand, eyewitness evidence to illuminate what the former president and his associates knew and said, if anything, about the relevant topics. Their testimonies are, thus, directly relevant, important, and essential to the grand jury's investigation.

Even more specifically, [redacted]

28 [redacted]

[redacted]

[redacted]

[redacted]

---

29 [redacted]

[redacted] Thus, the Witnesses undoubtedly will provide first-hand accounts that may provide insight into the investigation by supplementing the grand jury's factual repository with primary evidence and revealing individuals', including government officials', intent behind potentially criminal actions, a required showing under the relevant statutes. *See, e.g.*, 18 U.S.C. § 1001(a)(2) (*knowingly* or *willfully* making a materially false, fictitious, or fraudulent statement or representation) (emphasis added).

Specifically, in demonstrating the requisite *mens rea* for the offenses under investigation, the government correctly states that "evidence relating to the specific content of meetings and conversations involving the subjects of the investigation about the election certification and efforts to obstruct, impede, or influence it" are "[c]ritical" to determining whether any investigative target acted with the requisite intent—willfully, knowingly, or corruptly—to commit a criminal act. [redacted] On this issue, the Witnesses' testimonies would be highly relevant,

[redacted] after this Court granted the government's motion to compel these witnesses' testimonies. The value of those witnesses' testimonies were described at length in this Court's November 2022 opinion, [redacted] and December 2022 opinion, [redacted] granting the government's motion to compel the grand jury testimonies of [redacted]. *See* Nov. 2022 Mem. Op. at 30–33 [redacted]; Dec. 2022 Mem. Op. at 29–33 [redacted].

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

In his defense, the former president stresses that any discussion he had about the certification of electoral votes involved his duty to ensure fair presidential elections. [redacted] Like the testimonies of [redacted], the Witnesses' highly relevant testimonies will assist the grand jury in assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former president that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined. *See, e.g., In re Sealed Case*, 121 F.2d at 761–62 (finding that the Office of Independent Counsel "demonstrated that it is likely the subpoenaed documents contain important evidence that is not available elsewhere" because the evidence was "reasonably [] relevant to the question of whether [the investigation's target] made false statements to the White House"). Regardless of the outcome,

testimony pertaining to that key information more than fulfills the first prong of the standard of need test.

The former president's remaining counterargument falls flat. He states that the government's motion is nothing more than "specious and conclusory allegations" relying on an "empty factual record" and "boilerplate and conclusory statements of law, devoid of any particularized facts regarding the communications involved or the documents in the custody and control" of the Witnesses. [redacted]. He adds that the government's lack of factual support does not give this Court the occasion "to abrogate the key national security interests that protect" presidential communications. [redacted]

Case 1:23-mc-00100-JEB SEALED Document 1 Filed 10/04/23 Page 43 of 46

[redacted]

*2. No Available Alternative to Witnesses' Testimonies*

30 [redacted]

Relevant to the test's second prong, no alternative to this evidence is available. On this point, the former president counters that the government has already heard the testimony of [redacted] witnesses, namely, [redacted] so granting the government's motion would permit "cast[ing] an impermissibly wide net to capture [redacted] Although the argument is summarily asserted, the former president argues in essence that the government has presented the testimonies of [redacted] witnesses regarding the [redacted] topics of interest to the grand jury and so the testimonies of the instant Witnesses regarding those same topics is duplicative and thus available with due diligence elsewhere. [redacted]; *see also In re Sealed Case*, 121 F.3d at 754. That argument is unpersuasive. As discussed previously, the Witnesses possess unique and inimitable evidence that involved numerous private, one-on-one conversations with the former president. *See supra* pages 31–33; *see, e.g.*, [redacted]; [redacted]; [redacted]. [redacted]

[redacted]

Likewise, given the mostly conversational aspect of the communications in question, individuals who participated in the meetings and calls or heard about them through participants, *i.e.*, the Witnesses, are the only way to shepherd in this evidence. In its exhaustive search for witnesses, the government has identified these individuals because they are necessary to corroborate events about which other witnesses may have already testified. Although multiple witnesses may provide testimony about the same meeting or conversation, as the government explains, what these Witnesses recall may differ in detail. Even overlapping testimony as to certain aspects of these conversations corroborates the overall communication the grand jury seeks to consider, ensuring that the investigation is of the utmost accuracy and completeness. Finally, the government thus far has not discovered any written records of these conversations, leaving merely witnesses' recollections of the events to serve as the "best" and only "evidence of the conversations available." *Sirica*, 487 F.2d at 718.

***

On these grounds, the Witnesses possess vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential communications privilege in this case.

## III. CONCLUSION

Based on the foregoing analysis, the presidential communications privilege does not bar eliciting testimony before and production of documents to the grand jury from [redacted]

[redacted] Accordingly, the government's motion to compel compliance with the grand jury subpoenas is GRANTED.

Date: March 15, 2023

BERYL A. HOWELL
Chief Judge

* **THIS PAGE LEFT INTENTIONALLY BLANK** *

**SEALED MATTER ENCLOSED**

**AUTHORIZED PERSONS ONLY**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: GRAND JURY SUBPOENAS — Grand Jury No. 23-GJ-00012 (JEB)

UNITED STATES OF AMERICA — April 3, 2023

Interested Party,

Washington, D.C.

DONALD J. TRUMP,

Interested Party.

---------------------------------------------------------

SEALED PROCEEDING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

FOR THE UNITED STATES:
[redacted], Esquire
[redacted], Esquire
[redacted], Esquire
Special Counsel's Office
950 Pennsylvania Avenue Northwest
Room B-206
Washington, D.C.20530

[redacted]

FOR DONALD J. TRUMP:
[redacted]

[redacted]

REPORTED BY:
[redacted]
Official Court Reporter

The following proceedings began at 11:02 a.m.:

THE COURT: Good morning, everybody.

THE COURTROOM DEPUTY: Good morning, Your Honor. The courtroom has been locked and sealed.

We are here for Grand Jury Case 23-12, In Re: Grand Jury Subpoenas. Interested party, the United States of America, and interested party former President Donald Trump.

Beginning with counsel for the government, please approach the lectern and identify yourself for the record.

[redacted]: Good morning, Your Honor. [redacted] United States. Also with me at counsel table [redacted]

THE COURT: Good morning to all of you.

[redacted]: Good morning, Your Honor. [redacted] on behalf of President Donald J. Trump. And with me is [redacted]

THE COURT: Good morning, gentlemen. [redacted], even though I have known you for 20 years, I'm not offended that you keep getting my first name wrong in the pleadings. I've never been John Boasberg, I promise, really. I thought that we had a different relationship, but I'm sure you will talk to your people about that.

[redacted]

[redacted].

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

6

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

28

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

THE COURT: Thank you. All right. I am going to deny this motion for stay. I don't believe it's appropriate to be granted for a number of reasons. Again, we are all aware of the four-factor test. And on the merits, I agree with the government that there was a forfeiture of the argument regarding this ex parte preview proceeding in front of the Court.

But [redacted] position is not frivolous, that this is a broad, ongoing litigation. So even if there were no forfeiture or waiver, the proposal that I would be the one to question the witness I don't believe is a workable solution given that I don't -- I am not the investigator or the prosecutor. The government is. And for me to be inquiring about witnesses regarding specific conversations I don't have a background in I don't think is a workable solution.

To the extent that the solution would be for the government to question the witness in front of me, and that's not what the former President is proposing, but even if it was, I think, as the government points out here, that given that

they have [redacted] categories clearly delineated and that the witnesses were asked questions in the grand jury and interviews regarding those topics, that it has been sufficiently refined such that I have -- that Judge Howell found, and I agree, that it's not necessary to have this ex parte preview proceeding.

Similarly, in the motion to stay, the government did not argue regarding the importance or the unavailability of witnesses, but to the extent they are arguing that here as a basis that they are likely to prevail on the merits, I think the government is not likely to prevail.

I also have ruled on this in regard to [redacted] and found that the presidential communications privilege is overcome by the grand jury's need for this material given its importance and the unavailability of obtaining it elsewhere, and I think the same analysis that I performed there applies here.

This argument regarding other particularized forms of privilege, I don't think it's valid here where I have never heard from the former President what other potential privilege that actually is beyond the presidential communications privilege.

And so I find that the former President is not likely to succeed on the merits and that even -- and again, I'm not using a 51 percent scale because I know that under the standard, they just have to show some solid chance of

prevailing, not a likelihood. And they don't meet that here, the President doesn't meet that here for the reasons I set forth [redacted]

In terms of irreparable harm, I think it is telling that there was a two-week delay. And I understand from [redacted] that there are other pieces of litigation the President is involved in. However, he is not an indigent client or one who can't afford lawyers. In fact, there are four different law firms, in fact, on the pleading regarding the motion to stay. So I think that with four law firms, that he could have gotten something filed within a far shorter time period than the two weeks here. And that alone, I think, demonstrates there's no irreparability of harm.

But again, I think the reasons I stated in my questioning do apply, that if the court of appeals does reverse, either the government can be ordered not to use this in front of a grand jury, and when I say this, I mean the material and testimony that they obtained as a result of Judge Howell's order, or it can be excluded in a trial. And so therefore, there is no irreparable harm and there's no chilling effect on future presidential administrations because, as I said, the court of appeals will have ruled. So if, in fact, it reverses, then that's law that any administration can be aware of.

Lastly, the public interest is significant in not

granting the stay. The special counsel's investigation is moving quickly. There is an imperative that it moves quickly particularly so as not to interfere with the 2024 election cycle. So when the former President's pleading says that there will be a nominal impact from a delay, I think that is a vast understatement, that there would be a serious and deleterious impact from a delay, and that harms the public interest, which is in a speedy and -- a speedy resolution that considers all relevant information.

Okay. So I am happy to -- let's talk for a minute about I'm happy to stay my ruling for a brief but reasonable window. So I will ask [redacted] that the government couldn't require his testimony within 48 hours.

Does the government -- is that same time table workable for the government if I say you cannot put any witnesses -- any of these witnesses in the grand jury until noon on Wednesday, thus giving the former President the chance to seek an administrative stay in the court of appeals? Is there any reason why I shouldn't do that, [redacted]?

[redacted]: We would oppose that. And before I say why, I would just like to seek the Court's permission under Rule 6(e) to inform counsel for the former President about grand jury schedule for an upcoming witness.

THE COURT: You may.

[redacted]: So we expect to have a witness going into the grand jury [redacted]. That is why we would oppose the 48-hour turnaround. And we think that would give the former President sufficient time to alert the court of appeals and brief this on an admittedly expedited but, we think, doable schedule.

[redacted]

[redacted]

[redacted]

[redacted] May I be heard?

THE COURT: Sure.

[redacted]: I know, Your Honor, you will be developing your own procedures, obviously, going forward. I will just say that we would respectfully ask the Court to consider on briefing issues the real nature of expediency. I fully understand the Court's statements with regard to the need for the special counsel to move forward expeditiously. I would simply add from a very practical perspective that the conversations that we are talking about between the President and [redacted] happened sometime ago, meaning, you know, in January of, not even the last year, but the year before. The

difference between the memory of a person over one day, two days, three days, four days is going to be negligible at this point.

THE COURT: I don't think -- the government is not arguing that.

[redacted]: There is no statute of limitations issue that's involved, and there is no witness availability issue that's involved. And so from a purely practical perspective, giving any client, any movant, only 24 hours to obtain action by the D.C. Circuit on an issue, I don't want to say first impression, but important constitutional issues that come up every 10 or 20 years puts not only --

THE COURT: But I'm not doing that. I'm just saying you've got to get it -- they don't have to consider the merits in 24 hours. They can issue an administrative stay just as they did last time and then consider the merits. So I think the point is just this gives you time to file, and then they can decide. But I think that's the idea.

Again, your filing can crib -- your filing is not going to be difficult. I assume you will file the same thing you filed in front of me or generally. And then they will issue an administrative stay while they have briefing. I mean, their briefing is, I would agree with you, is quite an interesting briefing schedule they set last time, but that's them, not me.

[redacted]: I understand that. I'm simply saying that in my view, it pushes the D.C. Circuit into a mind-set, and it certainly pushes all the litigants into a mind-set that all this needs to be done overnight. And as somebody who has been dealing with this for some many months of rush, rush, rush, we would simply ask the Court to consider that. If you can give us 48 hours, we would greatly appreciate it. Thank you, Your Honor.

THE COURT: All right. [redacted] So until the witness can -- no witness can be -- no witness who is affected by my order may appear in front of the grand jury before noon tomorrow, [redacted]. Do you understand that?

[redacted]: I do. Thank you, Your Honor.

THE COURT: Yes, [redacted].

[redacted]: Your Honor, just an administrative matter. Is it possible without further written order to have the transcript available to the parties if they order it?

THE COURT: I so order.

[redacted]: Thank you, Your Honor.

THE COURT: Thank you.

Thanks, everybody.

(The hearing concluded at 11:59 a.m.)

\- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

4/4/23

[redacted]

Official Court Reporter
333 Constitution Avenue NW
Washington, D.C. 20001

[redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE GRAND JURY SUBPOENA** [redacted] | **Case No. 23-gj-13 (JEB)**<br><br>**<u>Under Seal</u>**<br><br>[redacted] |

**<u>MEMORANDUM OPINION</u>**

In the wake of the January 6, 2021, attack on the U.S. Capitol, a Special Counsel was appointed and a grand jury was empaneled to investigate potential interference with the transfer of power following the 2020 Presidential election. That grand jury has issued a subpoena for testimony to [redacted]. Anticipating that the former President Donald J. Trump would assert executive privilege to prevent [redacted] from testifying, the Government moved to compel compliance with the subpoena. Indeed, Trump has responded with an Opposition to the Motion to Compel that invokes the presidential-communications privilege. Because the Government has shown that the grand jury's need for information largely overcomes the former President's privilege claims, the Court will grant the lion's share of the Motion to Compel. [redacted]

## I. Background

As former Chief Judge Beryl Howell has recounted the factual background of the events leading up to January 6, 2021, and the related grand-jury investigation in depth in her prior Opinions, <u>see</u> <u>In re Grand Jury Subpoenas</u>, No. 23-gj-12, ECF No. 11 [redacted]; <u>In re Grand Jury Subpoenas</u>, No. 22-gj-39, ECF No. 15 [redacted]; <u>In re Grand Jury Subpoenas</u>, No. 22-gj-33, ECF No. 13 [redacted]; <u>In re Grand Jury</u>

Subpoenas, No. 22-gj-25, ECF No. 18 [redacted], the Court will confine this brief background section to the facts relevant to the instant subpoena and the former President's Motion.

A. Grand-Jury Investigation

On January 6, 2021, a Joint Session of Congress convened to certify the results of the Electoral College vote, which would confirm then-President-Elect Joseph R. Biden Jr.'s victory over incumbent President Trump. That certification proceeding was interrupted when an armed mob professing support for Trump violently attacked the Capitol to stop the certification of the vote. See [redacted] Opinion at 2, 6.

Following those events and the subsequent reporting on them, Special Counsel Jack Smith was appointed, and a grand jury in the District of Columbia began to investigate whether the former President, his staff in the White House and his campaign, and other Executive Branch officials violated 18 U.S.C. §§ 1512(c)(2) and (k) (attempted obstruction of an official proceeding and conspiracy to obstruct an official proceeding), 1001(a)(2) (knowingly or willfully making a materially false, fictitious, or fraudulent statement or representation within the jurisdiction of the federal government), and 371 (conspiracy to commit offense or to defraud the United States), in their efforts "to reverse the results of the 2020 presidential election." [redacted]

[redacted]

B. Grand-Jury Subpoena

On [redacted], the grand jury issued a subpoena to [redacted] seeking his testimony on "possible violations of federal criminal laws." [redacted] The Government then notified the White House Counsel's Office of the subpoena the next day and inquired

whether President Biden would assert executive privilege to bar [redacted] testimony. [redacted] That letter also listed [redacted] topics to be addressed during [redacted] anticipated testimony, [redacted] The Counsel's Office responded one week later, notifying the Government that President Biden "will not assert executive privilege with respect to the grand jury appearance by [redacted] regarding the topics" in the earlier letter. [redacted] That letter explained that President Biden would not "assert executive privilege" regarding "efforts to thwart the orderly transition of power under our Constitution." [redacted]

The Government communicated the same request to the former President's counsel by letter on February 8, 2023, and similarly included the [redacted] topics of [redacted] anticipated testimony. [redacted] The former President's counsel did not respond. [redacted] Nevertheless, anticipating that Trump would — as he had done repeatedly in the past for other witnesses — instruct [redacted] not to provide testimony he viewed to be protected by executive privilege, the Government filed this Motion to Compel to allow the Court to address the privilege claim in advance of [redacted] testimony. [redacted] As predicted, the former President intervened to oppose the Motion, contending that [redacted] testimony was protected by the presidential-communications privilege.

[redacted]

## II. Legal Standards

The Supreme Court has made clear that "[a] grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." United States v. R. Enters., Inc., 498 U.S. 292, 298 (1991) (internal quotation marks omitted). "[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority," and thus "a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." Id. at 300–01. The grand jury may seek information from "widely drawn" sources, and the duty to testify has been long recognized "as a basic obligation that every citizen owes his Government." United States v. Calandra, 414 U.S. 338, 344-5 (1974); see also id. (noting "citizens generally are not constitutionally immune from grand jury subpoenas and that the longstanding principle that the public has a right to every man's evidence is particularly applicable to grand jury proceedings") (alterations and internal quotation marks omitted) (quoting Branzburg v. Hayes, 408 U.S. 665, 682, 688 (1972)) (alterations and internal quotation marks omitted).

"The investigatory powers of the grand jury are nevertheless not unlimited," but subject to constraints imposed by Federal Rule of Criminal Procedure 17(c), "which governs the issuance of subpoenas *duces tecum* in federal criminal proceedings." R. Enters., Inc., 498 U.S. at 299; see Calandra, 414 U.S. at 346 (observing that "the grand jury's subpoena power is not unlimited"). This rule provides that, on motion, "the court may quash or modify the subpoena if

compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). A grand jury "may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." Calandra, 414 U.S. at 346. "Judicial supervision is properly exercised in such cases to prevent the wrong before it occurs." Id.

## III. Analysis

The Court will begin by providing an overview of executive privilege and the presidential-communications privilege. It will then turn to the application of this privilege to [redacted] anticipated testimony before the grand jury.

### A. Presidential-Communications Privilege

The former President seeks to block [redacted] from providing testimony to the grand jury by invoking executive privilege. Such privilege arises from the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities." Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 447 (1977) (GSA). Article II of the Constitution vests in the President a broad array of powers including, among others, command of the military, see U.S. Const. art. II, § 2, cl. 1, the power to grant pardons for offenses against the United States, id., and conduct foreign diplomacy. Id. § 2, cl. 2; id. § 3. To ensure that the President can "effectively and faithfully carry out his Article II duties and to protect the effectiveness of the executive decision-making process," Judicial Watch, Inc. v. Dep't of Just., 365 F.3d 1108, 1115 (D.C. Cir. 2004) (internal citations and quotation marks omitted), both the Constitution and common law recognize a need to keep confidential executive communications and deliberations. See also In re Sealed Case, 121 F.3d 729, 736-37 (D.C. Cir. 1997). The privilege granted to the executive branch has two distinct species, each derived from the same recognized need to protect

executive-branch decisionmaking, but with different scopes and prerequisites for application: the deliberative-process privilege and the presidential-communications privilege. See id. at 745.

As both parties confirm, at issue today is the latter. [redacted] This is a "constitutionally based privilege," Protect Democracy Project, Inc. v. Nat'l Sec. Agency, 10 F.4th 879, 885 (D.C. Cir. 2021), that applies to (1) "communications directly involving and documents actually viewed by the President," as well as documents "solicited and received" by the President or his "immediate White House advisers [with] broad and significant responsibility for investigating and formulating the advice to be given to the President," Judicial Watch, Inc., 365 F.3d at 1114 (internal citations omitted); and (2) communications that reflect "presidential decision-making and deliberations," id. at 1113, meaning "communications in performance of a President's responsibilities . . . of his office . . . and made in the process of shaping policies and making decisions." GSA, 433 U.S. at 449 (quoting United States v. Nixon, 418 U.S. 683, 708, 711, 713 (1977)) (formatting modified). Unlike the related deliberative-process privilege, which protects only "pre-decisional and deliberative material," the presidential-communications privilege is all encompassing. It applies to communications with the President that pertain to his official duties "'in their entirety,' including post-decisional and factual material within a record." Protect Democracy Project, Inc., 10 F.4th at 885–86 (quoting In re Sealed Case, 121 F.3d 745–46).

The presidential-communications privilege, however, is a qualified rather than an absolute privilege of immunity from the judicial process. Nixon, 418 U.S. at 706; GSA, 433 U.S. at 446; see also Protect Democracy Project, Inc., 10 F.4th at 886. The protections of that privilege can, accordingly, give way in certain circumstances. This is because any presumption of immunity from judicial process conferred on a President "must be considered in light of [the

Supreme Court's] historic commitment to the rule of law," Nixon, 418 U.S. at 708, in accordance with the "general rule . . . that privileges should be narrowly construed . . . 'for they are in derogation of the search for truth.'" In re Sealed Case, 121 F.3d at 749 (quoting Nixon, 418 U.S. at 710).

The presidential-communications privilege, consequently, can be overcome based on a showing of specific need for the presumptively privileged communications. Under this Circuit's showing-of-need test, "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." In re Sealed Case, 121 F.3d at 754; see also id. at 759–62 (application of the two-prong test). Under the first prong, "important evidence" is evidence that is "directly relevant to issues that are expected to be central to the trial" and is of clear evidentiary value, not merely for the purpose of impeachment of witnesses or discussion of tangential issues. Id. at 754–55; see also Nixon, 418 U.S. at 701. The second prong requires a showing of "unavailability," meaning that the evidence sought "should not be treated as just another source of information," but rather that efforts were made to obtain the information elsewhere and those efforts were not fruitful. In re Sealed Case, 121 F.3d at 755.

Like the beasts in George Orwell's Animal Farm, not all presidential communications are created equal, and the showing required to overcome an exercise of the privilege varies based on the context of the communication. Three separate categories of presidential communications exist with varying levels of — or no — such protection. In descending order, communications that we may label "core communications" refer to those regarding military, diplomatic, or sensitive national-security secrets. See GSA, 433 U.S. at 446–47; Nixon, 418 U.S. at 706, 710;

Case 1:22-mc-00113-BAH Document 32-17 Filed 10/28/24 Page 9 of 18

In re Sealed Case, 121 F.3d at 743 n.12 (noting that Nixon "implied . . . that particularized claims of privilege for military and state secrets would be close to absolute, [but] expressly held only that the presidential communications privilege, which is based only on a generalized interest in confidentiality, can be overcome by an adequate showing of need"). This category would include classified information, the unauthorized disclosure of which "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009).

Next is the category we may term "generalized communications," which covers communications relating to "the effective discharge of a President's powers." Nixon, 418 U.S. at 711; see also GSA, 433 U.S. at 446–47. Finally, communications with the President, even directly, fall completely outside of the protection of the privilege when the matters do not involve policy discussions with and decisionmaking by the President in the performance of his official duties. See Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 729 (D.C. Cir. 1974) (*en banc*) (noting premise of presidential-communications privilege as "'the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties'") (quoting Nixon v. Sirica, 487 F.2d 700, 717 (D.C. Cir. 1973) (*en banc*)); cf. Nixon, 418 U.S. at 705.

B. [redacted] Subpoena

The Court will now turn to the separate issues of whether the former President's invocation of the presidential-communications privilege applies to the anticipated testimony of [redacted] and, if so, whether and to what extent that privilege is overcome by the Government's showing of need. In such analysis, the Court assumes without deciding that a former President may invoke such privilege in the first place.

1. *Scope of Privilege*

To begin, the parties dispute which category, if any, applies to the communications the Government seeks to compel from [redacted] and thus what showing of need it must make. The prosecution here urges — notwithstanding its alternative arguments about [redacted] — that the Court should assume that the President has only a generalized interest in confidentiality. [redacted]

Trump, conversely, argues that "more than just a generalized interest in confidentiality" applies to the presidential communications in question, and that [redacted] subpoena should trigger an "absolute, unqualified Presidential privilege of immunity from judicial process," [redacted] (quoting Nixon, 418 U.S. at 706) (internal quotation marks omitted), given the testimony's relationship to "sensitive matters of national security" and the need for the President to have [redacted] [redacted] To support this assertion, he first highlights [redacted] The former President then declares that the specific domain of "[e]lection security matters . . . implicate[s] national security," [redacted] and thus further supports an "impermeable" version of executive privilege when it comes to [redacted] conversations with the President. [redacted] The Court does not concur.

To begin, the former President is not entitled to nearly "absolute" protection under the presidential-communications privilege even for national-security matters. Nixon itself does not purport to create an "absolute, unqualified" privilege for such topics. On the contrary, the Court

there acknowledged that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more," could sustain such a privilege. See 418 U.S. at 706. The Court noted only that "military or diplomatic secrets" require a court to show "the utmost deference to Presidential responsibilities." Id. at 710 (citing United States v. Reynolds, 345 U.S. 1, 73 (1953), a case about state-secrets privilege which is not at issue here). The Government further contends that what Trump is really attempting to assert is not a claim of privilege over "core communications" of the President but, rather, the near-absolute state-secrets privilege. [redacted] Trump, however, has never formally invoked that privilege. See United States v. Zubaydah, 142 S. Ct. 959, 969 (2022) (noting that "Government initially must formally invoke the [state-secrets] privilege").

In any event, the Court need not get bogged down in the details, because even if such an absolute, unqualified privilege for the President's national-security conversations theoretically existed, the communications sought here are very unlikely to require [redacted] to reveal confidential military or diplomatic secrets. Nor does the former President claim that they concern classified information that would risk damage to national security if disclosed. [redacted]

There is no reason to believe, based on the topics identified by the grand jury's subpoena, that "[redacted] would be asked to reveal military or state secrets concerning the nation's defense capabilities, intelligence-gathering methods or capabilities, or diplomatic relations with foreign governments." [redacted]. To the extent that Trump maintains that conversations about election security and integrity necessarily implicate core military, diplomatic, or national-security secrets and require sweeping protection, the Court disagrees.

As a last-ditch effort to reach for an absolute privilege covering his conversations with [redacted] Trump proposes an entirely novel carve-out category of "[a]bsolute [p]rotection" for presidential communications involving [redacted]. [redacted] That position misunderstand that the privilege's protections do not turn on who else is involved in the communications with the President.

At the end of the day, the communications at issue implicate only the former President's generalized interest in confidentiality. While such communications are presumptively privileged as presidential communications, they may be overcome by a showing of specific need.

*2. Showing of Need*

As a result, the Court next asks whether the Government has sufficiently overcome the presidential-communications privilege to warrant compelling the witness to testify fully before the grand jury. As a refresher, "[a] party seeking to overcome a claim of presidential privilege must demonstrate: first, that each discrete group of the subpoenaed materials likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere." In re Sealed Case, 121 F.3d at 754.

a. Important Evidence

Under the first prong, "important evidence" for the grand jury is evidence that is "directly relevant to issues that are expected to be central to the trial" and is of clear probative value, not merely for the purpose of impeachment of witnesses or discussion of tangential issues. Id. at 754–55. Assessing the grand jury's specific need for [redacted] testimony involves examining both the matters under investigation and whether the testimony could potentially shed light on those matters.

The grand jury is "seeking important evidence relating to the involvement, if any, of the former President, White House advisors, Executive Branch officials, campaign staff, outside attorneys, and others in efforts to unlawfully overturn the presidential election, including by obstructing Congress' certification of the electoral results." [redacted] In this proceeding, as in prior ones, the Government disclosed to the former President topics of investigative interest. [redacted]

As to whether [redacted] testimony could shed important light on those matters, the answer is clearly yes. [redacted]. [redacted]

[redacted]

As a result, the content of these meetings — and so [redacted] testimony about them — is highly relevant to the charges the grand jury is investigating. [redacted] which requires the grand jury to determine whether any subject acted knowingly and corruptly. See United States v. Gordon, 710 F.3d 1124, 1151 (10th Cir. 2013); United States v. Sandlin, 575 F. Supp. 3d 16, 32 (D.D.C. 2021); see also United States v. Reffitt, No. 21-32, ECF No. 119 (Jury Instructions) at 25-26 (D.D.C. Mar. 7, 2022) (Section 1512(c)(2) instructions). As this Court's predecessor has previously held with respect to other executive-branch witnesses, testimony from [redacted] "will assist the grand jury in

Case 1:22-gj-00031-JEB *SEALED* Document 32-1 Filed 10/28/24 Page 15 of 18

assessing factual and *mens rea* requirements and may lead the grand jury to concur with the former President that no criminal wrongdoing occurred at all or to find probable cause of criminal misconduct attributable to one or more individuals whose conduct is examined." [redacted] Opinion at 29.

The first prong of the need standard is conclusively established.

b. Availability Elsewhere

To next establish unavailability, the Government must show that it has made efforts to obtain the relevant information elsewhere and been unsuccessful. In other words, it must not be seeking "just another source of information." In re Sealed Case, 121 F.3d at 755.

The Government begins by emphasizing that, in many instances, [redacted] is withholding testimony about conversations where [redacted]. On top of that, [redacted] was [redacted] For these conversations, it is clear that the Government is not seeking "just another source of information" and can obtain the relevant material only through [redacted] subpoenaed testimony.

[redacted] was not a party to just one-on-one communications with the President, however. [redacted]. In these group conversations, the former President argues, the grand jury can find the information sought from other parties to those discussions. In fact, Trump points out that other executive-branch officials [redacted]

[redacted], [redacted] have all testified before the January 6 Committee [redacted]. [redacted]

This argument is unpersuasive for at least two independent reasons. First, as this Court's predecessor has repeatedly noted in prior decisions, the need for the Government to "corroborate events about which other witnesses may have already testified," [redacted] Op. at 45, particularly as they relate to the key elements of the crimes the grand jury is investigating, can support the necessity of the testimony in question. Cf. Smith v. United States, 384 U.S. 147, 157 (1954) (noting in tax-evasion case the importance of "corroborat[ion] by substantial independent evidence" to prove fraudulent conduct). As the Government points out, moreover, [redacted] have demonstrated that such corroboration ends up revealing new information describing what happened in meetings with Trump. [redacted]. [redacted] testimony about events would also carry particular and unmatched weight for the grand jury.

Second, even in meetings where others were present and could provide consistent recollections, [redacted] subjective impressions hold special weight in this investigation. The specific charges the grand jury is examining include 18 U.S.C. §§ 1512(c)(2) and (k) for attempted obstruction of an official proceeding and conspiracy to obstruct an official proceeding. The subjective impressions and reactions of [redacted] in his meetings with the former President — [redacted] — are therefore highly relevant to whether Trump knowingly and corruptly attempted to obstruct an official proceeding. Those impressions would

be unavailable to any other witness to those conversations as they would be [redacted] and [redacted] alone.

Finally, Trump's position arguably hamstrings the Government's ability to build its case. Because the presidential-communications privilege protects communications not just between the President and [redacted] but, rather, communications between the President and any advisor, every party to those group conversations would similarly be able to argue that the privilege should not be defeated because the information is available from a different member of those conversations. Trump has in fact instructed every member of the executive branch who has been subpoenaed to testify before the grand jury to withhold information that the former President believes to be privileged. [redacted]. Under this logic, no one could be required to testify.

That said, it is possible that some conversations occurred in which [redacted] was a part of a larger group and where his subjective impressions or reactions to the conversation are not particularly relevant. In those instances — and where several others in the group have testified and the cumulative weight of that testimony is beyond what is necessary for corroboration — the Court finds that the information is not so unavailable as to justify piercing the presidential-communications privilege.

* * *

In sum, the Government has shown both that [redacted] testimony would likely be a source of important information for the grand jury and that such information would be unavailable elsewhere, subject to the exceptions just outlined. This showing is sufficient to overcome the presidential-communications privilege. Finally, if, contrary to the Government's expectation, certain questions posed during testimony would necessarily elicit answers containing classified

military or foreign-intelligence information, [redacted] may refuse to answer, and the Government can decide whether it wishes to litigate the matter further with the Court.

## IV. Conclusion

For the foregoing reasons, the Court will grant in the main the Government's Motion to Compel Grand Jury Testimony.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: March 25, 2023

* **THIS PAGE LEFT INTENTIONALLY BLANK** *

**SEALED MATTER ENCLOSED**

**AUTHORIZED PERSONS ONLY**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:
GRAND JURY SUBPOENA
[redacted]

Grand Jury
No. 23-GJ-13

UNITED STATES OF AMERICA

Interested Party,

[redacted]

Interested Party,

DONALD J. TRUMP,

Interested Party..

April 10, 2023

Washington, D.C.

---------------------------------------------------------------

SEALED PROCEEDING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

FOR THE UNITED STATES: [redacted] Esquire
[redacted] Esquire
[redacted], Esquire
[redacted], Esquire
Special Counsel's Office
950 Pennsylvania Avenue Northwest
Room B-206
Washington, D.C.20530

FOR DONALD J. TRUMP: [redacted] Esquire
[redacted]

REPORTED BY: [redacted]
Official Court Reporter
333 Constitution Avenue Northwest
Washington, D.C. 20001
[redacted]

The following proceedings began at 10:01 a.m.:

THE COURT: Good morning, everybody.

THE COURTROOM DEPUTY: We are here regarding Grand Jury Subpoena [redacted] Interested Party, The United States of America; Interested Party, former [redacted] and Interested Party, former President Donald Trump.

Beginning with counsel for the government, please approach the lectern and identify yourself for the record.

[redacted] Good morning, Your Honor. [redacted] for the United States. Also with me at counsel table are [redacted]

THE COURT: Thank you. Welcome, all.

[redacted] Good morning, Your Honor. [redacted] on behalf of President Donald J. Trump.

THE COURT: Thank you. Good morning.

Okay. We are here today on the former President's motion to stay. Let me just ask you, [redacted] do you have a date yet for the testimony [redacted] and are you willing to disclose that at this point?

[redacted] What I am comfortable saying is [redacted] will not testify this week.

THE COURT: Okay.

[redacted]

THE COURT: Great. Thanks.

Okay. [redacted]

[redacted] Your Honor, we will submit on the papers.

THE COURT: Thank you very much.

All right. Again, we have been through this before, and it won't be any surprise if my ruling is the same. Although, I am also informed by the concurrence by Judge Millett, I think, which bolsters certain points, and so I will just make my ruling.

So I deny the stay. I find there is not a likelihood of success on the merits here. This is a qualified privilege which can be overcome, as I have said and Judge Millett also points out, that [redacted]s position isn't relevant.

As she said, the protection focuses on the content of the confidential communications to be disclosed, not the job title of the person being questioned. And so despite the insistence in the former President's papers that, given [redacted]s status, there should be a special privilege, I don't believe that Judge Millett thinks so, and I don't think so either given that the question is the -- subject is the topic of the communications, not the position held, and particularly here where my ruling has said that he can refuse to answer diplomatic and military secrets and come before me to litigate those on a case-by-case basis. Given the topics that the government wants to inquire on, it's unlikely or very unlikely to include those.

The government has also shown the need to overcome a qualified privilege, both that this is important information and unavailable from other witnesses.

On the issue of whether there should be a question-by-question review by the Court or whether the Court should preview the testimony in camera before permitting [redacted] to testify, I find, despite what is said in the reply, I find that this argument was forfeited because it was not raised in the opposition of the motion to compel.

Even if it had been raised in the motion to compel, I don't believe it's workable for the Court to step into the government's shoes and conduct some inquiry about which it is far less knowledgeable than is the government.

Second, I don't find there is irreparable harm. Again, the former President waited 11 days to file this, which has some relevance. But as Judge Millett points out, again, the injury would be to the presidency, not to Mr. Trump himself. And there's no injury to the presidency.

The current President did not assert a privilege. [redacted] can refuse to answer on specific diplomatic and military questions. And, again, if there is a positive circuit decision, meaning a circuit decision in his favor, then the material would be excluded.

And so the specter, as the former President argues in his motion, of transgressing [redacted]

communication forever isn't applicable because if there is a positive court of appeals ruling for the former President, then that will be the law going forward, and there won't be any chilling effect henceforth.

Last, I find it is in the public interest to not stay this given the importance of the testimony and the investigation to move forward. And given the current President has not exercised the privilege again speaks to the public interest. So I will deny the motion.

So, [redacted] given that [redacted] isn't going to be testifying this week, I will give you a little bit longer than I had before.

Let me ask you, [redacted] is there any reason here then not to give 48 hours to the former President to go to the court of appeals, in other words, that I would deny the motion to stay, but I would stay my ruling for 48 hours?

[redacted] No, that's fine. 48 hours is fine for the government.

THE COURT: Okay. So I'll say that I'll stay my ruling until noon on Wednesday.

[redacted] Appreciate that.

I just want to note for the record just because the Court may not be aware of it, last week when it was essentially a 24-hour turnaround, the Court correctly noted that you are not involved in the scheduling by the D.C. Circuit, but what

they did, I think we got an order -- at least I saw an order probably at 8:00 p.m. indicating that the government had until 4:00 a.m. in the morning to file their responsive papers, and then we had until 9:00 a.m. after receiving them to file ours. So there is this sort of compressed schedule, and it's helpful to have a little more time here.

THE COURT: All right. I hope that will give a little bit more. So although I'll note, [redacted] that I guess one of your colleagues asked -- called my chambers when we were discussing the schedule and asked was I aware that yesterday was [redacted] The answer was, of course, but filing at 5:45 on Friday evening [redacted] doesn't necessarily guarantee you a weekend off, so I'm sure you can let your colleagues know that.

[redacted] It's good to learn. It's good to live and learn.

The only last logistical thing that I would have is that the parties could have access to this transcript without further action by the Court.

THE COURT: Yes, so granted. Thanks for reminding me of that.

Anything else from the government?

[redacted] No, Your Honor.

THE COURT: Thanks, everybody. Talk to you soon, I'm sure.

(The hearing concluded at 10:11 a.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

4/10/23 [redacted]

Official Court Reporter
333 Constitution Avenue NW
Washington, D.C. 20001
[redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE GRAND JURY SUBPOENA GJ20230207-E0107** | **Case No. 23-gj-13 (JEB)**<br><br>**Under Seal**<br><br>***EX PARTE* TO GOVERNMENT ONLY** |

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. The Government's [1] Motion to Compel is GRANTED IN PART and DENIED IN PART;
2. [redacted] must testify in the grand jury on matters related to the [redacted] enumerated topics, with the exception of the specific circumstances detailed in Part III.B.2.b and page 17–18 of the accompanying Memorandum Opinion; and
3. The Government shall submit to the Court, by 5:00 p.m. on Sunday, March 26, 2023, proposed redactions outlined in red box to the accompanying Memorandum Opinion that are necessary before disclosure of the Opinion to [redacted] and former President Trump.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: March 25, 2023

| |
|---|
| MINUTE ORDER: As explained in yesterday's hearing, the Court ORDERS that the 25 Motion to Stay Pending Appeal is DENIED, although the Government shall not require [redacted] to appear in the grand jury before noon on April 12, 2023. So ORDERED, by Chief Judge James E. Boasberg on 4/11/2023. Counsel has been notified electronically.(znbn) (Entered: 04/11/2023) |
| |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using Court's Box system. Service will be accomplished on the following individual via email:

Charlie Savage
The New York Times
1627 I St. NW
Washington, DC 20016
202-369-6653
savage@nytimes.com

*s/ J. Kain Day*
J. Kain Day